# 26-2064

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellant

v.

STEPHANIE THOMAS,
Defendant-Appellee

CLAIRE EWING, COMMON CAUSE, SEIU DISTRICT 1199NE, CONNECTICUT ALLIANCE FOR RETIRED AMERICANS, CONNECTICUT CITIZEN ACTION GROUP, BETTE MARAFINO,
Intervenor-Defendants-Appellees

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

## BRIEF FOR THE UNITED STATES AS APPELLANT

HARMEET K. DHILLON
Assistant Attorney General

ERIC A. SELL
Deputy Assistant Attorney General

ANDREW G. BRANIFF
DAVID N. GOLDMAN
MEREDITH L. BAKER
AUDREY A. WEAVER
Attorneys
Department of Justice
Civil Rights Division
Appellate Section
Ben Franklin Station
P.O. Box 14403
Washington, D.C. 20044-4403
(202) 616-9405

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ..... 1

STATEMENT OF JURISDICTION ..... 2

STATEMENT OF THE ISSUES ..... 2

STATEMENT OF THE CASE ..... 3

SUMMARY OF THE ARGUMENT ..... 10

STANDARD OF REVIEW ..... 12

ARGUMENT ..... 12

I. The DOJ's demand for an electronic, unredacted copy of Connecticut's SVRL satisfied Title III's requirements ..... 12

A. Connecticut's SVRL is a record or paper that Title III requires the State to retain and preserve and to produce upon the Attorney General's demand ..... 13

1. The SVRL is a record that came into Secretary Thomas's possession ..... 15

2. Treating the SVRL as a "record" or "paper" under Section 301 is consistent with other federal voting laws ..... 24

B. The DOJ adequately stated the basis of its demand for Connecticut's SVRL ..... 28

**TABLE OF CONTENTS (continued): PAGE**


1. Courts play a limited role in assessing the Attorney General's demand under Title III ........ 29

2. The DOJ's demand stated an adequate basis ........ 35

C. The DOJ's stated purpose of ascertaining Connecticut's compliance with the NVRA and HAVA was sufficient ........ 40

1. Title III does not limit the proper purposes for which records may be demanded under Section 303 ........ 41

2. Mere allegations of purported improper purposes do not eliminate the United States' entitlement to records under Section 303 ........ 48

3. The United States adequately stated the purpose of its demand for Maine's SVRL ........ 49

D. The DOJ's demand does not implicate the Major Questions Doctrine ........ 50

E. Connecticut must produce an electronic copy of the SVRL ........ 52

II. The DOJ's demand for an electronic, unredacted copy of Connecticut's SVRL does not violate federal or state privacy laws ........ 53

A. The DOJ's demand complied with the Privacy Act ........ 54

B. The E-Government Act does not prevent the DOJ from obtaining Connecticut's SVRL ........ 58

**TABLE OF CONTENTS (continued):** **PAGE**

C. The Driver's Privacy Protection Act does not prevent the DOJ from obtaining Connecticut's SVRL ..... 62

D. Federal law preempts any contrary Connecticut privacy law ..... 63

CONCLUSION ..... 68

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**CASES:** **PAGE**

*Adamowicz v. United States*,
531 F.3d 151 (2d Cir. 2008) .................................................. 34, 39

*Alabama Ass'n of Realtors v. Department of Health & Hum. Servs.*,
594 U.S. 758 (2021) (per curiam) ........................................................ 51

*Alabama ex rel. Gallion v. Rogers*,
187 F. Supp. 848 (M.D. Ala. 1960),
*aff'd sub nom. Dinkens v. Attorney Gen. of the U.S.*,
285 F.2d 430 (5th Cir. 1961) ............................................................ 29

*American Oversight v. United States Dep't of Just.*,
45 F.4th 579 (2d Cir. 2022) .............................................................. 56

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013) .............................................................................. 64

*Bostock v. Clayton Cnty.*,
590 U.S. 644 (2020) .......................................................................... 48

*Brnovich v. Democratic Nat'l Comm.*,
594 U.S. 647 (2021) .................................................................. 44, 56

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001) .......................................................................... 64

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of N.Y.*,
273 F.3d 481 (2d Cir. 2001) ............................................................. 37

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002) ............................................................. 12

*Coleman v. Kennedy*,
313 F.2d 867 (5th Cir. 1963) (per curiam) ................................ 31, 42

**CASES (continued):** **PAGE**

*Crosby v. National Foreign Trade Council*,
530 U.S. 363 (2000) ........................................................ 65

*Dean v. United States*,
556 U.S. 568 (2009) ........................................................ 41

*Department of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*,
601 U.S. 42 (2024) ........................................................ 46

*Devine v. United States*,
202 F.3d 547 (2d Cir. 2000)........................................................ 58

*Doe v. Chao*,
540 U.S. 614 (2004) ........................................................ 54

*Donaldson v. United States*,
400 U.S. 517 (1971), *superseded by statute on other grounds*, Tax Reform Act of 1976,
Pub. L. No. 94-455, 90 Stat. 1520 ........................................ 31-32

*Electronic Privacy Info. Ctr. v. United States Dep't of Com.*,
356 F. Supp. 3d 85 (D.D.C.),
*vacated and remanded on other grounds*,
928 F.3d 95 (D.C. Cir. 2019) ........................................ 60-61

*Ex Parte Siebold*,
100 U.S. 371 (1879) ........................................................ 64

*Fischer v. United States*,
603 U.S. 480 (2024) ........................................................ 25-26

*Food Mktg. Inst. v. Argus Leader Media*,
588 U.S. 427 (2019) ........................................................ 16

*Foster v. Love*,
522 U.S. 67 (1997) ........................................................ 64

**CASES (continued):** **PAGE**

*Garcia-Bengochea v. Carnival Corp.*,
57 F.4th 916 (11th Cir. 2023) .......................................................16

*Glacier Nw., Inc. v. International Bhd. of Teamsters Loc. Union No. 174*, 598 U.S. 771 (2023) ..................................64-65

*Gross v. FBL Fin. Servs., Inc.*,
557 U.S. 167 (2009) .................................................................14, 41

*Hannah P. v. Coats*,
916 F.3d 327 (4th Cir. 2019) .....................................................36-37

*Juliano v. Health Maint. Org. of N.J., Inc.*,
221 F.3d 279 (2d Cir. 2000)...........................................................37

*Kennedy v. Bruce*,
298 F.2d 860 (5th Cir. 1962) ...................................................30, 36

*Kennedy v. Lewis*,
325 F.2d 210 (5th Cir. 1963) (per curiam) ....................................20

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962) ................................................. *passim*

*Kennedy v. Owen*,
321 F.2d 116 (5th Cir. 1963) (per curiam) ....................................20

*Lamar, Archer & Cofrin, LLP v. Appling*,
584 U.S. 709 (2018) ........................................................................14

*McIntyre v. Morgan*,
624 F. Supp. 658 (S.D. Ind. 1985) ..................................................13

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
572 U.S. 545 (2014) .................................................................14, 41

**CASES (continued):** **PAGE**

*Parker Drilling Mgmt. Servs., Ltd. v. Newton*,
587 U.S. 601 (2019) ........................................................ 45

*Public Int. Legal Found. v. Bellows*,
92 F.4th 36 (1st Cir. 2024) ........................................................ 66

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) (per curiam) ........................................................ 44-45

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) ........................................................ 26

*Reno v. Condon*,
528 U.S. 141 (2000) ........................................................ 62

*Reynolds v. Sims*,
377 U.S. 533 (1964) ........................................................ 44-45

*Richards v. Ashcroft*,
400 F.3d 125 (2d Cir. 2005) ........................................................ 14

*RNR Enters., Inc. v. S.E.C.*,
122 F.3d 93 (2d Cir. 1997) ........................................................ 33-35, 39

*SEC v. Brigadoon Scotch Distrib. Co.*,
480 F.2d 1047 (2d Cir. 1973) ........................................................ 48

*SEC v. Knopfler*,
658 F.2d 25 (2d Cir. 1981) (per curiam) ........................................................ 48-49

*South Carolina v. Katzenbach*,
383 U.S. 301 (1966) ........................................................ 3, 5

*Talwar v. Staten Island Univ. Hosp.*,
610 Fed. App'x 28 (2d Cir. 2015) ........................................................ 37

**CASES (continued): PAGE**

*Taniguchi v. Kan Pac. Saipan, Ltd.*,
566 U.S. 560 (2012) .......... 60-61

*United States v. Benson*,
819 F. Supp. 3d 753 (W.D. Mich.),
*aff'd*, 179 F.4th 470, *reh'g en banc denied*,
No. 26-1225, 2026 WL 2364306
(6th Cir. Aug. 14, 2026) .......... *passim*

*United States Dep't of Just. v. Tax Analysts*,
492 U.S. 136 (1989) .......... 19, 21

*United States v. Duke*,
332 F.2d 759 (5th Cir. 1964) .......... 67

*United States v. Epskamp*,
832 F.3d 154 (2d Cir. 2016) .......... 41

*United States v. Lynd*,
301 F.2d 818 (5th Cir. 1962) .......... 31

*United States v. McAnlis*,
721 F.2d 334 (11th Cir. 1983) .......... 54

*United States v. Mississippi*,
229 F. Supp. 925 (S.D. Miss. 1964),
*rev'd*, 380 U.S. 128 (1965) .......... 13-14, 67

*United States v. Morton Salt Co.*,
338 U.S. 632 (1950) .......... 39

*United States v. O'Henry's Film Works, Inc.*,
598 F.2d 313 (2d Cir. 1979) .......... 49

**CASES (continued): PAGE**

*United States v. Oregon*,
828 F. Supp. 3d 1092 (D. Or. 2026),
*appeal pending*, No. 26-1231 (9th Cir.)........................................43

*United States v. Powell*,
379 U.S. 48 (1964) ........................................................................32

*United States v. Stuart*,
489 U.S. 353 (1989) ........................................................................49

*United States v. Thomas*,
No. 3:26-cv-21, 2026 WL 2070437
(D. Conn. July 17, 2026)......................................................................3

*United States ex rel. Hart v. McKesson Corp.*,
96 F.4th 145 (2d Cir.),
*cert. denied*, 145 S. Ct. 163 (2024)............................................26-27

*Utility Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) ....................................................................50-52

*Vaughn v. Phoenix House N.Y. Inc.*,
957 F.3d 141 (2d Cir. 2020)....................................................12, 48

*Voter Reference Found., LLC v. Torrez*,
160 F.4th 1068 (10th Cir. 2025)......................................................24

*West Virginia v. EPA*,
597 U.S. 697 (2022) ....................................................................50-51

*Wyeth v. Levine*,
555 U.S. 555 (2009) ........................................................................65

**CONSTITUTION:** **PAGE**

U.S. Const. Art. I, § 4, Cl. 1 .......... 64

U.S. Const. Art. VI, Cl. 2 .......... 65

**STATUTES:**

Civil Rights Act of 1960 (CRA)
52 U.S.C. 20701 *et seq.* .......... 3
52 U.S.C. 20701-20706 .......... 41
52 U.S.C. 20701 .......... *passim*
52 U.S.C. 20702 .......... 54
52 U.S.C. 20703 .......... *passim*
52 U.S.C. 20704 .......... 4, 64, 67
52 U.S.C. 20705 .......... 4, 13
52 U.S.C. 20706 .......... 47, 67
Pub. L. No. 86-449, § 601, 74 Stat. 90 .......... 42

Civil Rights Cold Case Records Collection Act of 2018
Pub. L. No. 115-426, § 2(3)(B), 132 Stat. 5489 (2019) .......... 17

