# 26-2064

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

---

UNITED STATES OF AMERICA,
Plaintiff-Appellant,

v.

STEPHANIE THOMAS,
Defendant-Appellee,

CLAIRE EWING, COMMON CAUSE, SEIU DISTRICT 1199NE, CONNECTICUT ALLIANCE FOR RETIRED AMERICANS, CONNECTICUT CITIZEN ACTION GROUP, BETTE MARAFINO,
Intervenor-Defendants-Appellees.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---

## BRIEF OF SEIU DISTRICT 1199NE, CONNECTICUT ALLIANCE FOR RETIRED AMERICANS, CONNECTICUT CITIZEN ACTION GROUP, AND BETTE MARAFINO AS INTERVENOR-DEFENDANTS-APPELLEES

William Bloss
**KOSKOFF KOSKOFF & BIEDER P.C.**
350 Fairfield Avenue, Suite 501
Bridgeport, CT 06604
Tel.: (475) 766-4317

Aria C. Branch
Joshua C. Abbuhl
Julianna D. Astarita
Tori A. Shaw
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW,
Ste. 400
Washington, DC 20001
Tel.: (202) 948-1135

*(See inside cover for continuation of counsel)*

*Counsel for SEIU District 1199NE, Connecticut Alliance for Retired Americans, Connecticut Citizen Action Group, and Bette Marafino*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Intervenor-Defendants-Appellees SEIU District 1199NE, Connecticut Alliance for Retired Americans, and Connecticut Citizen Action Group, through undersigned counsel, each hereby certifies that they have no parent corporation and that no publicly held corporation owns 10% or more of their stock.

## TABLE OF CONTENTS

INTRODUCTION ....... 1

STATEMENT OF THE ISSUES ....... 2

STATEMENT OF THE CASE ....... 3

I. The Constitution and federal law commit voter registration practices to the States. ....... 3

 A. The Civil Rights Act of 1960 ....... 3

 B. The National Voter Registration Act ....... 7

 C. The Help America Vote Act ....... 8

II. DOJ embarks on a nationwide campaign to collect private voter data on millions of Americans. ....... 10

III. DOJ sues Connecticut to demand production of its protected voter data. ....... 13

IV. The district court dismisses DOJ's complaint. ....... 15

SUMMARY OF THE ARGUMENT ....... 15

STANDARD OF REVIEW ....... 17

ARGUMENT ....... 18

I. DOJ's CRA demand is subject to meaningful judicial review. ....... 18

II. The district court correctly held that the CRA does not cover state-created, dynamic records like Connecticut's SVRL. ....... 22

 A. Connecticut's SVRL was created by Connecticut election officials and therefore did not "come into" their possession. ....... 22

 B. Applying the CRA to Connecticut's SVRL would require it to be preserved without alteration upon threat of criminal penalty, but federal law requires constant updates. ....... 29

 C. DOJ's interpretation of the CRA should be rejected. ....... 31

III. The Court can also affirm the dismissal on other grounds. ....... 40

A. The CRA demand is invalid because DOJ failed to state any "basis" for investigating Connecticut's list maintenance program. ....................40

B. DOJ's purported purpose of investigating Connecticut's list-maintenance obligations is not a proper purpose under the CRA. ....................44

1. A proper purpose for a CRA demand must relate to investigations into the denial of the right to vote and violations of civil rights laws. ....................45

2. Ensuring compliance with the NVRA and HAVA is not a proper purpose under the CRA. ....................49

C. The CRA does not preempt Connecticut's voter privacy protections. ....................51

D. The Privacy Act prohibits DOJ from collecting Connecticut's voter list. ....................53

IV. If the Court vacates the dismissal, it should remand for additional proceedings. ....................57

CONCLUSION ....................58

# TABLE OF AUTHORITIES

## CASES

*Alabama ex rel. Gallion v. Rogers*,
187 F. Supp. 848 (M.D. Ala. 1960) ....................48

*Anniston Mfg. Co. v. Davis*,
301 U.S. 337 (1937)....................30

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013)....................3

*Azar v. Allina Health Servs.*,
587 U.S. 566 (2019)....................37

*Bartch v. Barch*,
111 F.4th 1043 (10th Cir. 2024)....................57

*Beijing Neu Cloud Oriental Sys. Tech. Co., Ltd. v. Int'l Bus. Machs. Corp.*,
110 F.4th 106 (2d Cir. 2024)....................17

*Bellitto v. Snipes*,
935 F.3d 1192 (11th Cir. 2019)....................10

*Biden v. Nebraska*,
600 U.S. 477 (2023)....................49

*Bufkin v. Collins*,
604 U.S. 369 (2025)....................40

*CFPB v. Accrediting Council for Indep. Colls. & Schs.*,
854 F.3d 683 (D.C. Cir. 2017)....................40

*Cipollone v. Liggett Grp., Inc.*,
505 U.S. 504 (1992)....................52

*City & Cnty. of S.F. v. EPA*,
604 U.S. 334 (2025)....................................................................................38

*Comm. to Stop Airport Expansion v. FAA*,
320 F.3d 285 (2d Cir. 2003)......................................................................28

*Common Cause v. U.S. Dep't of Just.*,
No. 26-1352, 2026 WL 3033772 (D.D.C. Oct. 9, 2026)...............................56

*Darby v. Greenman*,
14 F.4th 124 (2d Cir. 2021).........................................................................17

*DHS v. League of Women Voters*,
No. 26A308, 2026 WL 2879700 (U.S. Sep. 25, 2026) ...................... 13, 53, 54

*Donaldson v. United States*,
400 U.S. 517 (1971)....................................................................................20

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018)....................................................................................30

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)............................................................................. 45, 48

*Fischer v. United States*,
603 U.S. 480 (2024)....................................................................................38

*Fish v. Kobach*,
840 F.3d 710 (10th Cir. 2016).......................................................................7

*Foster v. Love*,
522 U.S. 67 (1997)................................................................................ 3, 47

*Ind. Prot. & Advoc. Servs. Comm'n v. Ind. Family & Soc. Servs. Admin.*,
149 F.4th 917 (7th Cir. 2025)......................................................................57

*Kennedy v. Bruce*,
298 F.2d 860 (5th Cir. 1962).......................................................................51

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962)................................................................*passim*

*League of Women Voters v. DHS*,
No. 25-CV-3501, 2025 WL 3198970 (D.D.C. Nov. 17, 2025) ..................... 53

*League of Women Voters v. DHS*,
835 F. Supp. 3d 79 (2026) ..................... 12

*Learning Res., Inc. v. Trump*,
607 U.S. 229 (2026) ..................... 45, 47

*Leocal v. Ashcroft*,
543 U.S. 1 (2004) ..................... 24

*LULAC v. Exec. Off. of the President*,
818 F. Supp. 3d 34 (D.D.C. 2026) ..................... 54

*Mary Jo C. v. N.Y. State & Local Ret. Sys.*,
707 F.3d 144 (2d Cir. 2013) ..................... 26

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
583 U.S. 109 (2018) ..................... 28

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021) ..................... 42

*Pa. State Conf. of NAACP v. Sec'y Commonwealth of Pa.*,
97 F.4th 120 (3d Cir. 2024) ..................... 5

*Palin v. N.Y. Times Co.*,
113 F.4th 245 (2d Cir. 2024) ..................... 41

*Patel v. Garland*,
596 U.S. 328 (2022) ..................... 39

*Pub. Int. Legal Found., Inc. v. Bellows*,
92 F.4th 36 (1st Cir. 2024) ..................... 8, 51, 52

*Pub. Int. Legal Found., Inc. v. Nago*,
174 F.4th 664 (9th Cir. 2026) ..................... 8

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012)....................50

*Republican Nat'l Comm. v. N.C. State Bd. of Elections*,
120 F.4th 390 (4th Cir. 2024)....................8

*Rucho v. Common Cause*,
588 U.S. 684 (2019)....................28

*Saks v. Franklin Covey Co.*,
316 F.3d 337 (2d Cir. 2003)....................24

*Schwier v. Cox*,
340 F.3d 1284 (11th Cir. 2003)....................28

*Schwier v. Cox*,
412 F. Supp. 2d 1266 (N.D. Ga. 2005)....................54

*Smiley v. Holm*,
285 U.S. 355 (1932)....................47

*United States Department of Justice v. Tax Analysts*,
492 U.S. 136 (1989)....................32

*United States ex rel. Polansky v. Exec. Health Res., Inc.*,
599 U.S. 419 (2023)....................19

*United States v. Albence*,
No. 25-1453, 2026 WL 3407115 (D. Del. Nov. 10, 2026)....................11, 22, 26

*United States v. Bd. of Elections of N.Y.*,
No. 1:25-CV-1338, 2026 WL 1999921 (N.D.N.Y. July 10, 2026).......... 32, 58

*United States v. Bellows*,
834 F. Supp. 3d 113 (D. Me. 2026) .................... 27, 45, 51

*United States v. Benson*,
179 F.4th 470 (6th Cir. 2026)....................*passim*

*United States v. Benson*,
187 F.4th 466 (6th Cir. 2026).................... 39, 43

*United States v. Benson*,
819 F. Supp. 3d 753 (W.D. Mich. 2026)........................................................29

*United States v. Clarke*,
573 U.S. 248 (2014)........................................................................... 57, 58

*United States v. Evans*,
No. 25-4403, 2026 WL 2267774 (D.D.C. Aug. 6, 2026)..................24, 35, 37

*United States v. Galvin*,
830 F. Supp. 3d 122, Unpublished (D. Mass. 2026) ....................................41

*United States v. Kosinski*,
976 F.3d 135 (2d Cir. 2020)........................................................................39

*United States v. Koski*,
No. 3:26-CV-42, 2026 WL 2032532 (E.D. Va. July 14, 2026) .....................27

*United States v. Markwood*,
48 F.3d 969 (6th Cir. 1995)..........................................................................41

*United States v. Morton Salt Co.*,
338 U.S. 632 (1950)......................................................................................43

*United States v. Oregon*,
828 F. Supp. 3d 1092 (D. Or. 2026) ................................................ 20, 41, 58

*United States v. Powell*,
379 U.S. 48 (1964).......................................................................16, 19, 20, 57

*United States v. Raffensperger*,
No. 1:26-cv-485, 2026 WL 3002013 (N.D. Ga. Sep. 30, 2026) ...................52

*United States v. Scanlan*,
No. 25-CV-371, 2026 WL 1864054 (D.N.H. June 29, 2026)........................27

*United States v. Sturm, Ruger & Co.*,
84 F.3d 1 (1st Cir. 1996) ...............................................................................44

*United States v. Weber*,
816 F. Supp. 3d 1168 (C.D. Cal. 2026) .......................................... 53, 56, 58

*Voter Reference Found., LLC v. Torrez*,
160 F.4th 1068 (10th Cir. 2025)......................................................8, 37, 51

*Watson v. Republican Nat'l Comm.*,
609 U.S. 672 (2026)..........................................................................................30

*West Virginia v. EPA*,
597 U.S. 697 (2022)..........................................................................................48

*Whitman v. Am. Trucking Ass'ns, Inc.*,
531 U.S. 457 (2001)..........................................................................................48

*Yates v. United States*,
574 U.S. 528 (2015)...................................................................................... 24, 29

**STATUTES & REGULATIONS**

68 Fed. Reg. 47610 ...........................................................................................55

68 Fed. Reg. 47611 ...........................................................................................56

Conn. Gen. Stat. § 9-50d............................................................................... 3, 51

Pub. L. No. 85-315, 71 Stat. 634 (1957).......................................................... 3, 46