Driver's Privacy Protection Act of 1994 (DPPA)
18 U.S.C. 2721 *et seq.* .......... 62
18 U.S.C. 2721(a) .......... 62
18 U.S.C. 2721(c) .......... 62
18 U.S.C. 2725(1) .......... 62
18 U.S.C. 2725(3)-(4) .......... 62
18 U.S.C. 2721(b)(1) .......... 62-63
52 U.S.C. 20703 .......... *passim*

E-Government Act of 2002
§ 201 .......... 59
§ 208(b)(1)(A)(ii) .......... 58, 60, 62
§ 208(b)(1)(A)(ii)(II) .......... 59
§ 208(b)(1)(B)(i) .......... 58-59
44 U.S.C. 3601 .......... 60
Pub. L. No. 107-347, 116 Stat. 2899 .......... 58-59

**STATUTES (continued): PAGE**

Help America Vote Act of 2002 (HAVA)
52 U.S.C. 21083(a) ... 61
52 U.S.C. 21083(a)(1)(A) ... 6, 52, 61
52 U.S.C. 21083(a)(1)(A)(i) ... 27
52 U.S.C. 21083(a)(1)(A)(vi) ... 27
52 U.S.C. 21083(a)(1)(A)(viii) ... 27
52 U.S.C. 21083(a)(2)(A) ... 6
52 U.S.C. 21083(a)(2)(A)(i)-(iii) ... 6
52 U.S.C. 21083(a)(5)(A)(i)-(ii) ... 6, 66
52 U.S.C. 21083(a)(5)(A)(iii) ... 6
52 U.S.C. 21111 ... 47, 54, 63
Pub. L. No. 107-252, 116 Stat. 1666 ... 44

National Voter Registration Act of 1993 (NVRA)
52 U.S.C. 20501 *et seq.* ... 1
52 U.S.C. 20501(a)(3) ... 43-44
52 U.S.C. 20501(b)(3) ... 5
52 U.S.C. 20507(a)(4) ... 5
52 U.S.C. 20507(i)(1) ... 5
52 U.S.C. 20510(a) ... 47, 54, 63

President John F. Kennedy Assassination
Records Collection Act of 1992
Pub. L. No. 102-526, § 3(2), 106 Stat. 3444 ... 17

Privacy Act of 1974
5 U.S.C. 552a(e)(4) ... 55
5 U.S.C. 552a(e)(4)(B) ... 56
5 U.S.C. 552a(e)(7) ... 54
Pub. L. No. 93-579, § 2(a)(5), 88 Stat. 1896 ... 54

Securities Act of 1933,
Pub. L. No. 73-22, § 20(a), 48 Stat. 86 ... 34

Securities Exchange Act of 1934,
Pub. L. No. 73-291, § 21(a), 48 Stat. 899 ... 34

**STATUTES (continued):** **PAGE**

10 U.S.C. 130c(d)(2)(C) .......... 20

13 U.S.C. 214 .......... 19

28 U.S.C. 1331 .......... 2

28 U.S.C. 1345 .......... 2

28 U.S.C. 1291 .......... 2

30 U.S.C. 1732(b) .......... 19

31 U.S.C. 5314(a) .......... 23

44 U.S.C. 2107 .......... 17

44 U.S.C. 3501 58-59

44 U.S.C. 3502 .......... 59-60

44 U.S.C. 3502(3)(A)(i) .......... 59, 61

44 U.S.C. 3502(3)(B) .......... 60

44 U.S.C. 3502(10) .......... 59

44 U.S.C. 3518(c)(1)(B) .......... 60

44 U.S.C. 3572(f) .......... 19

**LEGISLATIVE HISTORY:** **PAGE**

106 Cong. Rec. 6392 (1960) .......... 42

*Civil Rights—1959: Hearings Before the Subcomm. on Constitutional Rights of the S. Comm. on the Judiciary*, 86th Cong., 1st Sess. (1959) .......... 34

H.R. Rep. No. 86-956, 86th Cong., 2d Sess. (1959) .......... 20

Sen. Rep. No. 97-494, 97th Cong., 2d Sess. (1982) .......... 49

**RULES:**

Fed. R. App. P. 2 .......... 68-69

Fed. R. App. P. 41(b) .......... 68

Fed. R. App. P. 40(d)(1) .......... 69

**REGULATIONS:**

28 C.F.R. 0.50(a) .......... 55

68 Fed. Reg. 47,610 (Aug. 11, 2003) .......... 55-57

70 Fed. Reg. 43,904 (July 29, 2005) .......... 55

82 Fed. Reg. 24,147 (May 25, 2017) .......... 55

**MISCELLANEOUS:**

Authority to Obtain and Share Statewide Voter Roll Data, 50 Op. O.L.C. (2026), https://www.justice.gov/olc/media/1440346/dl .......... 17, 60

*Black's Law Dictionary* (7th ed. 1999) .......... 57

**MISCELLANEOUS (continued):** **PAGE**


*Merriam-Webster's Collegiate Dictionary* (10th ed. 2002) .......... 61

*Merriam-Webster's Collegiate Dictionary* (11th ed. 2003) .......... 53

Report of the United States Commission on Civil Rights (1959) https://www.usccr.gov/files/historical/1959/59-001-U.pdf .......... 22-23

*The American College Dictionary* (1959 ed.) .......... 17, 25

*The American Heritage College Dictionary* (4th ed. 2002) .......... 61

*The New Shorter Oxford English Dictionary* (4th ed. 1993) .......... 16-17

U.S. Dep't of Just., Justice Manual § 9-11.151 (2020), https://www.justice.gov/jm/jm-9-11000-grand-jury# .......... 56

U.S. Dep't of Just., Mem. of Understanding between the United States and Texas (May 13, 2008), available at https://www.justice.gov/media/1173461/dl?inline (last visited Sept. 22, 2026) .......... 52

U.S. Election Assistance Comm'n, *Celebrating 20 Years of HAVA* 1, https://www.eac.gov/sites/default/files/HelpAmericaVoteDay/HAVA_1-Pager_10-27-22_508.pdf (last visited Sept. 22, 2026) .......... 44

*Webster's New World Dictionary of the American Language* (8th coll. ed. 1960) .......... 16

*Webster's Third New International Dictionary* (1966 ed. unabridg.) .......... 17-18, 25

## INTRODUCTION

Title III of the Civil Rights Act of 1960 (CRA) gives the Attorney General sweeping authority to inspect election records. 52 U.S.C. 20703. The United States seeks to exercise this authority to inspect Connecticut's statewide voter registration list (SVRL)—not to change or maintain the SVRL for itself, but rather to fulfill its clear statutory duty to enforce the list maintenance provisions of the National Voter Registration Act of 1993 (NVRA), 52 U.S.C. 20501 *et seq*., and the Help America Vote Act of 2002 (HAVA), 52 U.S.C. 20901 *et seq*.

In dismissing the United States' Complaint and denying its Motion to Compel, the district court failed to give effect to this statutory mandate, instead gutting Title III by misconstruing its language. The district court's holding thwarts Congress's clear direction that officers of election must retain, preserve, and produce election records so that the Attorney General can appropriately enforce voting laws. And consequently, the court's holding prevents the Attorney General, through the Department of Justice (DOJ or Department), from fully enforcing federal laws designed to ensure fair and secure elections. This Court should reverse.

## STATEMENT OF JURISDICTION

This appeal is from a final judgment in a civil case. The district court had jurisdiction under 28 U.S.C. 1331 and 1345. That court entered an Order granting the Common Cause intervenor-defendants' Motion to Dismiss, denying as moot the remaining defendants' Motions to Dismiss, denying the United States' Motion to Compel, and directing entry of judgment on July 17, 2026. JA296.[1] The United States filed a timely notice of appeal on July 23, 2026. JA298. This Court has jurisdiction under 28 U.S.C. 1291.

## STATEMENT OF THE ISSUES

1. Whether Connecticut's SVRL is a record or paper that Title III of the CRA requires the State to retain and preserve and to produce upon the Attorney General's written demand.

2. Whether the DOJ adequately stated the basis and purpose of its demand for an electronic, unredacted copy of Connecticut's SVRL under Title III of the CRA.

---

[1] "JA__" refers to the page numbers of the Appendix filed with this Brief. "Doc. __, at __" refers to the docket number and internal page numbers on the district court docket sheet, No. 3:26-cv-21 (D. Conn.).

3. Whether federal or state privacy laws permit Connecticut to refuse the DOJ's demand for an electronic, unredacted copy of Connecticut's SVRL.

## STATEMENT OF THE CASE

The United States brought this action under Title III of the CRA. The district court (Kari A. Dooley, J.) entered a final Order dismissing the United States' claim under Federal Rule of Civil Procedure 12(b)(6). JA296; *United States v. Thomas*, No. 3:26-cv-21, 2026 WL 2070437 (D. Conn. July 17, 2026). The United States appeals.

1.a. Congress passed the CRA to strengthen the Civil Rights Act of 1957, which had "authorized the Attorney General to seek injunctions against public and private interference with the right to vote on racial grounds." *South Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966). The CRA "permitted the joinder of States as parties defendant" in such suits and "authorized courts to register voters in areas of systematic discrimination." *Ibid.* In addition, Title III of the CRA "gave the Attorney General access to local voting records." *Ibid.*; *see* 52 U.S.C. 20701 *et seq.*

Under Title III of the CRA, "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of any

[federal] general, special, or primary election . . . all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. 20701. In the key provision here, Title III further provides:

> Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative. This demand shall contain a statement of the basis and the purpose therefor.

52 U.S.C. 20703.

The Attorney General and his representatives are prohibited from disclosing such records or papers except to Congress and its committees, to governmental agencies, and in the presentation of a court proceeding. 52 U.S.C. 20704. And, should it be necessary, the Attorney General may seek the aid of a district court, which "shall have jurisdiction by appropriate process to compel the production of such record or paper." 52 U.S.C. 20705.

b. Although Congress enacted the CRA, including Title III, to "tr[y] to cope with the problem" of racial discrimination in voting, *Katzenbach*, 383 U.S. at 313, Congress has since enacted additional laws that affect the "records and papers which come into [election officers'] possession," 52 U.S.C. 20701. Relevant here are the NVRA and the HAVA, which help the federal government to ensure that States are overseeing federal elections in a fair and honest manner and "to protect the integrity of the electoral process." 52 U.S.C. 20501(b)(3).

The NVRA requires each State, with exceptions, "for at least 2 years" to "make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. 20507(i)(1). The NVRA further requires each State to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of . . . the death of the registrant; or . . . a change in the residence of the registrant." 52 U.S.C. 20507(a)(4).

Of highest importance to this litigation, HAVA requires States to implement a single centralized computerized SVRL, and mandates that the "appropriate State or local election official shall perform list maintenance with respect to the computerized list on a regular basis." 52 U.S.C. 21083(a)(1)(A) and (a)(2)(A). This process includes removing "individual[s]," "registrant[s]," and "ineligible voters" who should not appear on the lists. 52 U.S.C. 21083(a)(2)(A)(i)-(iii). HAVA also mandates that States may not "accept[] or process[]" an application for voter registration "unless the application includes" particular identifiers—namely, an "applicant's driver's license number" if he or she has one; "the last 4 digits of the applicant's social security number"; or, if the applicant has neither a driver's license nor a social security number, a state-assigned "unique identifying number." 52 U.S.C. 21083(a)(5)(A)(i)-(ii). "The State shall determine whether the information provided by an individual is sufficient to meet the[se] requirements . . . in accordance with State law." 52 U.S.C. 21083(a)(5)(A)(iii).