5 U.S.C. § 552a ................................................................................. 3, 54, 55, 56

6 U.S.C. § 1502 .................................................................................................27

7 U.S.C. § 12 .....................................................................................................27

8 U.S.C. § 1373 .................................................................................................53

10 U.S.C. § 130c ...............................................................................................33

13 U.S.C. § 214 .................................................................................................33

18 U.S.C. § 1512 .......... 38

18 U.S.C. § 3500 .......... 27

30 U.S.C. § 1732 .......... 27, 33

44 U.S.C. § 3572 .......... 33

49 U.S.C. § 47124a .......... 27

52 U.S.C. § 10101 .......... 6, 28, 47

52 U.S.C. § 20501 .......... 37

52 U.S.C. § 20507 .......... *passim*

52 U.S.C. § 20510 .......... 8

52 U.S.C. § 20701 .......... *passim*

52 U.S.C. § 20702 .......... 26, 29, 30

52 U.S.C. § 20703 .......... *passim*

52 U.S.C. § 20704 .......... 53

52 U.S.C. § 20705 .......... 19

52 U.S.C. § 21083 .......... *passim*

52 U.S.C. § 21085 .......... 9

52 U.S.C. § 21111 .......... 9

**FEDERAL RULES**

Fed. R. Civ. P. 1 .......... 18

Fed. R. Civ. P. 12 .......... 17, 18, 19

Fed. R. Civ. P. 24 .......... 20

Fed. R. Civ. P. 81 .......... 18

**LEGISLATIVE MATERIALS**

*An Act to Enforce Constitutional Rights, and for Other Purposes: Hearings on H.R. 8601 Before the S. Comm. on the Judiciary*, 86th Cong. (1960) .......... 34

*An Act to Enforce Constitutional Rights, and for Other Purposes: Hearings on H.R. 8601 Before the S. Comm. on the Judiciary*, 86th Cong., 2d Sess. (1960) .......... 5

*Hearings Before Subcomm. No. 5 of the H. Comm. on the Judiciary*, 86th Cong., 1st Sess. (1959) .......... 4

*Report of the U.S. Commission on Civil Rights* (1959) .......... 4

**OTHER AUTHORITIES**

AAG Harmeet Dhillon (@AAGHarmeetDhillon), X (Dec. 18, 2025, at 9:24 AM ET), https://x.com/AAGDhillon/status/2001659823335616795 .......... 12

*Acquire*, *Webster's Third New International Dictionary* (1966) .......... 23

*Alter*, *Webster's Third New International Dictionary* (1966) .......... 38

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) .......... 30

*Authority to Obtain and Share Statewide Voter Roll Data*, 50 Op. O.L.C. (May 12, 2026) .......... 12

*Come into*, *Webster's Third New International Dictionary* (1966) .......... 23

Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (Oct. 26, 2026), https://perma.cc/H6B7-6598 .......... 10

*Maintain*, *Oxford English Dictionary* (2d ed. 1989) .......... 37

Nicholas Kerr & Elise Spenner, *System that DHS Is Urging States to Use to Assess Voter Rolls Known to Return Faulty Results: Reports*, ABC News (July 19, 2026), https://perma.cc/6DGQ-737H.......................... 12

*Obtain, Oxford English Dictionary* (1933) .............................................................. 23

Rebecca Shabad, *Homeland Security Secretary Markwayne Mullin Threatens States over Elections*, NBC News (July 17, 2026), https://perma.cc/XE54-XUW2 ...................................................................... 12

*Receive*, *Black's Law Dictionary* (12th ed. 2024) .................................................. 23

*Receive*, *Webster's Third New International Dictionary* (1961) .............................. 23

## INTRODUCTION

In the last 18 months, the Department of Justice has embarked on an unprecedented campaign to collect the sensitive voter registration data of nearly every American. It began last year, when DOJ sent letters to election officials across the country demanding their State's full, unredacted statewide voter registration list ("SVRL"). Many refused, and DOJ sued 30 States and the District of Columbia to obtain these lists. DOJ has lost *every single one* of these cases so far: 29 courts—including the Sixth Circuit and the district court below—have rebuffed DOJ's demands. Not one has ruled for DOJ.

The district court's dismissal should be affirmed. DOJ claims that it is entitled to demand Connecticut's SVRL under Title III of the Civil Rights Act of 1960 ("CRA"). However, as the district court correctly held, the CRA entitles DOJ only to inspect records that "come into [the] possession" of election officials, such as the application, registration, and poll-tax payment records that the CRA requires them to preserve and make available for inspection. 52 U.S.C. §20701. The CRA does not apply to internally-created records such as a State's SVRL.

Numerous alternative grounds also support affirmance, including that DOJ failed to comply with the basic requirements for a CRA demand: that it provide a "statement of the basis and the purpose therefor." 52 U.S.C. §20703. Here, DOJ failed to provide any factual basis for its demand, and its stated purpose—that it

seeks to use the CRA to enforce unrelated federal statutes (the Help America Vote Act ("HAVA") and the National Voter Registration Act (the "NVRA"))—is improper. DOJ has also failed to show that the CRA preempts Connecticut's privacy laws, which protect against the disclosure of sensitive information DOJ seeks, and, in its hurry to obtain this data before the November 2026 elections, DOJ also failed to comply with its obligations under the federal Privacy Act.

Each of these grounds is fatal to DOJ's case. This Court should affirm the district court's order dismissing DOJ's complaint below and join the 29 other courts that have rejected DOJ's unprecedented and unlawful attempt to inject itself as a federal superintendent of state election procedures.

## STATEMENT OF THE ISSUES

1. Whether the CRA requires Connecticut to give DOJ Connecticut's SVRL, even though it is a state-created, dynamic database that does not "come into [election officials'] possession," and that by law must be continuously updated, rather than "preserved" and left unaltered. *See* 52 U.S.C. §§20701-20703.

2. Whether DOJ made a valid demand for production of Connecticut's SVRL under Title III of the CRA, even though DOJ provided no "statement of the basis" for the demand. *See id.* §20703.

3. Whether DOJ made a valid demand under the CRA when it sought the SVRL for the purported purpose of investigating Connecticut's voter-list

maintenance processes, rather than a purpose connected to protecting an individual's right to vote. *See id.*

4. Whether DOJ's demand for Connecticut's complete, unredacted SVRL as part of a national campaign to assemble voter lists from every State violates the federal Privacy Act or Connecticut's voter privacy laws. *See* 5 U.S.C. §552a; Conn. Gen. Stat. §9-50d.

## STATEMENT OF THE CASE

### I. The Constitution and federal law commit voter registration practices to the States.

The Constitution "invests the States with responsibility for the mechanics" of elections, including federal elections. *Foster v. Love*, 522 U.S. 67, 69 (1997). Congress may preempt state regulation of federal elections, but such preemption extends only "so far as it is exercised, and no farther." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013). Three federal election laws are implicated by this case: the CRA, the NVRA, and HAVA.

#### A. The Civil Rights Act of 1960

Congress enacted the CRA to address problems of proof that emerged from Southern resistance to the Civil Rights Act of 1957. The U.S. Commission on Civil Rights, created by the Civil Rights Act of 1957, was charged with "investigat[ing] allegations … that certain citizens of the United States are being deprived of their right to vote." Pub. L. No. 85-315, §104(a)-(b), 71 Stat. 634, 635 (1957). As part of

its work, the Commission reviewed voting applications in Jim Crow jurisdictions to identify discriminatory registration practices. By comparing voter registration forms submitted by Black and White applicants, the Commission revealed that election officials in Southern States often imposed tests on Black applicants and not White applicants, *see Report of the U.S. Commission on Civil Rights* 87-88 (1959) ("*Comm'n Rep.*"), and denied registration to Black applicants "because of inconsequential errors which they made, whereas many white applicants who committed similar errors were permitted to register," *id.* at 91.[1] The Commission thus concluded that reviewing voter "application forms" was "essential to any investigation of denials of the right to vote." *Id.* at 137.

Yet the Commission found its investigatory work thwarted by efforts to destroy or restrict access to "[r]ejected applications." *Id.* at 93. For instance, Alabama enacted legislation requiring the "destruction of the questionnaires of unsuccessful applicants for registration." *Hearings Before Subcomm. No. 5 of the H. Comm. on the Judiciary*, 86th Cong., 1st Sess. 212 (1959) ("*Hearings*") (Statement of Att'y Gen. Rogers).[2] Compounding the problem, DOJ lacked any "power in civil proceedings to require the production" of registration records, rendering its ability

---

[1] The Commission Report is available at: https://www.usccr.gov/files/historical/1959/59-001-U.pdf.

[2] Available at https://perma.cc/ET26-FKD9.

to investigate denials of the right to vote "relatively ineffective." H.R. Rep. No. 86-956, at 7 (1959). The Commission therefore recommended that Congress enact legislation requiring that election officials retain applications to vote and allow DOJ to inspect them. *Comm'n Rep.* at 137-38. DOJ likewise told Congress that comparing the voter applications of Black and White voters was essential to its civil rights work, explaining that, "[i]n many cases, discrimination in registration can be proved only by comparing the records of Negro applicants with those of white applicants." *An Act to Enforce Constitutional Rights, and for Other Purposes: Hearings on H.R. 8601 Before the S. Comm. on the Judiciary*, 86th Cong., 2d Sess. 6 (1960) (Statement of U.S. Att'y Gen. William P. Rogers).[3] "Congress responded by passing the Civil Rights Act of 1960." *Pa. State Conf. of NAACP v. Sec'y Commonwealth of Pa.*, 97 F.4th 120, 149 n.19 (3d Cir. 2024) (Shwartz, J., dissenting).

Congress tailored the CRA to the problem before it: the need to ensure the preservation and availability of the key evidence that DOJ and the Commission had identified as necessary to voting rights investigations. As explained by a principal drafter of the CRA, "[t]he purpose of title III is, first of all, to require that States preserve, for a reasonable length of time, the records upon which is based the decision of whether or not a person is a qualified elector." *Hearings* at 700

[3] Available at https://perma.cc/46G6-GQZB.

(Statement of Rep. William M. McCulloch). The CRA thus "enable[s] the Attorney General to determine whether §1971 suits or similar actions should be instituted." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962).[4] To that end, the CRA contains interlocking provisions that permit DOJ "to assemble all of the voter record information within the time-reach of the statute relating to all persons as to whom there is a question concerning infringement or denial of their constitutional voting rights." *Id.*

The core provision of the CRA requires officials to "retain and preserve" the records most critical to a voting rights investigation:

> Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any [federal election] … all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election[.]

52 U.S.C. §20701. The CRA criminalizes "willfully fail[ing]" to comply with the statute's command, *id.*, and threatens "imprison[ment]" for "[a]ny person … who willfully steals, destroys, conceals, mutilates, or alters any record or paper required by section 20701 of this title to be retained and preserved," *id.* §20702. The CRA allows DOJ to inspect covered records after it makes a compliant pre-suit demand:

> Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General

---

[4] Section 1971, as recodified, guarantees the right to vote "without distinction of race, color, or previous condition of servitude." 52 U.S.C. §10101(a)(1).

> or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying[.]

*Id.* §20703. The written demand "shall contain a statement of the basis and the purpose therefor." *Id.*

### B. The National Voter Registration Act

Three decades after the enactment of the CRA, Congress passed the NVRA to "establish procedures that will increase the number of eligible citizens who register to vote" and "to ensure that accurate and current voter registration rolls are maintained." *Id.* §20501(b). The NVRA's requirements are aimed at ensuring "simple means are available to register for federal elections and [that these] means are actively presented to voters by the states." *Fish v. Kobach*, 840 F.3d 710, 721 (10th Cir. 2016). It also requires covered States to take steps to ensure their voter rolls are reasonably up to date. *See* 52 U.S.C. §20507(a)(4). But in doing so, it reaffirms the principal role of States in managing registration lists, requiring only that States "conduct a general program" that "makes a reasonable effort" to remove persons that are ineligible because of either (1) their death or (2) a change in their residence. *Id.* The NVRA also tempers this modest list-maintenance obligation with a series of safeguards designed to prevent erroneous or rushed cancellation of voters' registrations. *Id.* §20507(a)(3), (b)-(e).