2. In August 2025, the DOJ sent a letter to Secretary of State Thomas seeking "information regarding Connecticut's procedures for complying with the statewide voter registration list maintenance

provisions of the [NVRA]," and asking for a "description of the steps that [Secretary Thomas] ha[s] taken, and when those steps were taken, to ensure that the State's list maintenance program has been properly carried out in full compliance with the NVRA." JA34. The DOJ cited concerns about Connecticut's responses to the Election Assistance Commission's Election Administration and Voting Survey (EAVS). JA34-35. Specifically, the DOJ pointed out that "Connecticut has one of the lowest rates in the nation for removing deceased persons from the voter registration rolls relative to the number of deaths." JA34. Furthermore, EAVS data showed Connecticut receiving more responses to confirmation notices than the number of confirmation notices Connecticut sent out. JA35. Also, Connecticut had reported that it did not track duplicate registrations, and the State had failed to provide information about merged records and "registration transactions submitted by persons already registered to vote." JA35.

Secretary Thomas responded two weeks later. JA38-41. She provided some of the requested information but said that her office was "gathering the requested data and [would] provide it as soon as practical." JA41. Her office never did so. JA24, 51.

In December 2025, the DOJ sent Secretary Thomas a second letter and requested "a copy of Connecticut's statewide voter registration list" containing "all fields," including "the registrant's full name, date of birth, residential address, [and] his or her state driver's license number or the last four digits of the registrant's social security number as required under HAVA to register individuals for federal elections." JA43 (emphasis and footnote omitted). The DOJ cited its authority under Title III of the CRA, as well as its authority to enforce the NVRA and HAVA. JA43-44. The letter stated, "[t]he purpose of this request is to ascertain Connecticut's compliance with the list maintenance requirements of the NVRA and HAVA." JA44.

Secretary Thomas refused to provide the SVRL. JA47-49. The DOJ then brought this suit (JA19-27) and moved for an order to compel the production of the SVRL (JA28-32). The district court ordered Secretary Thomas to show cause why she should not be required to produce the SVRL. JA54-55. Multiple parties intervened as defendants (Docs. 12, 23, 35, 40), and all defendants moved to dismiss the suit (Docs. 56, 58, 60). JA9-14.

The district court granted the Common Cause intervenors' Motion to Dismiss, denied the United States' Motion to Compel, and denied as moot the remining Motions to Dismiss. JA296. The court held that the "SVRL is not a record that falls within the scope of Title III." JA296. In reaching this conclusion, the court found persuasive the Sixth Circuit panel's holding that because Michigan election officials created that State's SVRL, the Michigan Secretary of State had not come into possession of the SVRL within the meaning of Title III. JA295-296 (citing *United States v. Benson*, 179 F.4th 470, 478 (*Benson II*), *reh'g en banc denied*, No. 26-1225, 2026 WL 2364306 (6th Cir. Aug. 14, 2026) (*Benson III*)). The district court likewise concluded that "[t]he SVRL is a record created by the state" and so "is not a record that comes into the state's possession at all." JA293. And the court held that this interpretation "is further compelled by Section 20702, which provides criminal penalties for 'any person who . . . alters' a record" within the scope of Section 20701. JA295 (omission in original). In the court's view, "the SRVL is constantly being 'altered' as information is updated," but "Section 20702 clearly contemplates that the records subject to Section 20701 are fixed in time when they 'come into the possession' of state officials such that they

cannot thereafter legally be altered, damaged or destroyed." JA295. Because the court held that the SVRL was not a record within the scope of Title III, the court did not reach other issues that defendants raised. JA289.[2]

## SUMMARY OF THE ARGUMENT

The district court erred in dismissing the DOJ's Title III claim on the ground that the SVRL is not a record subject to Title III's preservation and demand requirements because it is a self-generated document that does not "come[] into the state's possession." JA293. The CRA's text does not exclude self-generated documents. At most, the distinction between records *coming* into one's possession and *being* in one's possession is a temporal one—not a distinction between obtaining records from an outside source and through self-generation. And the CRA's preservation requirements do not conflict with the NVRA and HAVA's list maintenance requirements. Thus, the Attorney General is

[2] The district court decided the issue "within th[e] procedural framework" of the United States' Complaint and Motion to Compel and the defendants' motions to dismiss, "leaving to another day whether Title III contemplates a more truncated or streamlined invocation of the Court's authority." JA286 n.1.

entitled to reproduction and copying of Connecticut's SVRL to assess the State's compliance with the NVRA and HAVA.

The district court did not reach defendants' other arguments in favor of dismissal, but they do not provide any basis to affirm. The DOJ stated both the basis and purpose of its demand. The text of Section 303 does not limit a demand's purpose or give courts any means of evaluating a demand's basis. In any event, the DOJ sufficiently described the factual and legal basis for its demand, and the demand's stated purpose furthers Title III's aim to protect the rights of voters.

This Court should likewise reject defendants' various privacy-related arguments as meritless. First, the demand did not violate the Privacy Act because the DOJ has an applicable System of Records Notice, and because maintaining voting registration records is within the scope of an authorized law enforcement activity. Second, the E-Government Act does not require a privacy impact assessment in these circumstances. Third, the Driver's Privacy Protection Act permits disclosure of information when carrying out official government functions. Finally, the CRA preempts any contrary Connecticut privacy law under the Constitution and Supreme Court precedent.

## STANDARD OF REVIEW

This Court "review[s] *de novo* a district court's dismissal of a complaint pursuant to Rule 12(b)(6), construing the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Vaughn v. Phoenix House N.Y. Inc.*, 957 F.3d 141, 145 (2d Cir. 2020) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)).

## ARGUMENT

### I. The DOJ's demand for an electronic, unredacted copy of Connecticut's SVRL satisfied Title III's requirements.

Section 301 of Title III of the CRA imposes a "sweeping" obligation on election officials, *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962) (*Lynd II*), to "retain and preserve, for a period of twenty-two months from the date of [a federal election] *all* records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election," 52 U.S.C. 20701 (emphasis added).

Section 303 provides the Attorney General with a correspondingly comprehensive power to demand in writing that "the person having custody, possession, or control of such record[s] or paper[s]" make them

"available for inspection, reproduction, and copying" so long as the demand "contain[s] a statement of the basis and the purpose therefor." 52 U.S.C. 20703. After that written demand has been made, and the State election officer has rejected it, the Attorney General may seek an order from a federal court "by appropriate process to compel the production of such record or paper." 52 U.S.C. 20705.

Notwithstanding the plain language of these provisions, the district court dismissed the DOJ's Title III claim on the ground that Connecticut's SVRL is not a record or paper subject to the retention and preservation requirements of 52 U.S.C. 20701 because it did not "come into [the Secretary's] possession," and thus was not subject to the Attorney General's demand under 52 U.S.C. 20703. JA291, 293 (alteration in original). This was error.

### A. Connecticut's SVRL is a record or paper that Title III requires the State to retain and preserve and to produce upon the Attorney General's demand.

Connecticut's SVRL comes within the scope of Title III's "sweeping" retention provision. *Lynd II*, 306 F.2d at 226; *see also United States v. Mississippi*, 380 U.S. 128, 134 (1965) ("Title III . . . requires that records of voting registration be kept."); *McIntyre v. Morgan*, 624 F. Supp. 658,

664 (S.D. Ind. 1985) (stating that Title III encompasses "voting registration records"). In interpreting Title III, this Court should "begin[] and end[] with the text," *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553 (2014), with "the assumption that the ordinary meaning of that language accurately expresses the legislative purpose," *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009) (citation omitted). Title III's text supports a far broader investigative power than what the district court's reading allows.

Section 301 covers records "relating to any application, registration, payment of poll tax, or other act requisite to voting." 52 U.S.C. 20701. The term "relating to" should be defined "expansively." *Richards v. Ashcroft*, 400 F.3d 125, 129 (2d Cir. 2005); *see Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717-718 (2018). In Section 301, the phrase expands the type of records to be preserved beyond simply applications, registrations, or receipts for payments. 52 U.S.C. 20701. Instead, any record "relating to" one of those activities—or even relating to the catchall "other act requisite to voting"—must be preserved. *Ibid.* The SVRL is a record that relates to voter registration.

The district court erred in holding that Title III excludes self-generated records and that the NVRA and HAVA mandate alterations that would violate Title III were the SVRL within Title III's scope. JA293, 295. The phrase "come into his possession" broadly covers records created by States and local governments and records obtained from outside sources. And updating the SVRL in compliance with the NVRA and HAVA does not alter the SVRL within the meaning of Title III.

#### 1. The SVRL is a record that came into Secretary Thomas's possession.

The district court erred in holding that "record[s] created by the state" fall outside the scope of Title III because they do not "come[] into the state's possession at all." JA293. The phrase "come into his possession" refers to how and when possession began, 52 U.S.C. 20701; it does not exclude self-generated records. Any officer in possession of an SVRL came into possession at a distinct point in time.

While the district court below relied heavily on the Sixth Circuit panel decision in *United States v. Benson*, 179 F.4th 470, 478 (6th Cir. 2026) (*Benson II*), a majority of the Sixth Circuit recently expressed agreement with the United States that an SVRL is a record that "come[s] into [the] possession" of a State's chief election official. *United States v.*

*Benson*, No. 26-1225, 2026 WL 2364306, at *2 (6th Cir. Aug. 14, 2026) (*Benson III*) (Murphy, J., concurring in denial of reh'g en banc); *id.* at *9 (Griffin, J., dissenting); *id.* at *14 (Thapar, J., dissenting).

a. When a statute does not itself define a term, courts "ask what that term's ordinary, contemporary, common meaning was" at the time of enactment. *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 433-434 (2019) (citation and internal quotation marks omitted). An officer comes into possession of any record or document the moment that he "get[s]" or "acquire[s]" it and retains it within his control. *Webster's New World Dictionary of the American Language* 291 (8th coll. ed. 1960); *see id.* at 1140 (defining "possess" and "possession"); *id.* at 13 (defining "acquire" as "1. to get or gain by one's own efforts or actions. 2. to get possession of; get as one's own."). "Come into possession" is a broad term that both focuses the inquiry on the *moment* at which possession was obtained and denotes "possession by any means." *Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 933 (11th Cir. 2023) (Jordan, J., concurring) (discussing that "acquire" has two definitions, one of which is "[c]ome into possession of," which "broadly encompasses possession *by any means*" (alteration in original; emphasis added) (quoting 1 *The New*

*Shorter Oxford English Dictionary* 20 (4th ed. 1993))); *see The American College Dictionary* 11 (1959 ed.) (defining "acquire" similarly). The term "come into his possession" is broad enough to include both voter-generated and state-generated documents. *See* Authority to Obtain and Share Statewide Voter Roll Data, 50 Op. O.L.C., at 8-9 (2026), https://www.justice.gov/olc/media/1440346/dl.

Thus, contrary to the district court's conclusion, the word "come" cannot create a carve-out for self-generated documents. *See* JA293. If anything, Congress used the phrase "*come* into his possession" rather than "*are* in his possession," not to impose an unwritten carve-out for records or documents that are self-generated, but to focus on *how* and *when* the officer gains possession of the records or documents in the first instance.[3] 52 U.S.C. 20701; *see Webster's Third New International*

[3] This would not be the only time Congress has used the phrase in a manner meant to encompass both self-generation and receipt from an outside source. *See* Civil Rights Cold Case Records Collection Act of 2018, Pub. L. No. 115-426, § 2(3)(B), 132 Stat. 5489 (2019) (44 U.S.C. 2107 note) (referring to a record that "was created or made available for use by, obtained by, or otherwise came into the possession of" an agency or governmental body); President John F. Kennedy Assassination Records Collection Act of 1992, Pub. L. No. 102-526, § 3(2), 106 Stat. 3444 (44 U.S.C. 2107 note) (same).

*Dictionary* 453 (1966 ed. unabridg.) (defining "come into" as "to enter upon or into possession of: acquire esp. as an inheritance").