The NVRA expressly addresses enforcement and disclosure of records related to state compliance. It requires covered States to "make available for public inspection … all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." *Id.* §20507(i). Courts have held either that this inspection provision does not reach SVRLs, *e.g.*, *Pub. Int. Legal Found., Inc. v. Nago*, 174 F.4th 664, 678-83 (9th Cir. 2026), *petition for cert. filed*, No. 26-98 (U.S. July 17, 2026), or that it permits States to redact sensitive personal information about voters before disclosing SVRLs, *e.g.*, *Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1083 n.14 (10th Cir. 2025); *Pub. Int. Legal Found., Inc. v. Bellows* ("*PILF*"), 92 F.4th 36, 56 (1st Cir. 2024). The NVRA authorizes DOJ and private parties to sue to address alleged violations. *See* 52 U.S.C. §20510.

### C. The Help America Vote Act

A decade after the enactment of the NVRA and more than four decades after the enactment of the CRA, Congress enacted HAVA to "improve voting systems and voter access." *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 394 (4th Cir. 2024). Among other things, HAVA for the first time required States to create a "single, uniform, official, centralized, interactive computerized statewide voter registration list." 52 U.S.C. §21083(a)(1).

The list is dynamic by design. HAVA directs that "[a]ll voter registration information obtained by any local election official in the State shall be electronically entered into the computerized list on an expedited basis at the time the information is provided to the local official." *Id.* §21083(a)(1)(A)(vi). The State's chief election official must ensure "local election officials are able to enter [that] information," and the list is "coordinated with other agency databases within the State." *Id.* §21083(a)(1)(A). HAVA also requires States to take steps to ensure that "voter registration records" are "accurate and are updated regularly." *Id.* §21083(a)(4). In other words, HAVA charges States with regularly changing their SVRLs so that they reflect the current snapshot of each State's registered voters.

HAVA gives DOJ authority to sue to address violations of the statute, *see id.* §21111, but it does not grant DOJ the right to demand SVRLs or otherwise empower DOJ to superintend or audit States' voter list maintenance practices. To the contrary, HAVA reaffirms the preeminent role of States in managing SVRLs, instructing that each State's list be "defined, maintained, and administered at the State level," *id.* §21083(a)(1)(A), and committing "[t]he specific choices on the methods of complying with the requirements of [HAVA] … to the discretion of the State," *id.* §21085. The absence of any inspection provision in HAVA is a feature, not a bug— Congress viewed state authority over voter registration as central to preserving our democracy:

> Historically, elections in this country have been administered at the state and local level. This system has many benefits that must be preserved. *The dispersal of responsibility for election administration has made it impossible for a single centrally controlled authority to dictate how elections will be run, and thereby be able to control the outcome*. This leaves the power and responsibility for running elections where it should be, in the hands of the citizens of this country.

H.R. Rep. No. 107-329, pt. 1, at 31-32 (2001) (emphasis added).

HAVA also discusses list maintenance, but "[n]othing in HAVA broadens the scope of the NVRA's list-maintenance obligations." *Bellitto v. Snipes*, 935 F.3d 1192, 1202 (11th Cir. 2019). Instead, HAVA relies on the NVRA's list maintenance requirements to the computerized SVRL, charging most NVRA-covered States with "perform[ing] list maintenance" of the computerized voter lists "on a regular basis" consistent with the requirements of the NVRA. 52 U.S.C. §21083(a)(2)(A). HAVA also requires that state law "include provisions" geared toward ensuring SVRLs are "accurate and are updated regularly." *Id.* §21083(a)(4).

## II. DOJ embarks on a nationwide campaign to collect private voter data on millions of Americans.

Last year, DOJ sent letters to at least 48 States demanding States' SVRLs, which include sensitive information about each registered voter. Most States refused.[5] DOJ sued 30 States and the District of Columbia to compel disclosure.

---

[5] *See* Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (Oct. 26, 2026), https://perma.cc/H6B7-6598.

DOJ's legal theories have shifted over the course of these lawsuits. DOJ initially framed the matter largely in terms of the NVRA and HAVA. *See* Compl., *United States v. Bellows*, No. 1:25-CV-468 (D. Me. Sep. 16, 2025), ECF No. 1. But in its more recent suits against other States, DOJ rested exclusively on the CRA. Each district court that has addressed DOJ's CRA claims to date has dismissed them, *see United States v. Albence*, No. 25-1453, 2026 WL 3407115, at *2 n.1 (D. Del. Nov. 10, 2026) (collecting 27 cases and likewise dismissing), and the Sixth Circuit affirmed the Michigan district court's decision dismissing DOJ's claims, *United States v. Benson*, 179 F.4th 470 (6th Cir.), *reh'g en banc denied*, 187 F.4th 462 (6th Cir. 2026) ("*Benson III*").

DOJ has also recast its factual allegations. In its early complaints, DOJ alleged that its demands were prompted by state-specific concerns with voter list maintenance statistics. *See United States v. Bellows*, No. 1:25-CV-468 (D. Me. Sep. 18, 2025), ECF No. 5-4. In later cases, DOJ stopped claiming that its demands were prompted by any individualized review of a State's EAVS responses or list maintenance program, often failing to assert *any* purported factual basis for its ostensible need for this sensitive data. *E.g.*, Compl., *United States v. Ziriax*, No. 26-cv-361 (W.D. Okla. Feb. 26, 2026).

DOJ's actions betray its true purpose: to take federal control of state voter list maintenance. The former head of DOJ's Civil Rights Division confirmed that DOJ's

goal is to purge "hundreds of thousands of people" from voter rolls.[6] DOJ intends to run the voter lists it obtains from States through the Department of Homeland Security's ("DHS") notoriously unreliable Systematic Alien Verification for Entitlements ("SAVE") database to identify suspected noncitizens and then demand States remove them from voter rolls.[7] DHS Secretary Mullin has threatened election officials with withheld grants, fines, and even criminal prosecution if they do not meet the administration's voter removal demands.[8] Those threats come even though a federal court recently found that the federal government had "haphazardly combined and repurposed the private information of millions of Americans, including citizenship data that they knew to be unreliable," and that using SAVE for voter verification would risk removing "United States citizens from voter rolls based on inaccurate information." *League of Women Voters v. DHS* ("*LWV II*"), 835

---

[6] AAG Harmeet Dhillon (@AAGHarmeetDhillon), X (Dec. 18, 2025, at 9:24 AM ET), https://x.com/AAGDhillon/status/2001659823335616795.

[7] *See* Authority to Obtain and Share Statewide Voter Roll Data, 50 Op. O.L.C. (May 12, 2026) (slip op. at 1, 5-7); Nicholas Kerr & Elise Spenner, *System that DHS Is Urging States to Use to Assess Voter Rolls Known to Return Faulty Results: Reports*, ABC News (July 19, 2026), https://perma.cc/6DGQ-737H.

[8] Rebecca Shabad, *Homeland Security Secretary Markwayne Mullin Threatens States over Elections*, NBC News (July 17, 2026), https://perma.cc/XE54-XUW2.

F.Supp.3d 79, 95 (D.D.C.), *stay granted sub nom. DHS v. League of Women Voters* ("*LWV III*"), No. 26A308, 2026 WL 2879700 (U.S. Sep. 25, 2026).[9]

## III. DOJ sues Connecticut to demand production of its protected voter data.

On August 6, 2025, DOJ sent a letter to Secretary Thomas, requesting various information about Connecticut's compliance with the list maintenance provisions of the NVRA. JA34-36. The letter cited certain data regarding Connecticut that had been reported in the Election Administration and Voting Survey ("EAVS"). *Id.* The letter requested information related to some of the EAVS data, posed questions relating to Connecticut's list-maintenance procedures, and requested registration information from Connecticut's voter file, but only for certain individuals. *Id.* The letter did not request a copy of Connecticut's voter file and nowhere did it cite or reference the CRA. *Id.*

Secretary Thomas replied on August 20, 2025, with a detailed letter that responded to DOJ's questions regarding the State's list maintenance procedures and the data contained in the EAVS survey. JA38-41. As stated in later correspondence between the Secretary and DOJ, after the Secretary sent her August 20 letter, DOJ "sought no further assurances of Connecticut's compliance with any VRL [voter

---

[9] The Supreme Court stayed an injunction entered by the district court in *LWV II*. In doing so, the per curiam majority opinion did not dispute the district court's finding that data in SAVE is unreliable. For reasons discussed below, the Supreme Court's stay is not relevant to the arguments in this appeal. *Infra* 53-54 n.16.

registration list] maintenance laws, and did not claim that any of the provided responses were inadequate." JA48. Moreover, representatives from the Secretary's office then voluntarily met with DOJ counsel "to discuss issues related to Connecticut's VRL," during which DOJ counsel "raised no concerns." *Id.*

DOJ next corresponded with the Secretary's office on December 12, 2025. JA43-45. For the first time, DOJ demanded "a copy of Connecticut's statewide [voter registration list]" that contains "*all fields*." JA43. As authorization for its request, DOJ cited the NVRA, HAVA, and the CRA. JA43-44. The letter stated that the "purpose of this request is to ascertain Connecticut's compliance with the list maintenance requirements of the NVRA and HAVA" and demanded that the SVRL produced include highly sensitive voter information. JA44. The letter did not refer to the EAVS data referenced in the August 6 letter, nor the Secretary's response to that letter, nor did it identify any deficiencies or concerns with the Secretary's response. JA43-45.

The Secretary's office responded on Christmas Eve. JA47-49.[10] The letter explained that the NVRA, HAVA, and the CRA did not provide a lawful basis for DOJ to demand the SVRL, and that state law prohibited the Secretary from providing

---

[10] DOJ's December 12 letter demanded a response by December 26, JA43; the Secretary requested an additional seven days to account for staffing issues stemming from pre-scheduled vacations around the holidays, but DOJ ignored that request, JA47 n.1.

much of the sensitive information requested by DOJ. JA47-49. The Secretary therefore declined to produce the SVRL. JA47.

DOJ sued on January 6, 2026. JA19.

## IV. The district court dismisses DOJ's complaint.

DOJ's single-count complaint sought production of an unredacted copy of Connecticut's SVRL under the CRA. JA25-26. The district court observed that "the threshold question in this litigation is one of statutory construction," JA289, specifically, whether the SVRL is a record that "come[s] into [the Secretary's] possession," as that term is used in the CRA, JA291 (second alteration in original). Carefully examining the CRA's text, the district court held that it did not, stating that "a fairly straightforward reading of [the CRA] … compels this result." JA293. The district court observed that this conclusion was "further compelled" by the CRA's prohibition on "alter[ing]" covered records, because "[u]navoidably and of necessity … [Connecticut's] SVRL is constantly being 'altered' as information is updated." JA295. The district court dismissed the complaint. DOJ appealed.

## SUMMARY OF THE ARGUMENT

1. DOJ's CRA claim is properly reviewed under the Federal Rules of Civil Procedure. Nothing exempts CRA claims from review in the ordinary course, and the Supreme Court has made clear that judicial review of government document demands is necessary to ensure that any investigation will be conducted pursuant to

a legitimate purpose, that the underlying statute has been satisfied, and that the court's process is not being abused. *See United States v. Powell*, 379 U.S. 48, 57-58 (1964).