A majority of the en banc Sixth Circuit recently acknowledged the possibility that the phrase "come into . . . possession" had developed a meaning contrary to defendants' interpretation here. *Benson III*, 2026 WL 2364306, at *2 (Murphy, J., concurring); *see also id.* at *7 (Griffin, J., dissenting); *id.* at *13-14 (Thapar, J., dissenting). It "was a familiar legal expression" at the time Congress enacted Title III, "regularly used . . . to describe when a person lawfully assumed possession of property through an office, employment, or other legal authority." *Id.* at *7 (Griffin, J., dissenting). But that phrase "did not distinguish property according to its source," so "records that come into an official's possession could include self-created records." *Ibid.* In other words, "[t]he more natural inference is that . . . 'come into possession' [was] a familiar legal formulation identifying when the statutory duty attached, not . . . creating a separate substantive limitation on the records covered." *Ibid.* There is, in short, no external-source limitation to be found in the text of Title III. *Ibid.*; *Benson II*, 179 F.4th at 485 n.3, 486 n.7 (Nalbandian, J., dissenting).

The Supreme Court has demonstrated a similar understanding of the term. In cases under the Freedom of Information Act, the Supreme Court has imposed two requirements for a document to be an agency record: "First, an agency must either *create or obtain* the requested materials," and second, "the materials [must] have *come into the agency's possession* in the legitimate conduct of its official duties" and remain in the agency's possession at the time of a records request. *United States Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 144-145 (1989) (citation and internal quotation marks omitted; emphasis added). Thus, the Supreme Court has made clear that an agency record created by the agency can be said to have "come into the agency's possession"—coming into possession of material refers to when and how the possession began. *See id.* at 145-146.

Numerous statutes use similar phrases to regulate acquiring information or property *through improper means* or to trigger duties to act based on acquiring information or property *at a particular time*. *See, e.g.*, 44 U.S.C. 3572(f) ("comes into possession of such information by reason of his or her being an officer"); 13 U.S.C. 214 (similar); 30 U.S.C. 1732(b) ("as soon as practicable after it comes into the possession of the

Secretary"; "30 days after such information comes into the possession of the Secretary"); 10 U.S.C. 130c(d)(2)(C) (prescribing disclosure timing rules for sensitive information that "came into possession or under the control of the United States more than 10 years before the date on which the request is received").

Moreover, contemporaneous decisions confirm the point. *See Kennedy v. Owen*, 321 F.2d 116, 117 (5th Cir. 1963) (per curiam) (requiring the district court "to order each appellee to make available . . . all records and papers *in the possession*, custody or control of said appellee relating to any application, registration, payment of poll tax or other act requisite to voting" (emphasis added)); *Kennedy v. Lewis*, 325 F.2d 210, 212 (5th Cir. 1963) (per curiam) (requiring the district court to grant the same inspection rights); *see also* H.R. Rep. No. 86-956, 86th Cong., 2d Sess. 6, 37, 39 (1959) (explaining that Section 301 "would include *all records and papers* in the possession of election officers") (emphasis added). Placing an external-source limitation on Section 301 is an unnatural reading. Election officers in Connecticut acquired records and information from individual voters in the course of carrying out their duties. When they aggregated those individual records into one new,

single record—the SVRL—they acquired that new record and retained it within their control, thus coming into possession of the SVRL. *See Benson II*, 179 F.4th at 484 (Nalbandian, J., dissenting). The moment of the SVRL's creation is the relevant moment; after that moment, the creating officer possesses a new document that he or she previously did not possess. *See Tax Analysts*, 492 U.S. at 144-145.

b. Even accepting an external-source limitation, Title III imposes an *officer-specific* duty to preserve and produce certain voting-related records coming into the officer's possession, which would encompass the SVRL. *See* 52 U.S.C. 20701. A majority of the en banc Sixth Circuit recently agreed that Title III's "language imposes a specific duty on an individual (each officer of election), not a general duty on the entire State." *Benson III*, 2026 WL 2364306, at *2 (Murphy, J., concurring); *see id.* at *9 (Griffin, J., dissenting); *id.* at *14 (Thapar, J., dissenting). Thus, "the Secretary of State 'came into possession' of the voter-registration list when she assumed office" or otherwise gained control of it. *Id.* at *2 (Murphy, J., concurring). "[W]hen the [SVRL] comes under [the Secretary's] official custody and control through the actions of [her] subordinates, it comes into her possession." *Id.* at *9 (Griffin, J.,

dissenting); *see also id.* at *14 (Thapar, J., dissenting) (similar). That the fines and penalties follow the individual state official having possession of those records confirms the point. *See* 52 U.S.C. 20701. Because Title III's requirements are officer-specific, even accepting the district court's requirement that a record must come from some external source, JA293, that requirement was satisfied when Secretary Thomas received the SVRL from someone else in her office, or when she assumed office.

Context further demonstrates that Congress would not have created such a distinction between documents received from outside sources and those generated by state officers. As Judge Nalbandian has pointed out, one of the practices in the Jim Crow South when Title III was enacted was "the use of 'voucher' systems, whereby municipalities required prospective voters to find registered voters who could vouch for them." *Benson II*, 179 F.4th at 486 (Nalbandian, J., dissenting) (citing Report of the United States Commission on Civil Rights (1959) (1959 CCR Report) at 93, https://www.usccr.gov/files/historical/1959/59-001-U.pdf); *see also id.* at 475, 479 (majority opinion) (relying on the same report). "[C]ounty boards of registrars maintained internal indices that tracked the number of times each registered voter 'vouched' for an

applicant." *Id.* at 486 (Nalbandian, J., dissenting) (citation omitted). These indices would be government-created records, but once an index was passed "up the ladder," the receiving "state official came into possession of the index." *Ibid.* The indices were critical to the Commission because at least one state legislature had passed a bill permitting the destruction of the registration applications themselves. 1959 CCR Report at 137. These were among the records that the Commission recommended that Congress make available for federal inspection. *Id.* at 137-138.

And the Commission itself reviewed self-generated records, including overall voter registration lists for specific counties showing severe disparities in the registration rates of black and white citizens. 1959 CCR Report at 75, 82, 89. The Commission also gathered evidence of self-generated actions by county registrars, like error corrections on white voter registration applications. *Id.* at 87-88, 93. These county tally sheets and county voter registration lists have now been replaced by the self-generated electronic SVRL as required by HAVA.

In short, documents created by state agencies historically were some of the very types of records that the United States sought to

investigate to weed out discrimination. The district court's reading would exclude from the reach of Sections 301 and 303 all the most blatant evidence of discrimination—such as internal memoranda and documents showing whether officers accepted a proper application, including the SVRL. *See Benson II*, 179 F.4th at 486 n.7 (Nalbandian, J., dissenting).

#### 2. Treating the SVRL as a "record" or "paper" under Section 301 is consistent with other federal voting laws.

According to the district court, reading Title III to include the SVRL would put Title III's prohibition on altering records and the NVRA and HAVA's updating-and-modification requirements at odds with each other. JA295-296. That is incorrect. Reading Title III harmoniously with the NVRA and HAVA—which require continuous updates to the SVRL—yields the conclusion that an election officer properly "retain[s] and preserve[s]" an SVRL, 52 U.S.C. 20701, by updating it accurately as required by those statutes, *see Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1084-1085 (10th Cir. 2025) (explaining how States can "maintain" documents under the NVRA even when those documents are

"dynamic" and "constantly changing").[4] There is no obligation to create a new, static version of the database with every single edit.[5] On this point, a majority of the Sixth Circuit's judges found Title III of the CRA could be harmonized with the list maintenance requirements of the NVRA and HAVA to capture the SVRL in some form or another. *See Benson III*, 2026 WL 2364306, at *4-5 (Murphy, J., concurring); *id.* at *9-10 (Griffin, J., dissenting); *id.* at *14 n.7 (Thapar, J., dissenting).

At least three considerations show how Title III of the CRA can be harmonized with the NVRA and HAVA. First, the surrounding verbs elucidate the meaning of "alter" in this provision, which eliminates any conflict. *See Fischer v. United States*, 603 U.S. 480, 487 (2024). Those verbs all describe actions typically taken to make a document

---

[4] *See The American College Dictionary* 1035 (1959) (defining "retain" as, *e.g.*, "to keep possession of"; "to continue to use, practice, etc."); *id.* at 958 (defining "preserve" as, *e.g.*, "to keep alive or in existence; make lasting"; "to keep safe from harm or injury; save"; and "to keep up; maintain"); *Webster's Third New International Dictionary* 1938 (1966 unabridg.) (defining "retain" as, *e.g.*, "to hold or continue to hold in possession or use"); *id.* at 1794 (defining "preserve" as, *e.g.*, "to keep safe from injury, harm, or destruction"; to "maintain" (capitalization omitted)).

[5] The CRA does, however, require election officials to preserve the official voter registration lists distributed to local election offices for the conduct of each specific federal election.

unavailable, inaccessible, or inaccurate for evidentiary purposes. *See id.* at 489-490 (describing a similar list of verbs). The SVRL is, as required by the NVRA and HAVA, an inherently evolving and changing record. List maintenance keeps the SVRL current; it does not "alter" it as that term is used in Section 302.[6] *See Benson III*, 2026 WL 2364306, at *9 (Griffin, J., dissenting) ("'[A]lters' likewise refers to any minor tampering with or corruption of the document's integrity—not routine updates necessary to maintain an accurate voter list.").

Second, Section 302's prohibition on altering "record[s] or paper[s]" is accompanied by a mens rea requirement. The requirement that any penalizable alteration must be *willful* shows beyond all doubt that list maintenance under the NVRA and HAVA could never run afoul of the CRA's ban on altering records. *See United States ex rel. Hart v. McKesson Corp.*, 96 F.4th 145, 157 (2d Cir.) (describing willfulness as "know[ing]"

[6] Even if the statutes were truly inconsistent—and they are not—the "specific" list-maintenance requirements in the NVRA and HAVA would merely create "an exception" to the "general" prohibition in Section 302. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

that one's "conduct was unlawful" (citation omitted)), *cert. denied*, 145 S. Ct. 163 (2024).

And third, construing Title III to exclude the SVRL would contravene congressional intent by paralyzing the United States' ability to enforce various federal voting laws. The SVRL is not just *any* record "requisite to voting," 52 U.S.C. 20701, in an election. It is the only federally mandated statewide record of voters required to conduct every election. HAVA states that "[t]he computerized list shall serve as the official voter registration list for the conduct of all elections for Federal office in the State." 52 U.S.C. 21083(a)(1)(A)(viii). The SVRL must "serve as the single system for storing and managing the official list of registered voters throughout the State," 52 U.S.C. 21083(a)(1)(A)(i), and "[a]ll voter registration information obtained by any local election official in the State shall be electronically entered into the computerized list on an expedited basis at the time the information is provided to the local official," 52 U.S.C. 21083(a)(1)(A)(vi).

Consequently, to investigate whether a jurisdiction engages in practices that violate the CRA, the Uniformed and Overseas Citizens Absentee Voting Act, the NVRA, HAVA, or the Voting Rights Act of 1965,

for example, the Attorney General needs to examine both applications to register to vote and the final voting rolls, including the electronic SVRL, so as to assure himself that the applications are being properly processed and that reasonable list maintenance efforts have been practiced. *See Benson III*, 2026 WL 2364306, at *15-16 (Thapar, J., dissenting); *Lynd II*, 306 F.2d at 228.

The district court's perceived conflict between Section 302, on one hand, and the NVRA and HAVA, on the other, would effectively carve out vast numbers of federal election records, including SVRLs, from the United States' inspection authority under Title III, which was plainly not the intention of Congress in passing such "sweeping" legislation. *Lynd II*, 306 F.2d at 226.