2. The district court correctly dismissed DOJ's CRA claim for failure to state a claim. The district court correctly held that the CRA covers only static records—like voter applications—that "come into" the possession of election officials from an external source. 52 U.S.C. §20701. Dictionary definitions, common usage, and statutory context confirm that "come into" possession refers to receiving something from an outside source. The SVRL did not "come into" the possession of election officials, nor is it static; it is a dynamic database that is created, maintained, and continuously revised by election officials. Further, the CRA requires covered records to be retained, preserved, and not altered. That makes sense when applied to discrete documents submitted to election officials, but if extended to SVRLs, it would place the CRA in irreconcilable conflict with HAVA, which commands election officials to continuously update and alter SVRLs.

3. This Court should also affirm on other grounds that the district court did not reach but nonetheless warrant dismissal. DOJ did not comply with the CRA's requirement that it state "the basis and the purpose" for its demand. 52 U.S.C. §20703. It failed to provide any factual basis at all, and its alleged purpose—assessing list-maintenance compliance—is beyond the scope of the CRA. The

NVRA and HAVA specifically govern list maintenance, and fundamental principles of statutory interpretation preclude DOJ from repurposing the CRA to empower it to do what Congress chose not to authorize in the NVRA or HAVA. Further, Connecticut law protects the sensitive voter data at issue here from disclosure, and there is no indication in the CRA that Congress intended to preempt state privacy laws. Finally, DOJ failed to comply with the notice requirements of the federal Privacy Act, and thus is not entitled to unredacted copies of the SVRL.

4. DOJ has failed to state a claim for myriad reasons, but even if the Court were to accept DOJ's arguments and reverse the ruling below, DOJ would not be entitled to the immediate production of the unredacted SVRL. The next proper step would be to remand and allow for discovery on, among other things, whether DOJ's stated purpose is pretextual.

## STANDARD OF REVIEW

This Court "review[s] de novo the dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6)." *Darby v. Greenman*, 14 F.4th 124, 127 (2d Cir. 2021). This Court is "free to affirm on any ground that finds support in the record, even if it was not the ground upon which the trial court relied." *Beijing Neu Cloud Oriental Sys. Tech. Co., Ltd. v. Int'l Bus. Machs. Corp.*, 110 F.4th 106, 113 (2d Cir. 2024) (quotation omitted).

## ARGUMENT

### I. DOJ's CRA demand is subject to meaningful judicial review.

DOJ argues that a 64-year-old Fifth Circuit decision, *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962), largely exempts CRA claims from judicial review and that the tools available in the Federal Rules of Civil Procedure may not be used to challenge its CRA claim. Br.29-35. According to DOJ, the CRA instead requires some unspecified "special statutory proceeding[s]," free of any inconvenient "procedural device[s] or maneuver[s]" questioning DOJ's compliance with the statute it invokes. Br.30 (citing *Lynd*, 306 F.2d at 225-26). DOJ's position is unfounded.

DOJ points to nothing in the Federal Rules or the CRA that exempts its claim from Rule 12(b)(6) analysis. The Federal Rules "govern the procedure in all civil actions and proceedings in the United States district courts, except as stated in Rule 81." Fed. R. Civ. P. 1. This case is just such an action. Rule 81 provides a narrow set of prescribed cases that are exempt from the ordinary rules—such as certain admiralty or bankruptcy actions—but none involve the CRA. *See* Fed. R. Civ. P. 81(a).

Nor does anything in the CRA support the exemption DOJ seeks. The barrier DOJ faces here is high: the Federal Rules "are the default rules in civil litigation," and while Congress may override that command, courts "do not lightly infer that

Congress has done so; and silence on the subject is seldom enough." *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 436 (2023). The CRA merely provides that federal district courts "shall have jurisdiction *by appropriate process* to compel the production of [a covered] record or paper." 52 U.S.C. §20705 (emphasis added). That unremarkable jurisdictional language cannot be read to displace the Federal Rules or insulate CRA claims from routine judicial review.

In fact, just two years after the Fifth Circuit decided *Lynd*, the Supreme Court construed a statute with materially identical language to that found in the CRA (both refer to review by "appropriate process") and held that, since it "contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply." *Powell*, 379 U.S. at 58 n.18. DOJ appears to recognize this: Despite suggesting the CRA supplants the Federal Rules, DOJ explicitly invokes Rule 12(b)(6) as the standard of review for this appeal. Br.12.

*Powell* also recognizes the important role that meaningful judicial review plays in actions to enforce government document demands. *Powell* explains that a reviewing court must ensure, among other things, that the demand is made pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, and that the underlying statute authorizing the demand has been satisfied. *See* 379 U.S. at 58. It underscores that "[i]t is the court's process which is invoked to enforce the

administrative summons and a court may not permit its process to be abused." *Id.* That more than authorizes the judicial review that the district court conducted. Courts evaluating DOJ's recent CRA demands have consistently held that "[t]he Supreme Court's holding in *Powell* squarely rejects [DOJ's] contention[s] and reliance on *Lynd*." *United States v. Oregon*, 828 F.Supp.3d 1092, 1102 (D. Or. 2026), *appeal docketed*, No. 26-1231 (9th Cir. Mar. 3, 2026).

DOJ nonetheless claims that *Lynd* is "consistent" with the Supreme Court's decision in *Donaldson v. United States*, 400 U.S. 517, 529 (1971). *See* Br.31. But as DOJ admits, *Donaldson* held the "Civil Rules, of course, do have an application" to suits to enforce governmental demands. 400 U.S. at 528; *see* Br.32. *Donaldson* simply denied a taxpayer's attempt to intervene in enforcement proceedings directed toward a different entity; it did not say anything about the required scope of such proceedings. 400 U.S. at 527-31. Moreover, the court confirmed that Federal Rule 24(a)(2)—regarding intervention—continues to apply in a civil action to enforce a tax summons, reinforcing the general applicability of the Federal Rules in such actions. *See id.*[11]

---

[11] DOJ argues that, because an IRS summons is "meaningfully different from a Title III demand," *Powell* should not "impair summary enforcement proceedings." Br.32 n.7. But the differences between an IRS summons and a Title III demand cannot explain away the identical language used to describe the process that should be applied.

*Lynd* itself does not help DOJ, either. Unlike here, the *Lynd* court had no reason to conclude that DOJ did not invoke the CRA for a valid purpose or that it failed to comply with the statute's demand requirements. In that case, DOJ sought to investigate incidents of racial discrimination in voting and the record "establishe[d] without contradiction" that DOJ had "adequately stated the basis and the purpose" of its investigation based on evidence of racial discrimination "with respect to registration and voting." *Lynd*, 306 F.2d at 228-29, 229 n.6. As the court recognized, the CRA's "clearest purpose[]" is to permit investigations "concerning infringement or denial of … voting rights." *Id*. at 228. Even so, the court noted that, if there was a "genuine dispute" as to whether a "particular paper or record" is subject to the CRA, the court would "be open for … determination" of that question. *Id.* at 226. Thus, not only does *Lynd* not foreclose the objections to DOJ's demand here, it distinguished this very type of circumstance.

Finally, DOJ suggests judicial review is improper because the CRA contains no "judicially manageable standard" against which courts could ascertain the sufficiency of the Attorney General's stated basis and purpose. Br.33 (quoting *Benson III*, 187 F.4th at 480 (Thapar, J., dissenting)). But the CRA's plain text provides the standard—it requires that DOJ state "the basis and the purpose" for the demand, and it specifies the records that fall within its scope.

## II. The district court correctly held that the CRA does not cover state-created, dynamic records like Connecticut's SVRL.

The district court correctly held that an SVRL "is not a record that falls within the scope of Title III, and is therefore not subject to the preservation and production requirements contemplated therein." JA296. That conclusion is required by the CRA's plain text and accepted rules of statutory construction. Further, extending the CRA's requirement that covered records remain unaltered to Connecticut's dynamic SVRL would put the CRA into conflict with HAVA, which requires *constant* changes to SVRLs. JA295. DOJ's counterarguments are not persuasive and have been unanimously rejected by every court to consider them to date. *See Albence*, 2026 WL 3407115, at *6 n.5 (collecting decisions of 20 district courts and one court of appeals holding that the CRA does not cover SVRLs).

### A. Connecticut's SVRL was created by Connecticut election officials and therefore did not "come into" their possession.

The CRA requires election officers to "retain and preserve … all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. §20701. Only records that "come into" election officials' possession are subject to inspection upon a proper demand. *See id.* §20703. Here, all interpretive tools require the same conclusion: the SVRL did not "come into" possession of Connecticut election officials within the meaning of the CRA.

*First*, begin with ordinary meaning. The CRA does not define what it means for a record to "come into" possession of an election officer. But dictionaries from around the time Congress enacted the CRA equated "coming into" possession of something with acquiring, obtaining, or receiving the thing. *Come into*, *Webster's Third New International Dictionary* 453 (1966) ("to enter upon or in possession of: acquire esp. as an inheritance"); *Acquire*, *Webster's Third New International Dictionary* 18 (1966) ("to come into possession, control, or power of disposal of"); *Obtain*, 7 *Oxford English Dictionary* (1933) ("to come into the possession or enjoyment of (something)"); *Receive*, *Webster's Third New International Dictionary* 1894 (1961) ("to come into possession of: acquire"). This same understanding endures six decades later. *See, e.g.*, *Receive*, *Black's Law Dictionary* (12th ed. 2024) (defining "receive" as "to come into possession of or get from some outside source").

Common usage confirms what the dictionaries make clear. Consider, as the Sixth Circuit did, a cake. "A baker may purchase ingredients from a grocery store (flour, eggs, etc.) and then proceed to bake cakes." *Benson*, 179 F.4th at 479. The baker might have "come into" possession of the purchased ingredients, but it would be "rather strange to say" she has "'come into' possession" of a cake she baked with those ingredients. *Id.* By the same principle, "an ordinary English speaker would not say" that Connecticut came into possession of an SVRL that it "created." *Id.*; *see*

*also United States v. Evans*, No. 25-4403, 2026 WL 2267774, at *6 (D.D.C. Aug. 6, 2026) (drawing similar analogy). The district court's definition of "come into possession" is accordingly the "natural" and "ordinary" meaning of the phrase. *See Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004). Because Connecticut election officials internally generate and continuously update the SVRL, *see* JA69, JA292, it does not "come into" their possession and thus is not a record subject to inspection under the CRA.

*Second*, other text within the CRA confirms that the statute's use of "come into … possession" does not reach an internally created dynamic database like the SVRL. *See Saks v. Franklin Covey Co.*, 316 F.3d 337, 345 (2d Cir. 2003) ("The text's plain meaning can best be understood by looking to the statutory scheme as a whole and placing the particular provision within the context of that statute."). For example, §20701 explains that the relevant "records" are those "relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." Those are the sort of records that officials "obtain … from third parties," such as a prospective voter, rather than create themselves. *Benson*, 179 F.4th at 479; *see Yates v. United States*, 574 U.S. 528, 543 (2015) (plurality opinion) ("[A]ccompanying words" are key context because "a word is known by the company it keeps."). As the Sixth Circuit recounted, even the reference to records related to "payment of poll tax" reveals the narrow category of documents captured

in this language. *Benson*, 179 F.4th at 479. When the CRA was enacted, voters would pay poll taxes to their sheriff, who would provide a receipt for the voter to present to election officials. *Id.* The CRA thus requires that officers "would have to retain and preserve the poll-tax receipts submitted by voters, as these were often the only voter-registration documents these States had." *Id.*

Other provisions of the CRA further confirm that the statute covers only documents provided to election officials from an outside source. When a covered record "comes into" possession of an election official, the CRA initially requires the receiving official to "preserve" (and not "alter") the record for 22 months. 52 U.S.C. §§20701-20702. However, the CRA specifies that "when required by law," covered records "may be delivered to another officer of election," or may be "deposited with" a State-designated custodian who will "retain and preserve these records and papers at a specified place," at which point the retain-and-preserve requirement "devolve[s] upon" the new custodian. *Id.* This regulation makes sense when applied to records that are submitted to state election officials from an external source (such as applications for voter registration), since those are documents that *can* be "delivered to" or "deposited with" another person. But that is *not* true for Connecticut's SVRL, which is a "centralized" and "interactive" computer database. That database is not transferred from one person to another; election officials across Connecticut may continuously and independently change the information contained within it. 52

U.S.C. §21083(a)(1); JA69-70, 74. The SVRL is not being "delivered to" or "deposited with" any individual so that they can "retain and preserve" it in an unaltered format. 52 U.S.C. §§20701-20702; *see Albence*, 2026 WL 3407115, at *8 n.10 ("It seems unlikely that election officers are 'delivering' the electronic databases to other election officers.").