### B. The DOJ adequately stated the basis of its demand for Connecticut's SVRL.

The district court granted intervenors' motion to dismiss based solely on the conclusion that the SVRL is not a record within the scope of Title III. Before the district court, defendants and intervenors raised numerous other arguments that the court did not reach (*see* JA289), including an argument that the United States' statement of basis and purpose was inadequate, *see* Doc. 57, at 12-18; Doc. 58-1, at 20-28, 30-31;

Doc. 60, at 19-22. These arguments are incorrect. Courts have only a limited role in assessing a Title III demand, and here the Attorney General's demand complied with the statutory requirements.

A majority of Sixth Circuit judges agreed with the United States on this point: that DOJ satisfies the "basis" and "purpose" component of Title III in a written demand that "was based on 'Title III,'" described "factual concerns with [the State's] voter-registration list[]," and "identified its purpose to 'assess' the State's 'compliance' with the NVRA's and HAVA's list-maintenance requirements." *Benson III*, 2026 WL 2364306, at *3 (Murphy, J., concurring); *see also id.* at *10 (Griffin, J., dissenting); *id.* at *14 (Thapar, J., dissenting). Because the demand here is substantively analogous to the one in *Benson III*, this Court should conclude the same.

**1. Courts play a limited role in assessing the Attorney General's demand under Title III.**

Courts undertake a limited role in evaluating a Section 303 demand. The Attorney General's authority under Title III is "purely investigative," *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Attorney Gen. of the U.S.*, 285 F.2d 430 (5th Cir. 1961), and the "investigative process could be

completely disrupted if investigative hearings were transformed into trial-like proceedings," *Kennedy v. Bruce*, 298 F.2d 860, 863 (5th Cir. 1962) (citation omitted).

By invoking the court's jurisdiction to obtain records required to be maintained under Section 301, the DOJ initiated "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Lynd II*, 306 F.2d at 225. Such a proceeding "does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure," but merely "a simple statement by the Attorney General that after a [Section 303] written demand for inspection of records and papers covered in [Section 301], the person against whom an order for production is sought under [Section 305] has failed or refused to make such papers 'available for inspection, reproduction, and copying.'" *Id.* at 225-226 (quoting 52 U.S.C. 20703).

Under the statute's plain language, "[t]here is no place for any . . . procedural device or maneuver—either before or during any hearing of the application—to ascertain the factual support for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose therefor' as set forth in the written demand." *Lynd II*, 306 F.2d at 226 (quoting 52

U.S.C. 20703). Accordingly, a state official responding to the Attorney General's demand for federal election records may not utilize litigation tools ordinarily available under the Federal Rules of Civil Procedure to challenge "the reasons why the Attorney General considers the records essential." *Ibid.* Nor is "the factual foundation for, or the sufficiency of," this statement "open to judicial review or ascertainment." *Ibid.*; *see United States v. Lynd*, 301 F.2d 818, 822 (5th Cir. 1962) (*Lynd I*). The United States need not "allege specific details" underlying its demand, *Lynd I*, 301 F.2d at 822, but need only "identify in a general way the reasons for his demand," such as that it "was made for the purpose of investigating *possible* violations of a Federal statute," *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) (emphasis added; citation omitted). "No showing even of a prima facie case of a violation of Federal law need be made." *Coleman*, 313 F.2d at 868 (citation omitted). And Title III does not specify that "the basis" must be a factual one, as opposed to a legal one. *See* 52 U.S.C. 20703.

The Fifth Circuit's approach to Title III's "summary proceeding[s]," *Lynd II*, 306 F.2d at 226, is consistent with subsequent Supreme Court precedent. In *Donaldson v. United States*, the Supreme Court observed

that, although the Rules of Civil Procedure "have an application to a summons proceeding," they "are not inflexible in this application," and, moreover, precedent does not suggest those rules should be used to "impair a summary enforcement proceeding so long as the rights of the party summoned are protected and an adversary hearing, if requested, is made available." 400 U.S. 517, 528-529 (1971), *superseded by statute on other grounds*, Tax Reform Act of 1976, Pub. L. No. 94-455, 90 Stat. 1520; *see Lynd II*, 306 F.2d at 226 (allowing judicial determination of whether "written demand has been made" and whether the custodian "ha[s] been given reasonable notice of the . . . proceeding").[7] The district court did not resolve "whether Title III contemplates" a summary procedure (JA286 n.1), but Title III's summary nature also illustrates "[t]he restricted

[7] *Donaldson* also shows why defendants' reliance on *United States v. Powell*, 379 U.S. 48 (1964), is misplaced. *See* Doc. 59, at 4-8. The *Donaldson* Court explained that *Powell* should not impair summary enforcement proceedings that otherwise protect defendants' rights. 400 U.S. at 529. And *Powell* dealt with an IRS summons, which "is meaningfully different from a Title III demand" because it (1) "is directed at a private party with constitutional rights, rather than a state official; (2) can demand a much more "intrusive" scope of records; and (3) "is self-executing" and "triggers criminal contempt liability," whereas a Title III demand does not. *Benson III*, 2026 WL 2364306, at *15 (Thapar, J., dissenting).

substantive nature of the proceeding." *Lynd II*, 306 F.2d at 227.

"[N]othing in Title III gives courts a judicially manageable standard to apply in reviewing the demand's format." *Benson III*, 2026 WL 2364306, at *15 (Thapar, J., dissenting). Accordingly, the only "matters open for determination" by the court when a recipient challenges that demand are "whether the written demand has been made" and "whether the custodians against whom orders are sought have been given reasonable notice of the pendency of the proceeding." *Lynd II*, 306 F.2d at 226. Additionally, "[i]f, *after issuance of an order to produce*, a genuine dispute subsequently arises as to whether or not any specified particular paper or record comes within this broad statutory classification," that too may be addressed by the court. *Ibid.* (emphasis added).

Contrary to Secretary Thomas's argument below (Doc. 59, at 8), Title III's summary proceeding does not require the Attorney General to meet the requirements for an administrative subpoena—namely, showing "[1] that the investigation will be conducted pursuant to a legitimate purpose, [2] that the inquiry may be relevant to the purpose, [3] that the information sought is not already within [his] possession, and [4] that the administrative steps required . . . have been followed." *RNR*

*Enters., Inc. v. S.E.C.*, 122 F.3d 93, 96 (2d Cir. 1997) (omission in original); *see Civil Rights—1959: Hearings Before the Subcomm. on Constitutional Rights of the S. Comm. on the Judiciary*, 86th Cong., 1st Sess. 191-192 (1959) (statement of Attorney General William P. Rogers) (explaining the need for the power of "production and inspection . . . rather than for the issuance of a subp[o]ena").[8] These requirements apply where records are demanded pursuant to a statute that mandates a judicially reviewable relevance requirement. *See RNR Enters.*, 122 F.3d at 95 (reviewing subpoenas issued pursuant to the Section 20(a) of the Securities Act of 1933 and Section 21(a) of the Securities Exchange Act of 1934); Securities Act of 1933, Pub. L. No. 73-22, § 20(a), 48 Stat. 86, (codified at 15 U.S.C. 77t(a)) (permitting the SEC to demand information "concerning" potential violations); Securities Exchange Act of 1934, Pub. L. No. 73-291, § 21(a), 48 Stat. 899, (codified at 15 U.S.C. 78u(a)) (same). Title III does no such thing. But in any case, the Attorney General does

[8] In the subpoena context, once these requirements are met, the defendant can only defeat a subpoena by disproving one of these criteria or proving "an improper purpose," such as harassment, pressure to settle a collateral dispute, or "any other purpose reflecting on the good faith of the particular investigation." *Adamowicz v. United States*, 531 F.3d 151, 156 (2d Cir. 2008) (internal quotation marks and citations omitted).

not already possess the requested information. And as discussed below: the Attorney General has a legitimate purpose; the SVRL is relevant to that purpose; and the Attorney General has satisfied Title III's requirements. Even under the administrative-subpoena standard, the court's role "is extremely limited," *RNR Enters.*, 122 F.3d at 96 (citation omitted), and the Attorney General is entitled to the SVRL.

**2. The DOJ's demand stated an adequate basis.**

The DOJ's demand for an unredacted copy of Connecticut's SVRL easily satisfied the notice requirement imposed by the basis-and-purpose language. At the outset, the December 12 letter itself invoked the CRA, requested the SVRL, and stated that the DOJ's purpose was to "ascertain Connecticut's compliance with the list maintenance requirements of the NVRA and HAVA." JA44. This letter thus informed Secretary Thomas of why the demand was being made and provided her with the statutory bases for the demand. This was all the notice to which she was entitled.

Even assuming that the DOJ was required to state a factual basis, it did so. In its August 6 letter, the DOJ requested information about Connecticut's list maintenance under the NVRA and cited numerous concerns from the EAVS, including that: "Connecticut ha[d] one of the

lowest rates in the nation for removing deceased persons from the voter registration rolls"; the State reported receiving more responses to confirmation notices than the number of confirmation notices sent out; data regarding duplicate and merged registrations was missing; and Connecticut admitted that it did not even track duplicate registration information. JA33-34. This highly specific factual basis gave Secretary Thomas more than sufficient notice of the DOJ's grounds for concern. *See Bruce*, 298 F.2d at 861 (stating that basing a demand upon "information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting" "compli[ed] with the requirements of [Title III]").

Before the district court, defendants argued that the August 6 letter could not have provided the basis because that letter did not invoke the CRA or demand the SVRL (Doc. 57, at 17), nor did the December 12 letter refer to the prior correspondence or the EAVS data (Doc. 57, at 17; Doc. 58-1, at 31). They are incorrect.

Nothing in Title III requires the United States to ritualistically use the word 'basis,' 'based upon,' or any other magic words when communicating its demand to a State. *Cf. Hannah P. v. Coats*, 916 F.3d

327, 345 (4th Cir. 2019) ("Proper notice does not require any magic words." (citation and internal quotation marks omitted)); *see also Talwar v. Staten Island Univ. Hosp.*, 610 Fed. App'x 28, 30 (2d Cir. 2015) (summary order) (similar). Nor does Title III require that the relevant communications all appear in one letter. *See Benson III*, 2026 WL 2364306, at *15 (Thapar, J., dissenting). The purpose of a notice requirement is to empower the receivers of the notice to comply with their responsibilities—or appropriately challenge their obligations. *See Juliano v. Health Maint. Org. of N.J., Inc.*, 221 F.3d 279, 287 (2d Cir. 2000); *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of N.Y.*, 273 F.3d 481, 488 (2d Cir. 2001).

The two letters provided Secretary Thomas sufficient notice of her obligation and—as evidenced by her follow-up letter and this litigation—the ability to challenge it. The December 12 letter was part of the same series of communications; Secretary Thomas's own letters show this. The DOJ did not ask for the SVRL in its August letter; instead, it sought more information about Connecticut's processes based on the EAVS discrepancies. JA34-35. Secretary Thomas responded with *some* information but explicitly said that her office was "gathering the

requested data and w[ould] provide it as soon as practical." JA41. Yet she never did so. JA24. Unsurprisingly, then, after waiting months for a response, the DOJ sent a follow-up letter requesting the SVRL. *See* JA43. Given Secretary Thomas's pending, unfulfilled promise to provide additional information, she reasonably should have understood the December letter to be a follow-up in the same conversation. And her office's December 24 letter shows that she in fact did so: the letter specifically recounted the recent communications between her office and the DOJ, including the August letter, when responding to the CRA demand. JA47-49. This was all the notice—and all the basis—required.

Intervenors further argued that the DOJ was required to say that it believed Connecticut might be violating federal law, explain why the Secretary's August 20 letter was an insufficient response, and explain how the SVRL would assist in determining that question. Doc. 57, at 17; *see* Doc. 60, at 19. And they contended that the SVRL is unnecessary to determine Connecticut's compliance with NVRA-mandated list maintenance. Doc. 57, at 19; Doc. 60, at 21; *see also* Doc. 58-1, at 26-27.