A similar conclusion follows from §20701's statutory time limit. A record covered by §20701 must be "retain[ed] and preserve[d]" only "for a period of *twenty-two months*" "*from* the date of any [federal] election." *Id.* §20701 (emphasis added). This provision applies naturally to records received from an external source: a prospective voter submits an application for voter registration to an election official, and then the election official must retain that application (unaltered) for the 22-month period following the election, after which the election official is free to discard it. *Id.* §§20701-20702. In contrast, this statutory text simply does not fit an internally generated record like Connecticut's SVRL, which was created decades ago, compiles voter information across many elections, and is intended to be perpetually maintained and updated. Applying the CRA to such a record would render the CRA's 22-month time limit ineffective and inoperative. *See Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 156 (2d Cir. 2013) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.").

*Third*, if Congress had intended for the CRA to cover dynamic documents created by election officials, such as SVRLs, it had "obvious alternative" language at its disposal. *United States v. Bellows*, 834 F.Supp.3d 113, 123 n.10 (D. Me. 2026) (quoting *Lozano v. Montoya Alvarez*, 572 U.S. 1, 16 (2014)). It could have written the CRA to simply encompass "all records" that met the subsequent statutory criteria, without any qualifier regarding possession, as it did in the NVRA. *United States v. Koski*, No. 3:26-CV-42, 2026 WL 2032532, at *5 (E.D. Va. July 14, 2026) (quoting 52 U.S.C. §20507(i)(1)). Or "Congress could have required the retention and production of all election-related records and papers '*in* the possession of' the state election official." *Bellows*, 834 F.Supp.3d at 123 n.10 (emphasis added). Indeed, Congress frequently employs the phrase "in the possession of" when it means to do so. *See, e.g.*, 30 U.S.C. §1732(b); 6 U.S.C. §1502(a); 18 U.S.C. §§3500(a)-(b), 1968(f)(3)-(4); 7 U.S.C. §12(e); 49 U.S.C. §47124a(b)(1). But Congress "chose not to use this broader formulation in Section 20701 and, having done so, the court must give meaning to the words 'come into.'" *United States v. Scanlan*, No. 25-CV-371, 2026 WL 1864054, at *6 (D.N.H. June 29, 2026).

DOJ seeks to collapse the distinction between these alternative phrases, reading "come into … possession" to reach all documents "in" an election official's possession. But this renders the statute's inclusion of "come into … possession" meaningless. Indeed, the CRA's text would align with DOJ's proposed interpretation

only if the Court were to delete the phrase "which come into his possession" as follows:

> Every officer of election shall retain and preserve … all records and papers ~~which come into his possession~~ relating to any application, registration, payment of poll tax, or other act requisite to voting in such election[.]

52 U.S.C. §20701. But "[c]ourts are required to give effect to Congress' express inclusions and exclusions, not disregard them." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 126 (2018). DOJ's interpretation violates accepted canons of construction. *See Comm. to Stop Airport Expansion v. FAA*, 320 F.3d 285, 288 (2d Cir. 2003) ("We disfavor an interpretation of a statute that renders statutory language superfluous.").

*Fourth*, the CRA also "draw[s] meaning from related provisions." *Rucho v. Common Cause*, 588 U.S. 684, 716 (2019). Echoing language in the CRA, the materiality provision in the Civil Rights Act of 1964 prohibits the denial of the right to vote based on "an error or omission on *any record or paper relating to any application, registration, or other act requisite to voting*, if such error or omission is not material in determining whether such individual is qualified under State law to vote." 52 U.S.C. §10101(a)(2)(B) (emphasis added); *see also* 52 U.S.C. §20701. The materiality provision concerns "errors or omissions on … application forms," *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003), just as the 1960 CRA concerns application forms and similar materials submitted by voters.

*Fifth*, DOJ's contrary reading would ascribe "a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." *Yates*, 574 U.S. at 543. If DOJ were correct that the CRA reaches internally generated documents, every email, memo, handwritten note, or any other record created by *any* election official in Connecticut—including drafts—would need to be "retained and preserved" and not "altered," so long as it "relat[es] to" a voter's application, registration or other voting prerequisite in a particular election. 52 U.S.C. §§20701-20703. Those unlikely consequences, however, are avoided if "come into … possession" is given its more natural reading of reaching only records obtained from an external source. *See United States v. Benson*, 819 F.Supp.3d 753, 770 (W.D. Mich. 2026) ("[N]othing in the CRA's text implies an intent to require states to preserve every election-related record that they *create*.").

### B. Applying the CRA to Connecticut's SVRL would require it to be preserved without alteration upon threat of criminal penalty, but federal law requires constant updates.

The CRA's preservation requirement confirms that the statute does not apply to Connecticut's SVRL. Any record covered by the CRA must be "retain[ed] and preserv[ed]" and may not be "alter[ed]." 52 U.S.C. §§20701, 20702. If Section 20701 is read to cover Connecticut's SVRL, it would effectively require election officials to simultaneously preserve and modify the same record by creating a new, static version of the database with every single edit, which, per the State, is "not

technically feasible." JA74. It is implausible that "Congress was attempting to require the impossible." *Anniston Mfg. Co. v. Davis*, 301 U.S. 337, 355 (1937).

The command to preserve and retain covered records is paired with Section 20702's criminal penalties for those who willfully "alter" them. 52 U.S.C. §20702. As the district court recognized, HAVA *requires* States to establish a dynamic SVRL that "is constantly being 'altered' as information is updated; voters are added; voters are removed; addresses changed; or any of the thousands of datapoints contained in the [list] otherwise require modification." JA295; 52 U.S.C. §21083(a). Adopting DOJ's interpretation of the CRA would create an unavoidable clash with HAVA, and by extension, place election officials in the impossible bind of choosing which statute to honor—at risk of criminal penalty.

The Court should avoid an interpretation of the CRA that would introduce this legal discord. "The body of the law should make sense," and "it is the responsibility of the courts, within the permissible meanings of the text, to make it so." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 252 (2012). Accordingly, courts must "interpret Congress's statutes as a harmonious whole rather than at war with one another." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502 (2018). Earlier-adopted statutes should be read "to contain that permissible meaning which fits most logically and comfortably into the body of both previously *and subsequently* enacted law." *Watson v. Republican Nat'l Comm.*, 609 U.S. 672,

690 n.8 (2026) (emphasis added) (quotation omitted). This Court should join the Sixth Circuit and numerous district courts in declining to "adopt a reading that would place election officials in violation of one federal law for trying to comply with others." *Benson*, 179 F.4th at 480.

**C. DOJ's interpretation of the CRA should be rejected.**

DOJ lodges a host of objections to the district court's conclusion, but none justify this Court breaking rank with the chorus of judicial decisions holding that the CRA's plain text does not extend to internally generated, dynamic SVRLs.

*First*, DOJ misses the point in arguing that Connecticut's SVRL must be covered by the CRA because it "relates to voter registration" and the phrase "relating to" should be read "expansively." Br.14. To be covered by the CRA, a record must not merely "relate to" voter registration—it must *also* "come into" the possession of election officials. Whether the SVRL *relates* to voter registration is irrelevant to whether that dynamic, state-created list came into the possession of election officials.

*Second*, DOJ argues that "the term 'come into his possession' is broad enough to include both voter-generated and state-generated documents." Br.17. But if reaching both categories of records were Congress's objective, simpler and more obvious language was available: "Congress could have referred simply to 'records in the possession of' election officials, or even just 'records' without any qualifier,

but it did not." *United States v. Bd. of Elections of N.Y.*, No. 1:25-CV-1338, 2026 WL 1999921, at *9 (N.D.N.Y. July 10, 2026) (citation modified). To support its argument, DOJ cites a Fifth Circuit decision from the 1960s and a snippet of the CRA's legislative history, both of which expressly use the phrase "*in* the possession" of election officials. Br.20. But those are not the words Congress wrote into the CRA, and, as discussed, DOJ's proposed reading conflicts with the ordinary meaning of "come into … possession" and renders that phrase surplusage.

*Third*, DOJ claims the Supreme Court "has demonstrated a similar understanding" of "come into … possession," citing *United States Department of Justice v. Tax Analysts*, 492 U.S. 136 (1989). *See* Br.19. But as the Sixth Circuit recognized, *Tax Analysts* "provides no insight" about "'come into … possession,' as Title III uses it." *Benson*, 179 F.4th at 481. In *Tax Analysts*, there was no dispute that the relevant statutory term ("agency records") would include self-created records; the Court's analysis relied on a separate agency-recordkeeping statute that defined "record" to include materials "*made or received*" by an agency, 492 U.S. at 145-46 (emphasis added); and the phrase "come into … possession" appears nowhere in the statute at issue in *Tax Analysts*.

*Fourth*, DOJ contends that the SVRL "c[ame] into possession" of Connecticut election officials when they "aggregated" individual records received from voters "into one new, single record." Br.20-21. But this precisely illustrates the distinction

drawn by the CRA: it is true the "individual records" sent by voters to election officials "c[a]me into [their] possession," and thus are covered by the CRA, but no reasonable speaker of English would use that phrase to describe Connecticut's SVRL, which is a database created *by* election officials.

*Fifth*, DOJ points to other statutes that use the phrase "come into possession," *Id.*, but each confirms that Congress deliberately uses the phrase "come into possession" when referring to things *received* by someone. For example, 44 U.S.C. §3572 uses the phrase "comes into possession" in a statute regarding "information supplied by individuals or organizations to an agency"; *see also* 13 U.S.C. §214 (prohibiting disclosure of information that "comes into … possession" of person by virtue of their employment with the Bureau of the Census, which collects data from U.S. citizens and residents); 10 U.S.C. §130c (using phrase "came into possession … of the United States" in statute regarding information "provided by" a foreign government); 30 U.S.C. §1732(b) (providing States and Indian tribes access to oil and gas royalty information "as soon as practicable after it comes into the possession of the Secretary," in a statute authorizing "cooperative agreement[s]" allowing States, Indian tribes, and the Secretary of the Interior "to share oil or gas royalty

management information"). The district court's construction of the CRA sits comfortably among these laws.[12]

*Sixth*, DOJ asserts that the "context" in which the CRA was enacted supports DOJ's view. Br.22-24. In fact, it supports the opposite conclusion. The Civil Rights Commission found its investigation thwarted by Jim Crow officials' efforts to destroy "[r]ejected applications" submitted by Black applicants, *Comm'n Rep.* at 93, and determined that comparing such applications to accepted applications submitted by White applicants was "essential to any investigation of denials of the right to vote," *id.* at 137. That is why it recommended Congress enact legislation requiring voter applications to be preserved and subject to inspection. *Id.* at 138. The Attorney General agreed, explaining to Congress that, "[i]n many cases, discrimination in registration can be proved only by comparing the records of Negro applicants with those of white applicants." *An Act to Enforce Constitutional Rights, and for Other Purposes: Hearings on H.R. 8601 Before the S. Comm. on the Judiciary*, 86th Cong.