Intervenors are incorrect. Nothing in Title III requires the DOJ to spell out in detail its concerns and how the requested records will

alleviate them. "Questions of relevancy or good cause . . . are completely foreign to the summary proceeding under [Title III]." *Lynd II*, 306 F.2d at 228. And in all events, federal agencies may "investigate merely on suspicion that the law is being violated, or even just because [they] want[] assurance that it is not." *United States v. Morton Salt Co.*, 338 U.S. 632, 642-643 (1950).

Regardless, under any reasonable interpretation of the DOJ's letters, the basis for the DOJ's written demand is clear—that Connecticut's list maintenance program may violate the NVRA and HAVA—and thus the demand put Connecticut on "reasonable notice of the pendency of the proceeding." *Lynd II*, 306 F.2d at 226. And the relevance of the SVRL to that purpose is self-evident. Indeed, even in an administrative subpoena proceeding, this Court "defer[s] to the agency's appraisal of relevancy." *RNR Enters.*, 122 F.3d at 97 (citation omitted), and the question is only whether the record "might . . . throw[] light upon" the disputed issue, *Adamowicz v. United States*, 531 F.3d 151, 156 (2d Cir. 2008) (citation omitted). The SVRL is perhaps the most relevant evidence of whether Connecticut's list maintenance program is reasonable—a low rate of ineligible voters or noncitizens, for example,

may suggest a program is more likely to be reasonable; a high rate, by contrast, suggests a program is more likely to be unreasonable. Further, in a subsequent investigation, the Attorney General would have "nothing to compare the underlying [voter registration records]" with unless he was able to obtain the State's "voter file," and he could not "tell whether ineligible individuals have, in fact, made it onto [Connecticut's] voter rolls." *Benson III*, 2026 WL 2364306, at *15 (Thapar, J., dissenting).

### C. The DOJ's stated purpose of ascertaining Connecticut's compliance with the NVRA and HAVA was sufficient.

The district court did not reach the sufficiency of the DOJ's stated purpose for its demand. Defendants argued below that the DOJ's stated purpose was insufficient because (1) Title III may only be used to remedy discrimination and may not be used to enforce the NVRA and HAVA (Doc. 57, at 13-15; Doc. 58-1, at 21-28); (2) the DOJ failed to adequately explain its purpose (Doc. 60, at 20); and (3) the stated purpose was pretextual (Doc. 57, at 18-19; Doc. 58-1, at 28-29; Doc. 60, 22-25). They are wrong on all counts.

### 1. Title III does not limit the proper purposes for which records may be demanded under Section 303.

a. Interpreting Title III's coverage "begins and ends with the text," *Octane Fitness*, 572 U.S. at 553, with "the assumption that the ordinary meaning of that language accurately expresses the legislative purpose," *Gross*, 557 U.S. at 175 (citation omitted). "A particular statute's plain meaning can best be understood by looking to the statutory scheme as a whole and placing the particular provision within the context of that statute." *United States v. Epskamp*, 832 F.3d 154, 162 (2d Cir. 2016) (internal quotation marks and citation omitted). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Dean v. United States*, 556 U.S. 568, 573 (2009) (alteration in original; citation omitted).

Here, the plain text of Title III provides no limitation on the permissible purpose of the Attorney General's demand. *See* 52 U.S.C. 20701-20706. By contrast, Congress made clear elsewhere in the CRA when it intended a remedy to be limited to particular harms—namely,

racial discrimination. *See* Pub. L. No. 86-449, § 601, 74 Stat. 90 (1960) (applying Title VI of the CRA to violations of rights "on account of race or color") (52 U.S.C. 10101).

Section 303 does not give the Attorney General a list of acceptable purposes but simply provides that the demand must state its purpose. 52 U.S.C. 20703. This is a procedural limitation, not a substantive one. Section 303's "basis and purpose" requirement does not limit the scope of the Attorney General's inspection powers, but rather—as the cases immediately following the CRA's passage indicate—ensures reasonable notice to officers of election. *See Lynd II*, 306 F.2d at 226; *Coleman*, 313 F.2d at 868; *see also* 106 Cong. Rec. 6392 (1960) (statement of Rep. Cramer) (explaining that the "basis and purpose" requirement was designed to ensure election officials had "notice as to why such an inspection was being made and as to what law or what constitutional provision, right, or immunity might be involved"); *Benson III*, 2026 WL 2364306, at *4 (Murphy, J., concurring) ("Although § 20703 requires the DOJ to identify the 'purpose' for its demand, I see nothing in the statute's text that limits the purposes for which the DOJ may request the

records."). And stating the demand's purpose would be a useless exercise if only one permissible purpose existed.

b. Even if Title III were limited to "investigating violations of individuals' voting rights," as Secretary Thomas argued (Doc. 58-1, at 21 (quoting *United States v. Oregon*, 828 F. Supp. 3d 1092, 1105 (D. Or. 2026), *appeal pending*, No. 26-1231 (9th Cir. argued May 19, 2026)), that requirement has been met here.

Ensuring Connecticut's compliance with the NVRA and HAVA relates to individual voting rights, and thus is a proper purpose for the Attorney General's Title III demand for federal election records under Secretary Thomas's theory. By broadly authorizing the Attorney General to demand election records from States, the CRA is "one of the federal government's most important tools to inspect states' election records, ensure they comply with federal law, and thus protect the integrity of our elections." *Benson III*, 2026 WL 2364306, at *13 (Thapar, J., dissenting).

Congress passed the NVRA after finding that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation . . . and disproportionately harm voter participation by various groups, including racial minorities." 52 U.S.C.

20501(a)(3). And HAVA, for its part, is a federal statute aimed at protecting voting rights. The statute "establish[es] minimum election administration standards for States and units of local government with responsibility for the administration of Federal elections." Pub. L. No. 107-252, 116 Stat. 1666 (2002) (preamble). Those minimum standards, including accurate voter lists, were created to "address[] a variety of improvements to voting systems and voter access that were identified following the 2000 election."[9]

Moreover, the Supreme Court has recognized that fraudulent votes—which can be minimized through the NVRA's and HAVA's procedures—can "dilute the right of citizens to cast ballots that carry appropriate weight." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 672 (2021). Indeed, "[t]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam) (quoting *Reynolds v. Sims*, 377 U.S. 533, 555

[9] U.S. Election Assistance Comm'n, *Celebrating 20 Years of HAVA* 1, https://www.eac.gov/sites/default/files/HelpAmericaVoteDay/HAVA_1-Pager_10-27-22_508.pdf (last visited Sept. 22, 2026).

(1964)). Because both the NVRA and HAVA are federal election laws that protect voting rights, "the DOJ may use the CRA to investigate possible violations of" either statute. *United States v. Benson*, 819 F. Supp. 3d 753, 767 (W.D. Mich. 2026) (*Benson I*).[10]

Secretary Thomas further contended that Congress did not "specifically intend[] for the CRA to be used to enforce NVRA and HAVA because those laws did not exist in 1960." Doc. 58-1, at 25. But "[t]here is no rule of statutory interpretation that prevents a statute from interacting with, or being used in conjunction with, subsequently enacted statutes." *Benson I*, 819 F. Supp. 3d at 767. And because it is well-settled that "Congress legislates against the backdrop of existing law," *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 611 (2019) (citation omitted), the more relevant question is whether Congress, in passing the NVRA and HAVA, *disallowed* the Attorney General from using his pre-

[10] SEIU District 1199NE intervenors have argued that the DOJ's stated purpose "is antithetical to Title III's purpose" and that the DOJ "seeks to undermine" constitutional voting rights. Doc. 57, at 15-16. But they have not explained how enforcing HAVA and the NVRA's list maintenance provisions undermines anyone's constitutional rights, even if it does lead to the removal of "hundreds of thousands" of duplicate, non-citizen, or deceased registrants. *Ibid.*; *see Purcell*, 549 U.S. at 4.

existing investigative authority to aid him in carrying out his newer responsibilities. It did not.

The Attorney General's enforcement authority under the NVRA and HAVA does not operate in a vacuum, completely separate from his pre-existing Title III investigative authority. Title III gives the Attorney General investigative powers; the NVRA and HAVA give him enforcement powers. These laws operate in harmony. *See Department of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 63 (2024) (discussing the "strong presumption" that "federal statutes touching on the same topic" "can coexist harmoniously" and a court's duty to "giv[e] effect to both" (citation omitted)). Title III, the NVRA, and HAVA work together to secure fair elections. This Court can and should give full effect to each.

c. Defendants also pointed out that the NVRA makes States primarily responsible for list maintenance (Doc. 57, at 3; Doc. 58-1, at 1, 13, 27; Doc. 60, at 8), and Secretary Thomas expressed concern that the DOJ might "seek[] to dictate that a voter must be removed from Connecticut's voter rolls" (Doc. 58-1, at 26). It is true that Connecticut bears responsibility for adding and removing voters from its SVRL in

compliance with the NVRA and HAVA. But Congress gave the Attorney General the authority to enforce the NVRA and HAVA, 52 U.S.C. 20510(a), 21111, thereby anticipating that the Attorney General might sometimes need to step in and review a State's compliance. And the Attorney General is by no means attempting to supplant Connecticut's responsibility to maintain its voter rolls—this case is about the Attorney General's authority to *inspect* Connecticut's SVRL, not to *remove* anyone from the SVRL. The Secretary's concern about removals is misplaced.

Finally, Secretary Thomas argues that "Title III was intended for use at the local level" and that most States did not have statewide voting records in 1960. Doc. 58-1, at 25. But Title III on its face refutes any local limitation—it applies to "[e]very officer of election" and defines "officer of election" to mean any person acting "under color of any Federal, State, Commonwealth, or local law, statute, ordinance, regulation, authority, custom, or usage" in connection with responsibilities related to voting. 52 U.S.C. 20701, 20706. Title III was drawn broadly enough to cover records "relating to" voting activities regardless of whether the records were State or local. 52 U.S.C. 20701. More fundamentally, Congress's "expectations" of how a statute may be applied in light of present

circumstances do not control the meaning of the statute. *Bostock v. Clayton Cnty.*, 590 U.S. 644, 683 (2020).

### 2. Mere allegations of purported improper purposes do not eliminate the United States' entitlement to records under Section 303.

To the extent defendants argued that the Attorney General's stated purpose is pretextual, that argument provides no basis to affirm. *See* Doc. 57, at 18-19; Doc. 58-2, at 28-29; Doc. 60, at 22-25. As already discussed, Section 303 leaves no room for a court to second-guess the stated basis and purpose of the Attorney General's demand. Even if the demand were judicially reviewable, the district court was required to take the well-pleaded facts as true and draw all reasonable inferences in favor of the United States. *See Vaughn v. Phoenix House N.Y. Inc.*, 957 F.3d 141, 145 (2d Cir. 2020).