[12] Elsewhere, in a footnote, DOJ cites two instances in which Congress drafted statutes to reach certain records that were "created or made available for use by, obtained by, or otherwise came into the possession of" an agency. Br.17 n.3. DOJ argues this construction shows that Congress has used the phrase "came into … possession" to "encompass both self-generation and receipt from an outside source." *Id.* To the contrary, it demonstrates that Congress *distinguishes* between those two categories, making clear that a record is covered if it was "created" *or* "obtained" by an agency. There is no basis to read the residual clause containing "came into possession" as doing anything more than applying belt-and-suspenders language that reiterates the use of "obtained."

9 (1960) (Statement of U.S. Att'y Gen. William P. Rogers). DOJ needed those *applications* specifically because, "[w]ithout access to accepted and rejected registration materials, the Attorney General could not independently evaluate whether black voters had satisfactorily established their qualifications or had done all that was asked of white voters, such that their omission from the voter rolls could be attributed to race." *Evans*, 2026 WL 2267774, at *9.

Unlike voter applications, voter lists would "not have enabled the Attorney General to conduct the sort of *comparative* analysis necessary to seek injunctive relief." *Id.* at *10 (emphasis added). Regardless, voter lists (although not modern-day SVRLs, with their detailed personal identifying information) were *already* available to DOJ in most states even before the CRA, because "voter rolls have long been treated as public records, which are made available to political parties, advocacy organizations, and members of the public." *Id.* (citing Joseph P. Harris, *Registration of Voters in the United States*, Inst. for Gov't Rsch. 44, 167, 179, 236, 259, 270, 272, 290 (1929)). That is why, "[i]n the years leading up to the passage of Title III, the Civil Rights Commission was able to obtain lists of qualified voters, even in jurisdictions hostile to its mission." *Id.* It is no surprise that Congress drafted

the CRA to cover records that were *not* already available, rather than ones that were.[13]

*Seventh*, DOJ argues that because Title III imposes an officer-specific duty to preserve records, Title III should still cover the SVRL because the Secretary must have "received [it] from someone else in [their] office," or gained control over it "when she assumed office." Br.22. This again misunderstands the nature of the SVRL. Unlike documents a voter may submit to an election official, the SVRL is not an individual record that is transferred from one person to another. It is an "interactive" and "centralized" database that many persons can simultaneously access and change. 52 U.S.C. §21083(a)(1); JA69-70, 74, 81. Indeed, other language in the CRA emphasizes the difference between a dynamic database maintained and updated by multiple people and a static document that one election official passes along to another. 52 U.S.C. §20701 (providing that, if records are appropriately "deposited with" another custodian, then the duty to retain and preserve "devolve[s] upon such custodian"). It would be redundant if all the phrase "come into possession" did was address such situations.

---

[13] DOJ also misses the mark with its complaint that the district court's reading of the CRA would exclude "blatant evidence of discrimination" appearing in "internal memoranda." Br.24. Such evidence would be fully available to DOJ via civil discovery once it sets out a claim that survives a motion to dismiss and might also be reached by the NVRA's inspection provision.

It would also be strikingly odd for Congress to reach self-generated records in this way: under this theory, when an election official creates a new record, it would not be subject to the CRA until it was transmitted to a *different* election official. *See Evans*, 2026 WL 2267774, at *10 n.8 (rejecting DOJ's argument that the CRA's coverage would "turn on the staffing practices of state election bodies"). That is particularly true because if Congress had intended to reach internally generated records, it could have done so "in a much more straightforward way." *Azar v. Allina Health Servs.*, 587 U.S. 566, 577 (2019).

*Eighth*, DOJ argues that the district court incorrectly concluded that applying the CRA's retain-and-preserve requirement to an SVRL would put that statute in conflict with the NVRA's and HAVA's requirements that the SVRL be updated regularly. Br.24-28. DOJ relies on *Voter Reference Foundation* to suggest that DOJ's reading of the CRA can be harmonized with these statutes, but that is wrong. Br.24-25. In holding that a dynamic SVRL is a record under the *NVRA*, the Tenth Circuit interpreted the NVRA's directive to "*maintain*[]" records subject to disclosure. *Voter Reference Found.*, 160 F.4th at 1085 (quoting 52 U.S.C. §20501(b) (emphasis added)). Its holding hinged on the dictionary definition of "maintain": "to 'carry on' or 'keep up.'" *Id.* (quoting *Maintain*, *Oxford English Dictionary* (2d ed. 1989)). To "carry on" or "keep up" something stands in contrast to the CRA's command to "preserve," "retain," and not "alter" records. 52 U.S.C. §§20701-20702.

DOJ further attempts to paper over this conflict by asking the Court to ignore the plain meaning of the term "alter" in the CRA. Br.25-26. But "alter" simply means "to cause to become different in some particular characteristic." *Alter*, *Webster's Third New International Dictionary* 63 (1966). The very point of list maintenance is that the list will "become different" every time a voter registers, updates their registration, or is removed. DOJ also cites *Fischer v. United States* to suggest that the term "alter" applies only to actions that impair the document's evidentiary value, Br.25—but *Fischer* reached that conclusion because the obstruction-of-justice statute it construed in 18 U.S.C. §1512 contains an additional mens rea requirement that the CRA does not: it criminalizes altering documents "*with the intent to impair the object's integrity or availability for use in an official proceeding*." 603 U.S. 480, 486 (2024) (emphasis added) (applying 18 U.S.C. §1512). And, depending on the issue being investigated, updating an SVRL *would* impair its evidentiary value—such as if an ineligible voter previously listed were removed. "Alter" "must be read in [its] context and with a view to [its] place in the overall statutory scheme." *City & Cnty. of S.F. v. EPA*, 604 U.S. 334, 350 (2025) (citation omitted). Read together, the CRA's requirements that covered records be retained and preserved, *and* not altered, are all consistent with an obligation to keep records in a static, identical form. It does not make sense to extend that obligation to a dynamic, constantly evolving SVRL.

DOJ seizes on the word "willful" in the CRA to claim election officials have free rein to "alter" a voter list. Br.26-27. But a person acts willfully when they act with "knowledge that the conduct is unlawful." *United States v. Kosinski*, 976 F.3d 135, 154 (2d Cir. 2020) (citation omitted). If the Court holds Connecticut's SVRL is covered by the CRA, election officials would thereafter be on notice that they cannot "alter" it without violating the statute.

*Finally*, DOJ turns to hyperbolic policy arguments, claiming that it would "paralyz[e]" DOJ's ability to enforce federal laws if the CRA did not reach SVRLs. Br.27. This is not credible. DOJ's present campaign for *unredacted* SVRLs from nearly all States is unprecedented; DOJ has never before needed the sweeping and previously unasserted power it now claims is vital to enforcing federal law. Further, "policy concerns cannot trump the best interpretation of the statutory text." *Patel v. Garland*, 596 U.S. 328, 346 (2022). If Congress thought it necessary for DOJ to audit unredacted SVRLs to assess compliance with the NVRA or HAVA, it would have given DOJ the authority to do so *in the NVRA or HAVA*. It did not.[14]

[14] DOJ also asserts that, although the Sixth Circuit denied en banc review in *United States v. Benson*, "a majority of the Sixth Circuit's judges found Title III of the CRA could be harmonized with the list maintenance requirements of the NVRA and HAVA to capture the SVRL in some form or another." Br.25. DOJ, however, overstates its case. In particular, Judge Murphy's concurrence in denial of rehearing (which two other judges joined in full and a third joined in part) is far more equivocal than DOJ suggests and does not clearly announce a definitive position on any of the issues raised by DOJ. *Benson III*, 187 F.4th at 463-69.

## III. The Court can also affirm the dismissal on other grounds.

DOJ's demand also fails for a multitude of independent reasons addressed by the parties below, each of which provides an independent basis to affirm.

### A. The CRA demand is invalid because DOJ failed to state any "basis" for investigating Connecticut's list maintenance program.

Dismissal is also warranted because DOJ's demand letter failed to include any "basis" in its request. JA43-45. That failure provides an additional ground for affirmance because the CRA requires the Attorney General to make a "demand in writing," and specifies that "[t]his demand shall contain a statement of the basis and the purpose therefor." 52 U.S.C. §20703. The inclusion of the word "shall" "imposes a mandatory command." *Bufkin v. Collins*, 604 U.S. 369, 379 (2025). Requiring DOJ to articulate a factual basis for *why* it seeks the information it demands is an important check against bad-faith investigations. *See CFPB v. Accrediting Council for Indep. Colls. & Schs.*, 854 F.3d 683, 691 (D.C. Cir. 2017) (quashing civil investigative demand that failed to "adequately state 'the specific conduct under investigation'"). Because DOJ failed to state the "basis" for its request in its demand letter, DOJ has not satisfied the CRA's plain requirements.

DOJ alleges that its December 12, 2025 letter is its CRA demand, JA24, but although that letter stated that the "*purpose* of this request is to ascertain Connecticut's compliance with the list maintenance requirements of the NVRA and HAVA," it included nothing at all about DOJ's *factual basis* for its demand. JA44

(emphasis added); *see, e.g.*, *United States v. Galvin*, 830 F.Supp.3d 122, 129 (D. Mass. 2026) (holding materially identical letter was "facially inadequate"), *appeal docketed*, No. 26-1657 (1st Cir. June 10, 2026). Accordingly, DOJ's attempt to reframe the inquiry as whether it provided Connecticut with "notice" must be rejected. Br.35. The CRA does not tell DOJ to provide "notice"; it orders that DOJ "shall" include "the basis" for its demand. 52 U.S.C. §20703.

In a single sentence that lacks any citation to authority, DOJ states that its letter contained "the *statutory* bases for the demand." Br.35 (emphasis added). This argument is forfeited because it is "unaccompanied by some effort at developed argumentation." *Palin v. N.Y. Times Co.*, 113 F.4th 245, 279 (2d Cir. 2024) (quotation omitted). In any event, courts have rejected the same argument in many of the parallel cases where DOJ sought state voter files, holding instead that the CRA requires DOJ to state the "factual basis" for the demand. *E.g.*, *Galvin*, 830 F.Supp.3d at 130; *Oregon*, 828 F.Supp.3d at 1103-04.

Pivoting, DOJ states that "[e]ven assuming [it] was required to state a factual basis, it did so" in an earlier letter that DOJ sent to Connecticut on August 6, 2025. Br.35. But neither the statutory text nor precedent authorizes such a lax approach to DOJ's obligations under the CRA. *See United States v. Markwood*, 48 F.3d 969, 977 (6th Cir. 1995) (to be entitled to enforcement of a document demand, an agency must have "met the statutory requirements pertaining to … enforcement"). Congress was

unequivocal: "*This demand*"—*i.e.*, the "written demand" required under the CRA—"shall contain *a* statement of the basis and the purpose therefor." 52 U.S.C. §20703 (emphases added). "Congress's decision to use the indefinite article 'a' … suggests that the government must issue a *single* statutorily compliant document." *Niz-Chavez v. Garland*, 593 U.S. 155, 163 (2021) (emphasis added). In *Niz-Chavez*, the Supreme Court was clear that similar statutory instructions require the government to provide "'a' single document containing the required information, not a mishmash of pieces with some assembly required." *Id.* at 161. DOJ's failure to provide all required information in a written letter likewise violates the plain terms of the CRA and suffices to affirm the dismissal. *See id.* at 172 ("If men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them.").