Further, even under administrative-subpoena precedents, *see Benson I*, 819 F. Supp. 3d at 765 ("[T]he Court construes a request for records under the CRA as a form of administrative subpoena."), a party resisting a subpoena based on claims of "bad faith" must support its assertions with evidence—a burden "not easily met." *SEC v. Brigadoon Scotch Distrib. Co.*, 480 F.2d 1047, 1056 (2d Cir. 1973); *SEC v. Knopfler*,

658 F.2d 25, 26 (2d Cir. 1981) (per curiam) (explaining that a subpoena recipient must provide "a meaningful and substantial factual showing" supporting a claim of bad faith to justify an evidentiary hearing). Defendants' reliance on out-of-court statements and news articles not properly subject to judicial notice falls well short of the required showing. *See* Doc. 57, at 4-5; Doc. 58-1, at 7-8; Doc. 60, at 5-6. Nor would defendants be entitled to discovery on this point, even under administrative subpoena precedents; their allegations do not amount to "a substantial preliminary showing." *United States v. O'Henry's Film Works, Inc.*, 598 F.2d 313, 320 (2d Cir. 1979); *see Lynd II*, 306 F.2d at 226; *cf. United States v. Stuart*, 489 U.S. 353, 369 (1989) ("[S]ummons enforcement proceedings should be summary in nature and discovery should be limited." (alteration in original) (quoting S. Rep. No. 97-494, 97th Cong., 2d Sess. 285 (1982)). And to the extent defendants rely on the number of lawsuits the DOJ has filed as evidence of pretext, *see* Doc. 57, at 18; Doc. 58-1, at 7-8; Doc. 60, at 23, there is nothing improper about the DOJ taking seriously its congressionally authorized responsibility to enforce federal election laws nationwide.

### D. The DOJ's demand does not implicate the Major Questions Doctrine.

Secretary Thomas also invoked "the major questions doctrine" to cabin the reach of Title III. Doc. 58-1, at 17-20. This doctrine is inapplicable for multiple reasons.

First, this doctrine applies when a statute is ambiguous and there is no clear congressional authorization for an agency's arrogated power. *See West Virginia v. EPA*, 597 U.S. 697, 724 (2022) (rejecting the EPA's claim of authority when the EPA had "located" its "newfound power in the vague language of an 'ancillary provision'") (citation modified); *see also Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("EPA's interpretation is also unreasonable because it would bring about an enormous and transformative expansion in EPA's regulatory authority *without clear congressional authorization*." (emphasis added)). But here, Title III gives the DOJ "clear congressional authorization," *Utility Air Regul. Grp.*, 573 U.S. at 324, to demand production of "all records and papers which come into [an officer of election's] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election," 52 U.S.C. 20701; *see* 52 U.S.C. 20703.

Second, these precedents analyze the scope of delegations of traditionally legislative authority, not an executive official's mode of investigation based on a concededly lawful federal statute. In the major-questions cases, an agency claimed a delegation of authority that explicitly belonged to Congress. *See, e.g.*, *West Virginia*, 597 U.S. at 706 (regulatory power); *Utility Air Regul. Grp.*, 573 U.S. at 324 (same). By contrast, here the DOJ asserts only the investigative authority that naturally belongs to the Executive Branch. The DOJ is not exercising delegated authority, regulating private conduct, or exercising some other authority typically enjoyed by Congress. *See West Virginia*, 597 U.S. at 724 ("[T]he Agency's discovery [of its own power] allowed it to adopt a regulatory program that Congress had conspicuously and repeatedly declined to enact itself."); *Alabama Ass'n of Realtors v. Department of Health & Hum. Servs.*, 594 U.S. 758, 760 (2021) (per curiam) ("The new, administratively imposed moratorium went further than its statutory predecessor, covering all residential properties nationwide and imposing criminal penalties on violators.").

Finally, in this arena, the Supreme Court looks at whether the agency's power is "newfound." *West Virginia*, 597 U.S. at 724; *see Utility*

*Air Regul. Grp.*, 573 U.S. at 324. The DOJ has long enforced federal election laws, including the NVRA, and it has utilized the CRA to do so.[11]

In sum, the major-questions doctrine does not apply.

### E. Connecticut must produce an electronic copy of the SVRL.

Secretary Thomas argued below that "the CRA only contemplates physical access at a particular location," not electronic production. Doc. 59, at 17-18. This dispute as to *how* the United States may copy the SVRL has no bearing on *whether* the United States is entitled to a copy of the SVRL. Title III requires States to make records "available" to the Attorney General "for inspection, reproduction, and copying." 52 U.S.C. 20703. The SVRL exists in electronic form, *see* 52 U.S.C. 21083(a)(1)(A), and the most natural way to reproduce or copy a computerized list is to

---

[11] *See* Order, at 2, *United States v. Alabama*, No. 2:08-cv-920 (M.D. Ala. Mar. 27, 2009) (Doc. 24); Compl., *United States v. Georgia*, No. 1:06-cv-2442 (N.D. Ga. Oct. 12, 2006) (Doc. 1); U.S. Dep't of Just., Mem. of Understanding between the United States and Texas (May 13, 2008), available at https://www.justice.gov/media/1173461/dl?inline (last visited Sept. 22, 2026). The Court entered a consent decree in the Georgia case requiring production of the SVRL. *See* Consent Decree, *Georgia*, *supra* (Oct. 27, 2006) (Doc. 4).

make an electronic copy. In any event, Secretary Thomas has never suggested that she would allow the DOJ to come make its own electronic copy in her office—which the DOJ would gladly do.

## II. The DOJ's demand for an electronic, unredacted copy of Connecticut's SVRL does not violate federal or state privacy laws.

Because the district court held that the DOJ's demand was beyond the scope of Title III, it did not reach defendants' privacy-related arguments. JA289. Defendants argued below that the demand violated three federal privacy laws—the Privacy Act, the E-Government Act, and the Driver's Privacy Protection Act—and that compliance would violate Connecticut privacy laws. *See* Doc. 57, at 19-27; Doc. 58-1, at 32-40; Doc. 60, at 25; Doc. 81, at 8-10. Connecticut's duty to comply with Title III is independent of any duty the United States has under other federal laws. Even if the United States' compliance were lacking—and it is not—Connecticut would still be required to comply with Title III and produce its SVRL. *See United States v. McAnlis*, 721 F.2d 334, 337 (11th Cir. 1983) (holding that compliance with a provision of the Privacy Act was "not a prerequisite to enforcement of an [Internal Revenue Service]

summons"). In any event, the United States is complying with each of the applicable privacy laws.

### A. The DOJ's demand complied with the Privacy Act.

Congress designed the Privacy Act to "protect the privacy of individuals" through regulation of "the collection, maintenance, use, and dissemination of information" by federal agencies. *Doe v. Chao*, 540 U.S. 614, 618 (2004) (quoting the Privacy Act of 1974, Pub. L. No. 93-579, § 2(a)(5), 88 Stat. 1896).

Connecticut relied below on a provision of the Privacy Act that prohibits federal agencies from "maintain[ing] [any] record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute . . . or unless pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C. 552a(e)(7); *see* Doc. 58-1, at 34-35. Enforcing the CRA, the NVRA, and HAVA is such law enforcement activity. *See* 52 U.S.C. 20702, 20510(a), 21111. The United States nonetheless agrees not to object to redaction of information—like party affiliation and how an individual has voted—that both describes First Amendment activity and is not pertinent to the Department's investigation.

Defendants contended that the DOJ failed to identify in its Complaint a System of Records Notice (SORN) required by the Privacy Act. *See* Doc. 57, at 24-27; Doc. 58-1, at 36-38; 5 U.S.C. 552a(e)(4). But the DOJ was not required to name applicable SORNs in its Complaint. Regardless, the full list of routine uses for the DOJ's collection of voter information can be found in the SORN titled JUSTICE/CRT–001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47,610, 47,611 (Aug. 11, 2003); 70 Fed. Reg. 43,904 (July 29, 2005); and 82 Fed. Reg. 24,147, 24,149, 24,151 (May 25, 2017). The SORN states that "[t]he records in the system of records are kept . . . in the ordinary course of fulfilling the responsibility assigned to [the Civil Rights Division] under the provisions of 28 CFR 0.50, 0.51." 68 Fed. Reg. at 47,611. And the cited regulation, in turn, makes clear that the Civil Rights Division is responsible for "[e]nforcement of all Federal statutes affecting civil rights, including those pertaining to elections and voting." 28 C.F.R. 0.50(a). Accordingly, the SORN covers records maintained to enforce the NVRA, HAVA, and the CRA.[12]

---

[12] The SORN further identifies the "Civil Rights Division Web page" as a source describing "[t]he delegated legal duties and responsibilities of

Nor can the SORN be read to exclude registered voters. The Privacy Act requires that a SORN identify "the categories of individuals on whom records are maintained in the system." 5 U.S.C. 552a(e)(4)(B). The SORN covers a variety of people, including "[s]ubjects of investigations, [and] victims." 68 Fed. Reg. at 47,611. The term "subject[]" is a "term[] of art in the context of DOJ investigations," *American Oversight v. United States Dep't of Just.*, 45 F.4th 579, 582 n.2 (2d Cir. 2022) (citation omitted), which includes anyone whose "conduct is within the scope of the . . . investigation," U.S. Dep't of Just., Justice Manual § 9-11.151 (2020), https://www.justice.gov/jm/jm-9-11000-grand-jury#. Persons who appear in a statewide voter registration list are "[s]ubjects of investigations," 68 Fed. Reg. at 47,611, as their voter registrations are within the scope of the Division's investigation into list maintenance. Moreover, because votes cast by eligible voters may be diluted by those cast by ineligible voters, *see Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 672 (2021),

---

each section" of the Division. 68 Fed. Reg. at 47,611. And the Voting Section's webpage identifies all three statutes prominently and by name. U.S. Dep't of Just., Civil Rights Division, Voting Section, https://www.justice.gov/crt/voting-section.

eligible voters are potential "victims" of NVRA and HAVA non-compliance, 68 Fed. Reg. at 47,611.

Additionally, the SORN is broad enough to cover Connecticut's SVRL. *See* Doc. 57, at 25; Doc. 58-1, at 37. "Records" in the SORN can include "case files, matters, memoranda, correspondence, studies, and reports relating to enforcement of civil rights laws and other various duties of the Civil Rights Division." 68 Fed. Reg. at 47,611. By denoting both "case files" and "matters," *ibid.*, the SORN covers both investigations that have proceeded to litigation and those that have not. *See Merriam-Webster's Collegiate Dictionary* 766 (11th ed. 2003) (defining matter as "a subject under consideration" or "a subject of disagreement or litigation"); *Black's Law Dictionary* 992 (7th ed. 1999) (similar). All records obtained as part of the Division's investigation into Connecticut's list maintenance are part of a "matter[]" and fit comfortably within the SORN. 68 Fed. Reg. at 47,611.

Finally, Connecticut argued below that "it is impossible to know" whether the SORN meets other requirements, such as accurately describing how the records will be retrieved and used. Doc. 58-1, at 37. The Privacy Act does not require the United States to plead and prove,

to Connecticut's satisfaction, that its future actions will comply with the present SORN. *See Devine v. United States*, 202 F.3d 547, 550 (2d Cir. 2000) ("The principal enforcement mechanism for individuals whose rights under the Act have been violated is the provision of civil remedies contained in [5 U.S.C.] 552a(g), which . . . authorizes an aggrieved individual to bring a civil suit . . . ."). The United States has clearly stated its intent to follow the Privacy Act's requirements. JA44. And Connecticut cannot escape its own legal responsibilities by speculating about whether the United States will comply with its responsibilities in the future.

### B. The E-Government Act does not prevent the DOJ from obtaining Connecticut's SVRL.

In the district court, Secretary Thomas argued that because the United States has not conducted a privacy impact assessment (PIA), the United States has not complied with the E-Government Act. Doc. 58-1, at 38-39. Pursuant to the E-Government Act, agencies must "conduct a [PIA]" before "initiating a new collection of information" in particular circumstances "if identical questions have been posed to, or identical reporting requirements imposed on, 10 or more persons." E-Government Act of 2002, Pub. L. No. 107-347, § 208(b)(1)(A)(ii) and (B)(i), 116 Stat.