Consistent with *Niz-Chavez*, the Sixth Circuit squarely rejected DOJ's identical argument that a court could stitch together multiple, individually-deficient letters to create a single compliant CRA demand. *See Benson*, 179 F.4th at 483 (affirming dismissal because "[t]he government cannot pinpoint a [CRA] demand with a statement of the basis *and* purpose"). To the extent DOJ contends that a "majority" of Sixth Circuit judges "agreed with the United States" that DOJ could transform multiple, deficient letters into a single compliant demand, Br.29, DOJ is plainly mistaken. Judge Murphy, in an opinion concurring in the denial of en banc

rehearing that was joined by three other judges, wrote that (in his view) DOJ had submitted a *single* letter that "likely included enough information" to satisfy the CRA, specifically noting that one of the letters DOJ had sent included an explicit statement of purpose and *also* "referred to [DOJ's] earlier requests showing the factual concerns with Michigan's voter-registration lists." *Benson III*, 187 F.4th at 466 (Murphy, J., concurring); *see also id.* at 467 (observing that DOJ could remedy this issue by "sending a new letter with all the information contained across the three [earlier] letters"). DOJ's letter to Connecticut, in contrast, nowhere refers to other correspondence sent by DOJ that could be understood to provide DOJ's factual basis for its demand. JA43-45.[15]

Even assuming that DOJ could somehow be deemed to have stated "the basis" for its demand, DOJ's purported "basis" here would be disconnected from the information it seeks. A government document demand must be "reasonably relevant" to the matter under investigation. *United States v. Morton Salt Co.*, 338

[15] DOJ's suggestion that the Secretary's December 24, 2025 letter demonstrates that the Secretary "understood" the December 12 letter to be a "follow-up" of DOJ's earlier conversations is both wrong and beside the point. Br.38. The December 24 letter was explicit that DOJ failed to provide any "basis" in the December 12 letter, and it expressed surprise at the new demand given that DOJ had "raised no concerns" following the Secretary's response to DOJ's earlier demand for separate information. JA48. In any event, both the CRA and *Niz-Chavez* make clear that regardless of what the Secretary "understood," DOJ was still required to include a "statement" of its basis in the December 12 demand letter and not rely on the reader's subjective "understanding" of what the basis might be.

U.S. 632, 652 (1950); *see also United States v. Sturm, Ruger & Co.*, 84 F.3d 1, 4 (1st Cir. 1996). But obtaining Connecticut's unredacted SVRL would shed little light on whether Connecticut complied with its federal list-maintenance obligations, which only require "reasonable effort[s]" to remove voters who died or moved. 52 U.S.C. §20507(a)(4). The SVRL is just a snapshot of registered voters that becomes immediately outdated; it says next to nothing about Connecticut's *programs* to *remove* voters from the list. The unredacted list is thus not "reasonably relevant" to DOJ's purported investigation.

### B. DOJ's purported purpose of investigating Connecticut's list-maintenance obligations is not a proper purpose under the CRA.

DOJ's alleged purpose for its demand is "to ascertain Connecticut's compliance with the list maintenance requirements of the NVRA and HAVA." JA44. But investigating Connecticut's compliance with its list maintenance obligations under those laws has no relation to the purpose of the CRA, which Congress enacted to aid DOJ in the enforcement of civil rights laws (and specifically the Civil Rights Act of 1957).

It makes little sense to allow DOJ to use the CRA to investigate compliance with separate statutes—the NVRA and HAVA—that have detailed enforcement regimes of their own that do not include similar inspection authority. "The United States' undertaking to obtain through the Civil Rights Act what it has all but conceded it cannot obtain under the specific statutes it is seeking to enforce is in

direct contravention" of foundational principles of statutory interpretation. *Bellows*, 834 F.Supp.3d at 126. When DOJ "wants to enforce HAVA and the NVRA, it must use the pre-suit investigation and enforcement mechanisms that Congress provided in those statutes—which do not contemplate production of the unredacted computerized list to the Attorney General so that he might loom over the shoulder of … state election official[s]." *Id.*

#### 1. A proper purpose for a CRA demand must relate to investigations into the denial of the right to vote and violations of civil rights laws.

DOJ contends that the CRA "provides no limitation on the permissible purpose of" a Title III demand, such that the provision encompasses "investigating possible violations of [any] Federal statute." Br.31, 41 (quotation omitted). But the CRA's text and overall context foreclose that expansive claim. Courts do not read isolated fragments of statutory text to find previously undiscovered wellsprings of federal power. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) (explaining "a reviewing court should not confine itself to examining a particular statutory provision in isolation"). "Textualists—like all those who use language to communicate—do not interpret words in a vacuum. Instead, we use context, including '[b]ackground legal conventions,' 'common sense,' and 'constitutional structure,' to ascertain a text's 'most natural meaning.'" *Learning*

*Res., Inc. v. Trump*, 607 U.S. 229, 301 (2026) (Barrett, J., concurring) (quoting *Biden v. Nebraska*, 600 U.S. 477, 509, 511-12, 515 (2023) (Barrett, J. concurring)).

DOJ argues that Title III lacks specific language limiting it to violations of individuals' voting rights. Br.41-42. But the relevant statutory and historical context is rife with references to individual voting rights—and is not seriously disputed. *See supra* Statement §I.A. Congress enacted the CRA to bolster enforcement of a closely related statute, the Civil Rights Act of 1957. *See* Pub. L. No. 85-315, 71 Stat. 634 (1957). Title III's "purpose is to enable the Attorney General to determine whether [§10101] suits or similar actions should be instituted." *Lynd*, 306 F.2d at 228. But it was also undisputed that "[i]t [was] not the purpose of title III to supervise State elections." *Hearings* at 700 (Statement of Rep. William M. McCulloch, a principal drafter of Title III). Rather, the "purpose of Title III" is to preserve records for cases where "reasonable cause is thought to exist that any person qualified to vote has been improperly denied that right." *Id.*; *see also id.* at 599 (Attorney General Rogers explaining Title III is meant to facilitate investigations into "complaints that qualified persons have been denied the right to vote in violation of Federal law"); 106 Cong. Rec. 5086 (1960) (explaining Title III "requires the preservation of voting records and gives the Justice Department power to inspect them in enforcing the 1957 act" (Statement of Sen. Saltonstall)). Indeed, Representative Cramer, who proposed the relevant basis and purpose language, did so to ensure that any demand

"have some relationship to the title and purpose of the bill, the title of the bill being 'to enforce constitutional rights.'" 106 Cong. Rec. at 6392 (Statement of Rep. Cramer).

Buttressing this historical context are important "'[b]ackground legal conventions,' 'common sense,' and 'constitutional structure.'" *Learning Res.*, 607 U.S. at 301 (Barrett, J., concurring) (quoting *Nebraska*, 600 U.S. at 509, 511-12, 515 (Barrett, J., concurring)). The Constitution, in the first instance, "invests the States with responsibility for the mechanics of congressional elections." *Foster*, 522 U.S. at 69. The Elections Clause empowers States to "provide a complete code for congressional elections, not only as to times and places, but in relation to … registration." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). And both the NVRA and HAVA supply important "background legal conventions" reinforcing that voter registration remains principally a state matter. *See supra* Statement §§I.B-C. These foundational principles reinforce that Congress did not grant DOJ authority to demand inspection of unredacted state voter rolls on a whim and for any conceivable purpose.

Furthermore, the text of Title III is concerned with individuals' ability to register to vote and cast a vote freely. Its focus on "act[s] requisite to voting," 52 U.S.C. §§10101(a)(2)(B), 20701, demonstrates that its inspection provision is also rooted in an *individual's* right to vote. That unmistakable textual cue aligns with the

CRA's history, which, as contemporary courts observed, "leaves no doubt but that [the CRA] is designed to secure a more effective protection of the right to vote." *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960), *aff'd per curiam*, 285 F.2d 430 (5th Cir. 1961). This Court should reject DOJ's attempt to convert the CRA, enacted to *protect* individuals' right to vote, into a tool to further its efforts to *remove* voters from States' voter rolls.

The Court also "must be guided to a degree by common sense," which reinforces that Congress did not haphazardly grant DOJ a power of such "political magnitude" in a six-decade-old civil rights law that no court has ever applied outside of voting rights investigations. *Brown & Williamson*, 529 U.S. at 133. In recent years, the Supreme Court has emphatically rejected the notion that Congress accidentally grants sweeping power to the Executive Branch through obscure or opaque statutory provisions. Instead, it demands "clear congressional authorization," not "a merely plausible textual basis," when an agency like DOJ claims previously "unheralded" power. *West Virginia v. EPA*, 597 U.S. 697, 722-23 (2022). Congress, after all, "does not ... hide elephants in mouseholes," *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001), particularly when attempting to excavate "long-[dormant] statute[s]" which "represent[] a transformative expansion in [its] ... authority." *West Virginia*, 597 U.S. at 723 (citation modified).

DOJ fails to grapple with the context, history, statutory framework, and constitutional presumptions above. Nor does DOJ advance any principled limitation on the permissible scope of CRA demands. Its principal argument is that the CRA may be marshaled for the purpose of "investigating *possible* violations of a Federal statute." Br.31 (quoting *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (quoting 106 Cong. Rec. at 7767 (Statement of Sen. Keating))). But just beforehand, Senator Saltonstall made clear that Title III was intended "to add essential features to the laws already on the statute books toward ending discrimination in the voting privileges of our citizens." 106 Cong. Rec. at 7767.

Ultimately, DOJ argues that Title III can be used to "investigat[e] possible violations" of *any* federal statute. Br.31. But just as a parent's instruction to "[m]ake sure the kids have fun" does not mean a babysitter may take the kids on a multi-day jaunt to a rollercoaster park, *Nebraska*, 600 U.S. at 513 (Barrett, J., concurring), the CRA's instruction that DOJ state the "purpose" for its demand does not give DOJ carte blanche to invoke the CRA for whatever purpose it desires.

**2. Ensuring compliance with the NVRA and HAVA is not a proper purpose under the CRA.**

DOJ claims that "even if Title III were limited to 'investigating violations of individuals' voting rights,'" "that requirement has been met here" because "ensuring Connecticut's compliance with the NVRA and HAVA relates to individual voting rights." Br.43.

To start, a core problem with DOJ's invocation of the CRA as a tool for disclosure of list maintenance records is that Congress has spoken to that issue in a different statute. The NVRA grants DOJ the right to inspect "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. §20507(i)(1). DOJ cannot supplant the tools Congress *did* provide for federal list maintenance supervision—including an inspection provision—with the one DOJ *wishes* Congress provided. Allowing DOJ to invoke another statute's disclosure tool because it finds the NVRA unsatisfactory would result in "the superfluity of a specific provision that is swallowed by the general one." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). In such cases it is "[t]he terms of the specific authorization [that] must be complied with." *Id.*; *see also* Scalia & Garner, *Reading Law*, *supra*, at 184 (explaining the general provision is "suspended" as "to cases covered by the specific provision").

DOJ argues that its purpose in monitoring Connecticut's NVRA and HAVA compliance relates to voting rights. Br.43. This fails immediately, as DOJ never stated such a purpose in its demand letter. JA43-45. In any event, DOJ cannot use the specter of supposedly "fraudulent votes" to transform an NVRA and HAVA list-maintenance investigation into a CRA-permissible civil rights investigation. Br.44. The authority DOJ relies on makes clear that list-maintenance issues such as

"failures to purge voters who have moved away or have died" do not "bear any particular importance" to a CRA inquiry. *Kennedy v. Bruce*, 298 F.2d 860, 863 n.2 (5th Cir. 1962).