2899, 2921-2922 (44 U.S.C. 3501 note) (hereinafter cited without reference to the Statutes at Large or the U.S. Code note). And a "collection of information" is—with certain exclusions noted below—the act of "obtaining, causing to be obtained, soliciting, or requiring the disclosure to third parties or the public, of facts or opinions by or for an agency, regardless of form or format, calling for," as relevant here, "answers to identical questions posed to, or identical reporting or recordkeeping requirements imposed on, ten or more persons," where a "person" can include a "State." 44 U.S.C. 3502(3)(A)(i) and (10); *see* E-Government Act § 201 (incorporating definitions from 44 U.S.C. 3502 and 3601). The PIA requirement does not apply here for several reasons.

First, the Attorney General has not asked identical questions of nor imposed any reporting requirements on any persons in connection with the Department of Justice's demand for Connecticut's (or any State's) SVRL. *See* E-Government Act § 208(b)(1)(A)(ii)(II); *cf.* 31 U.S.C. 5314(a) (mandating that the Secretary of the Treasury require individuals to keep records or file reports regarding certain financial relationships or transactions with foreign agencies).

Second, a "collection of information" does not include information collected during an investigation like the type the Department is carrying out here. "[T]he term 'collection of information' . . . shall not include a collection of information described under [44 U.S.C. 3518(c)(1)]." 44 U.S.C. 3502(3)(B); *see* E-Government Act § 201. And 44 U.S.C. 3518(c)(1)(B), in turn, generally excludes any collection of information "during the conduct of" an "investigation involving an agency against specific individuals or entities." The Department's investigation into Connecticut's compliance with HAVA falls squarely within this carve-out. *See* Authority to Obtain & Share Statewide Voter Roll Data, 50 Op. O.L.C., at 33 (2026), https://www.justice.gov/olc/media/1440346/dl.

Third, the Attorney General has not "initiat[ed] a new collection of information." E-Government Act § 208(b)(1)(A)(ii). "The term 'initiating'" in the E-Government Act "has no statutory . . . definition," *Electronic Privacy Info. Ctr.* (*EPIC*) *v. United States Dep't of Com.*, 356 F. Supp. 3d 85, 87 (D.D.C.), *vacated and remanded on other grounds*, 928 F.3d 95 (D.C. Cir. 2019), nor does the term "new." *See* 44 U.S.C. 3502, 3601. Accordingly, courts give these terms their "ordinary meaning" and may consult dictionary definitions. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566

U.S. 560, 566-568 (2012). "Contemporary dictionaries define 'initiate' as '[t]o begin, commence, enter upon; to introduce, set going, give rise to, originate, "start" (a course of action, practice, etc.).'" *EPIC*, 356 F. Supp. 3d at 89 (citation omitted; brackets in original) (collecting definitions). The relevant definition of "new" is "[h]aving been made or come into being only a short time ago; recent" or "[n]ever used . . . before now." *The American Heritage College Dictionary* 936 (4th ed. 2002); *see also Merriam-Webster's Collegiate Dictionary* 780 (10th ed. 2002).

The demand in this case did not begin any new collection of information. The Attorney General demanded that Secretary Thomas provide the State's SVRL, which the State was required to "define[], maintain[], and administer[] at the State level." 52 U.S.C. 21083(a)(1)(A). Ever since the passage of HAVA, an SVRL has been required to "contain[] the name and registration information of every legally registered voter in the State and assign[] a unique identifier to each legally registered voter in the State." *Ibid.*; *see generally* 52 U.S.C. 21083(a). Seeking information already maintained by the State due to *pre-existing* "reporting or recordkeeping requirements," 44 U.S.C. 3502(3)(A)(i) (defining "collection of information"), is not the "*initiat*[*ion* of] a *new*

collection of information," E-Government Act § 208(b)(1)(A)(ii) (emphasis added).

### C. The Driver's Privacy Protection Act does not prevent the DOJ from obtaining Connecticut's SVRL.

The United States' demand also complied with the Driver's Privacy Protection Act of 1994 (DPPA), 18 U.S.C. 2721 *et seq.*; *see* 18 U.S.C. 2721(a) and (c); Doc. 58-1, at 39-40. Although the DPPA generally prohibits the disclosure of "personal information" obtained by a state department of motor vehicles in connection with a motor-vehicle record, 18 U.S.C. 2721(a) and (c); *see* 18 U.S.C. 2725(1) and (3)-(4), disclosure is allowed "[f]or use by any government agency . . . in carrying out its functions," including law enforcement or other regulatory enforcement purposes. 18 U.S.C. 2721(b)(1); *see also Reno v. Condon*, 528 U.S. 141, 145 & n.1 (2000) ("The DPPA *permits* DMVs to disclose personal information from motor vehicle records for a number of purposes," including "for use 'by any government agency . . . in carrying out its functions.'") (quoting 18 U.S.C. 2721(b)(1) (1994 ed. and Supp. III)).

The United States' demand for an electronic, unredacted copy of Connecticut's SVRL falls squarely within this exception. The Department is a "government agency . . . carrying out [one of] its functions," 18 U.S.C.

2721(b)(1), namely, assessing and ensuring compliance with federal election statutes. *See* 52 U.S.C. 20510(a) (authority to enforce the NVRA); 52 U.S.C. 21111 (authority to enforce HAVA). In particular, the Department of Justice is verifying voter registration records and associated list maintenance activities by state and local entities. Under the governmental-function exemption in Section 2721(b)(1), the United States' use of and access to the SVRL is authorized even though some of the information originates from a motor-vehicle record.

Secretary Thomas argued that the Section 2721(b)(1) exception "is not mandatory" but rather "is directed to the Secretary's discretion." Doc. 58-1, at 40. That observation is irrelevant when another federal law (the CRA) demands disclosure. Secretary Thomas cannot use the DPPA as a shield against her mandatory preservation and production duties under the CRA when the DPPA's exception clearly allows her to comply with both statutes.

### D. Federal law preempts any contrary Connecticut privacy law.

Defendants argued that Connecticut law bars unredacted disclosure of the SVRL. *See* Doc. 57, at 19; Doc. 58-1, at 32-34. State law does not permit Connecticut to defy federal law. Notwithstanding a

State's authority over the conduct of federal elections, Congress can override state choices. U.S. Const. Art. I, § 4, Cl. 1. The Elections Clause "is a default provision" that leaves the States responsible for the mechanics of congressional elections "only so far as Congress declines to preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997); *see Ex Parte Siebold*, 100 U.S. 371, 384 (1879). And "the States' role in regulating congressional elections—while weighty and worthy of respect—has always existed subject to the express qualification that it 'terminates according to federal law.'" *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 14-15 (2013) (quoting *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001)). Accordingly, "federalism concerns . . . are somewhat weaker" in the Elections Clause context, and courts should not apply any presumption against preemption. *Ibid.*

Title III imposes a "sweeping" obligation to preserve and produce federal election records, *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962), while supplying its own privacy protections for the records produced, 52 U.S.C. 20704. To the extent Connecticut law would bar production, it conflicts with and thwarts the enforcement of federal law and therefore is preempted. *See Glacier Nw., Inc. v. International Bhd. of*

*Teamsters Loc. Union No. 174*, 598 U.S. 771, 776 (2023) ("It is a bedrock rule . . . that federal law preempts state law when the two conflict."); *see* U.S. Const. Art. VI, Cl. 2.

A "state law is naturally preempted to the extent of any conflict with a federal statute." *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 (2000). Conflict preemption applies both "where it is impossible for a private party to comply with both state and federal law, and where under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 372-373 (brackets in original; internal quotation marks and citations omitted). Whether a state law poses a sufficient obstacle to implicate preemption is determined "by examining the federal statute as a whole and identifying its purpose and intended effects." *Id.* at 373; *see Wyeth v. Levine*, 555 U.S. 555, 565 (2009)). A state law that "undermines the intended purpose and 'natural effect'" of federal law is preempted. *Crosby*, 530 U.S. at 373.

Analogizing the CRA to the NVRA, defendants have argued that nothing in the CRA prohibits Connecticut from redacting sensitive information in the SVRL prior to producing it for inspection. Doc. 57, at

21; Doc. 58-1, at 33; Doc. 60, at 25-26. But there is a glaring distinction between inspection under the NVRA and inspection under the CRA; namely, that the NVRA contains a *public* inspection provision. Courts have interpreted the NVRA to not require releasing voters' unredacted personal information to the public at large. *See Public Int. Legal Found. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024) (collecting cases). But under the CRA, only the Attorney General and his representatives may inspect covered records. *See* 52 U.S.C. 20703, 20704. The production of information (including *federal* social security numbers) to the United States does not raise the same concerns as arise in the NVRA context.

As for defendants' concern about the burden such disclosure would place on the right to vote (*see* Doc. 60, at 27-28; Doc. 81, at 6), Congress, in enacting HAVA, has already weighed any competing interests and determined that fair, secure elections are sufficiently important to warrant requiring would-be registrants to provide States with their identifying information, *see* 52 U.S.C. 21083(a)(5)(A)(i)-(ii). Having that same identifying information shared with the United States is no greater a burden.

Congress also anticipated that covered records would contain sensitive information when it prohibited the "disclos[ure of] any record or paper produced pursuant to [Title III]." 52 U.S.C. 20704. And indeed, they did contain such information. *See United States v. Duke*, 332 F.2d 759, 761, 768 (5th Cir. 1964) (good moral character, literacy); *United States v. Mississippi*, 229 F. Supp. 925, 995 & nn.92-93 (S.D. Miss. 1964) (Brown, J., dissenting) (birthdate, good moral character, address, length of residency), *rev'd*, 380 U.S. 128 (1965). Defendants argued below that "statewide voting records were rare in 1960" (Doc. 58-1, at 25; *see* Doc. 59, at 14). But privacy interests are no less real when the records at issue are local as compared to statewide, and Congress made sure to cover both types of records, *see* 52 U.S.C. 20706.

The purpose of the CRA—to allow the Attorney General access to the information necessary to determine whether there is a violation of federal law—would be entirely thwarted by allowing States to redact identifying information from voting records. There is every reason to think that Congress fully intended the Attorney General to have access to complete voter lists with identifying information to be able to determine whether applicants have, in fact, been registered to vote. *See*

*generally United States v. Benson*, No. 26-1225, 2026 WL 2364306, at *14, *16 (6th Cir. Aug. 14, 2026) (Thapar, J., dissenting). To the extent state law would prohibit Connecticut from complying with the DOJ's demands, state law must yield.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's judgment dismissing the DOJ's Title III claim and denying the Motion to Compel Records, and remand with instructions to order Secretary Thomas to immediately produce the requested unredacted SVRL. This Court should make clear that Title III of the CRA authorizes the United States to demand from a State an electronic, unredacted copy of its SVRL to determine the State's compliance with the NVRA and HAVA.

Further, because the DOJ is entitled to "prompt and expeditious inspection" of voting records under Title III, the "mandate of this Court [should] issue forthwith." *Kennedy v. Lynd*, 306 F.2d 222, 231 (5th Cir. 1962); *see* Fed. R. App. P. 2, 41(b).

In the alternative, and for the same reason, the United States requests that the Court shorten the time for filing a petition for rehearing and rehearing en banc. *See* Fed. R. App. P. 2, 40(d)(1).

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General

ERIC A. SELL
Deputy Assistant Attorney General

s/ David N. Goldman
DAVID N. GOLDMAN
ANDREW G. BRANIFF
MEREDITH L. BAKER
AUDREY A. WEAVER
Attorneys
Department of Justice
Civil Rights Division
Appellate Section
Ben Franklin Station
P.O. Box 14403
Washington, D.C. 20044-4403
(202) 616-9405

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limits of Local Rule 32.1(a)(4)(A) because the brief contains 13807 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5)-(6) because it was prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft 365.

s/ David N. Goldman
DAVID N. GOLDMAN
Attorney

Date: September 24, 2026