DOJ's attempt to shoehorn the CRA into a voter list inspection tool would also upset the "comprehensive scheme for the creation and upkeep of states' computerized SVRLs" Congress created in HAVA and the NVRA. *Bellows*, 834 F.Supp.3d at 125. Indeed, HAVA contains no inspection provision at all, and courts have concluded that the NVRA does not mandate the disclosure of the sensitive voter information DOJ seeks. *See Voter Reference Found.*, 160 F.4th at 1083 n.14; *PILF*, 92 F.4th at 56.

### C. The CRA does not preempt Connecticut's voter privacy protections.

Connecticut law prohibits the disclosure of sensitive voter information contained in a voter file, including driver's license and social security numbers. Conn. Gen. Stat. §9-50d(b). DOJ does not contest that Connecticut law prohibits the disclosure of such information and now appears willing to accept some redactions on the SVRL that pertain to party affiliation and how an individual has voted on First Amendment grounds. *See* Br.54. Because DOJ has failed to demonstrate that the CRA preempts Connecticut's voter privacy laws, it is not entitled to Connecticut's full, unredacted SVRL.

Nothing in the CRA's text specifically extends to sensitive voter information, and the early case law confirms it was not meant to. As *Lynd* recognized, the CRA was intended to reach only "public records which ought ordinarily to be open to legitimate reasonable inspection," *not* "confidential, private papers and effects." 306 F.2d at 231. Accordingly, the CRA cannot be read to "sweep[] … broadly" enough to cover an unredacted SVRL. *United States v. Raffensperger*, No. 1:26-cv-485, 2026 WL 3002013, at *7 (N.D. Ga. Sep. 30, 2026). Because a State "can comply with Title III of the CRA even if it only produces a *redacted* SVRL," *id.* (emphasis added), there is no conflict between the CRA and Connecticut's voter privacy laws, so they are not preempted.

Indeed, since driver's license numbers and partial social security numbers were not required to be provided on registration forms until 2002, *see* 52 U.S.C. §21083(a)(5)(A)(i), Congress's purpose in enacting the CRA could not possibly have extended to requiring the disclosure of such information. *See also Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) ("[T]he purpose of Congress is the ultimate touchstone of pre-emption analysis." (citation modified) (quoting *Malone v. White Motor Corp.*, 435 U.S. 497, 504 (1978))). Further, courts have held that "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in [state voter files]." *PILF*, 92 F.4th at 56. Just like the NVRA, the CRA is devoid of any language prohibiting redactions.

DOJ attempts to identify a preemptive conflict in the CRA by citing 52 U.S.C. §20704, which provides that DOJ may not share records obtained under the CRA except to Congress, other government agencies, or in a judicial proceeding. *See* Br.64. But §20704 exists to prevent *DOJ* from disclosing sensitive information; it does not speak to whether *States* may enact their own protections. Nor does it conflict with Connecticut law. Both federal and state "privacy protections can coexist because the latter does not obstruct the former." *United States v. Weber*, 816 F.Supp.3d 1168, 1189 (C.D. Cal. 2026).

### D. The Privacy Act prohibits DOJ from collecting Connecticut's voter list.

The Court should also affirm because the mass data collection DOJ seeks would violate the Privacy Act. *See Weber*, 816 F.Supp.3d at 1192-94 (dismissing DOJ's demand for California's unredacted SVRL on this ground).

The Privacy Act "offers substantial protection[] regarding governmental use and retention of identifiable personal information." *League of Women Voters v. DHS*, No. 25-CV-3501, 2025 WL 3198970, at *1 (D.D.C. Nov. 17, 2025), *stayed on other grounds*, *LWV III*, 2026 WL 2879700, at *2-3.[16] One such requirement is that, before

---

[16] On September 25, the Supreme Court stayed an injunction granted in *League of Women Voters* that would have prevented the federal government from allowing States to compare their voter files against the federal SAVE database. *See LWV III*, 2026 WL 2879700, at *2-3. The Court's basis for granting the stay rested on 8 U.S.C. §1373, which (as relevant here) limits the ability of a State to "prohibit" or "restrict"

an agency may "establish or revise any 'system of records,' it must 'publish in the Federal Register … a notice of the existence and character of the system of records.'" *Id.* at *2 (alterations omitted) (quoting 5 U.S.C. §552a(e)(4)). The System of Records Notice or "SORN" must include a defined set of information about the records stored in the system—including the "purposes for which the information is intended to be used," whose records are at issue, and the types of records covered. 5 U.S.C. §552a(e).

DOJ does not contest that Connecticut's SVRL qualifies as a "system of records" under the Act. *See Schwier v. Cox*, 412 F.Supp.2d 1266, 1271-72 (N.D. Ga. 2005) (holding a voter list is a system of records), *aff'd*, 439 F.3d 1285 (11th Cir. 2006). DOJ must, therefore, issue a compliant SORN "*before*" it engages in activity covered by the Act. *LULAC v. Exec. Off. of the President*, 818 F.Supp.3d 34, 115-16 (D.D.C. 2026).

---

its governmental entities from providing information regarding "citizenship" or "immigration status" to the federal government. *See* 8 U.S.C. §1373(a)-(b). That statute and the Court's analysis in *LWV III* are not applicable here, for several reasons, including that §1373(b) only covers instances where the information to be provided regards "the immigration status, lawful or unlawful, of any individual." Providing an SVRL—which is a snapshot of a State's registered voters—is not providing information regarding whether an individual's immigration status is lawful or unlawful.

DOJ points to a SORN identified as "JUSTICE/CRT-001," the "Central Civil Rights Division Index File and Associated Records." Br.55-56. But this SORN fails to support DOJ's attempt to collect voter data here several times over. *First*, it does not disclose what DOJ intends to do with the voter data—indeed, it does not even *mention* the NVRA, HAVA, or the CRA. DOJ seeks to excuse this omission because the SORN refers to the Civil Rights Division's website, which in turn mentions the statutes, Br.55-56 n.12, but the Privacy Act requires information in the SORN to be "publish[ed] in the Federal Register"—not on an agency's webpage. 5 U.S.C. §552a(e)(4). And the Division's website merely lists the statutes enforced by the Voting Section—it does not disclose the intended "routine use[s]" of the mass data collection DOJ seeks here. *Id.* §552a(e)(4)(D).

*Second*, the SORN says DOJ may maintain information about the "[s]ubjects of investigations, victims, [and] potential witnesses." 68 Fed. Reg. 47610, 47611 (Aug. 11, 2003). DOJ insists this language covers its demand because every one of the more than *two million* registered voters in Connecticut is simultaneously a "subject" and "victim" in its "investigation into list maintenance." Br.56-57. Connecticut's voters would be aghast to learn that DOJ views each and every one of them as a "subject"—a term that, as DOJ recognizes, means that the individual's "conduct" is under "investigation." *Id.* And it is similarly implausible to call every registered voter in Connecticut a "victim" in an investigation purportedly about the

sufficiency of the State's voter roll maintenance. Reading those terms as capaciously as DOJ urges would make a mockery of the Privacy Act's notice requirements. *See Common Cause v. U.S. Dep't of Just.*, No. 26-1352, 2026 WL 3033772, at *29 (D.D.C. Oct. 9, 2026) (DOJ's "reading of the 2003 SORN defies belief").

*Third*, the SORN describes the categories of covered records as "case files, matters, memoranda, correspondence, studies, and reports relating to enforcement of civil rights laws and other various duties of the Civil Rights Division." 68 Fed. Reg. at 47,611. Although this language may cover run-of-the-mill files maintained for specific investigations and litigation, it would be remarkable to conclude—as DOJ insists—that these terms extend to permit proactively seizing each State's full, unredacted voter list.

For all these reasons, this SORN does "nothing to put a member of the American public on notice that specifically, their voter registration data is going to be collected on [such] an unprecedented level." *Weber*, 816 F.Supp.3d at 1193-94. "Because the DOJ has not fulfilled its requirements under the Privacy Act, it cannot collect the sensitive, unredacted voting records of millions of" Connecticut residents. *Id.* at 1194.[17] And, contrary to DOJ's invitation to ignore this Privacy Act violation

[17] The "law enforcement" exception DOJ references means only that DOJ is not *categorically* barred from collecting First Amendment information. *See* 5 U.S.C. §552a(e)(7). There is no law enforcement exception to the Act's SORN requirement. *Id.* §552a(e)(4).

and order production of Connecticut's SVRL anyway, Br.53-54, courts may not "command[] unlawful conduct." *Bartch v. Barch*, 111 F.4th 1043, 1063 n.23 (10th Cir. 2024) (quoting *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 79-80 (1982)); *see Ind. Prot. & Advoc. Servs. Comm'n v. Ind. Family & Soc. Servs. Admin.*, 149 F.4th 917, 939 (7th Cir. 2025) ("Needless to say, courts are not authorized to issue injunctions that authorize or direct people to violate valid federal statutes." (citation modified)).

## IV. If the Court vacates the dismissal, it should remand for additional proceedings.

Even if the Court were to reverse, it should reject DOJ's audacious request to "remand with instructions to order Secretary Thomas to immediately produce the requested unredacted SVRL" and to immediately issue its mandate. Br.68. The appropriate next step would be for the matter to proceed to discovery, including as to whether DOJ's purpose in seeking Connecticut's SVRL was pretextual. *See United States v. Clarke*, 573 U.S. 248, 254 (2014) (permitting discovery into government's motive in issuing document demand upon "a showing of facts that give rise to a plausible inference of improper motive"). The CRA requires DOJ to state "the purpose" for its demand, so it matters whether the asserted purpose is the true one. *See Powell*, 379 U.S. at 58 ("It is the court's process which is invoked to enforce the administrative summons and a court may not permit its process to be abused.").

Multiple courts have expressed concern regarding DOJ's "potential ulterior motives for seeking sensitive voter data." *Bd. of Elections of N.Y.*, 2026 WL 1999921, at *7 n.7; *see also, e.g.*, *Weber*, 816 F.Supp.3d at 1182-86 (concluding DOJ's stated purpose in demanding California's SVRL was "pretextual" and "contrived"); *Oregon*, 828 F.Supp.3d at 1107 (expressing "serious doubt as to the true purposes for which [DOJ] is seeking voter registration lists in this and other cases, and what it intends to do with that data"). If this Court were to vacate the district court's dismissal, the appropriate next step would be to allow the district court to consider factual evidence related to the true purposes of DOJ's unprecedented investigation into Connecticut's voter file, after appropriate discovery, to determine if the investigation has been undertaken for an "improper motive." *Clarke*, 573 U.S. at 254.

## CONCLUSION

The Court should affirm.

Dated: November 12, 2026

Respectfully submitted,

*/s/ Aria C. Branch*
Aria C. Branch
Joshua C. Abbuhl
Julianna D. Astarita
Tori A. Shaw
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW,
Ste. 400
Washington, DC 20001
Tel.: (202) 948-1135

William Bloss
**KOSKOFF KOSKOFF & BIEDER P.C.**
350 Fairfield Avenue, Suite 501
Bridgeport, CT 06604
Tel.: (475) 766-4317

*Counsel for SEIU District 1199NE, Connecticut Alliance for Retired Americans, Connecticut Citizen Action Group, and Bette Marafino*

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Federal Rule of Appellate Procedure 32(a) and Second Circuit Local Rule 32.1(a)(4)(A) because it contains 13,948 words, excluding the parts exempted by Fed. R. App. P. 32(f). This brief also complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) because it was prepared in Times New Roman 14-point font using Microsoft Word for Microsoft 365.

Dated: November 12, 2026

*/s/ Aria C. Branch*
Aria C. Branch