# 26-2064-cv

*To Be Argued By*:
Michael Rondon
Assistant Attorney General

# In the United States Court of Appeals for the Second Circuit

The United States of America,
Plaintiff-Appellant
v.
Stephanie Thomas,
Defendant-Appellee.

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT**

**BRIEF OF DEFENDANT-APPELLEE**

WILLIAM TONG
ATTORNEY GENERAL

Michael Rondon
Blake T. Sullivan
Elizabeth Lewis
Assistant Attorneys General
165 Capitol Avenue
Hartford, CT 06106
Ph: 860-808-5020
Email: Michael.Rondon@ct.gov

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iv

STATEMENT OF THE ISSUES ........ 1

INTRODUCTION ........ 1

STATEMENT OF THE CASE ........ 5

I. Legal Background ........ 5

A. Federal Priorities for SVRL Maintenance ........ 5

1. NVRA ........ 7

2. HAVA ........ 8

B. Connecticut SVRL Maintenance ........ 10

II. Factual Background ........ 12

A. The Federal Initiative to Collect and Audit State SVRLs ........ 12

B. DOJ Demands Connecticut's SVRL ........ 15

C. Procedural History ........ 18

STANDARD OF REVIEW ........ 19

SUMMARY OF ARGUMENT ........ 19

ARGUMENT ........ 20

I. DOJ's Demand Is Unenforceable ........ 20

A. An SVRL Is Not a "Record" under the CRA ........ 20

1. The Secretary Creates the SVRL, so It Does Not "Come Into the Secretary's Possession" ........ 21

2. An SVRL Cannot Be "Retained and Preserved" for Twenty-Two Months because It Is Constantly Updated ........ 30

3. An SVRL Is Not the Type of "Record" Congress Contemplated in the CRA because It Is Statewide, Electronic, and Includes Sensitive Data ..................... 35

B. DOJ's Demand Lacks a Valid "Purpose" ............................... 40

1. DOJ's Reason for the Demand Must Be Consistent with the Purpose of the CRA ...................................... 40

2. The Purpose of the CRA Is to Prevent Voting Discrimination............................................................ 42

3. DOJ's Stated Purpose for Its Demand Is Unrelated to Voting Discrimination............................................. 44

4. The Federal Government Has Stated that It Has Other Purposes that Are Clearly Outside the Scope of the CRA......................................................... 54

C. DOJ's Demand Lacks a "Basis" ............................................. 55

II. Federal and State Privacy Law Prohibit Disclosure ..................... 59

A. DOJ's Demand Violates the Privacy Act ............................... 59

B. DOJ's Demand Violates the E-Government Act.................... 64

C. DOJ's Demand Violates the Driver's Privacy Protection Act........................................................................................ 66

D. The CRA Does Not Preempt State Privacy Law Prohibiting Disclosure of Sensitive Information .................. 67

III. The CRA Does Not Authorize a Summary Proceeding ................. 70

A. The Federal Rules of Civil Procedure Apply ......................... 70

B. Alternatively, the CRA Demand Should Be Enforced as an Administrative Subpoena ........................................... 75

CONCLUSION ......................................................................................... 78

CERTIFICATE OF COMPLIANCE ....................................................... 79

CERTIFICATE OF SERVICE........................................................80

# TABLE OF AUTHORITIES

## Cases

*ACORN v. Edgar*, 56 F.3d 791 (7th Cir. 1995) ........................................ 6

*Alabama Assn. of Realtors v. HHS*, 594 U.S. 758 (2021) ........................ 23

*Alexander v. Sandoval*, 532 U.S. 275 (2001)........................................... 46

*Am. International Group v. Bank of Am. Corp.*, 712 F.3d 775 (2d Cir. 2013) ................................................................................ 38 n.93

*American Civil Rights Union v. Philadelphia City Commissioners*, 872 F.3d 175 (3d Cir. 2017)....................................... 47

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) ............................................................................................. 7, 48, 68

*Assn. of Community Organizations for Reform Now v. Fowler*, 178 F.3d 350 (5th Cir. 1999)............................................................ 47

*Barnhart v. Peabody Coal Co.*, 537 U.S. 149 (2003)......................... 35, 36

*Becker v. IRS*, 34 F.3d 398 (7th Cir. 1994) ............................................ 61

*Bellitto v. Snipes*, 935 F.3d 1192 (11th Cir. 2019).............................. 6, 52

*Biden v. Nebraska*, 600 U.S. 477 (2023) ................................................ 45

*Burch v. P.J. Cheese, Inc.*, 861 F.3d 1338 (11th Cir. 2017) .................... 71

*Clarkson v. IRS*, 678 F.2d 1368 (11th Cir. 1982) .................................. 60

*Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262 (2019)............................................................................ 40 n.98

*Comcast Corp. v. National Assn. of African American-Owned Media*, 589 U.S. 327 (2020) ........................................................ 22 n.63

*Common Cause v. United States DOJ*, Civil Action No. 26 - 1352 (SLS), 2026 U.S. Dist. LEXIS 232452 (D.D.C. Oct. 9, 2026)............................................................................................ passim

*Conner v. United States*, 434 F.3d 676 (4th Cir. 2006)................76 n.139

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000)..................67

*Da Cunha v. Freden*, 175 F.4th 61 (2d Cir. 2026) ..................................48

*Dep't of Comm. v. New York*, 588 U.S. 752 (2019)..................................55

*Donaldson v. United States*, 400 U.S. 517 (1971)..................................74

*Dubin v. United States*, 599 U.S. 110 (2023) ..........................................23

*Epic Systems Corp. v. Lewis*, 584 U.S. 497 (2018)..................................45

*FAA v. Cooper*, 566 U.S. 284 (2012) .......................................................59

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ..........................................................................................34

*Figueroa v. Foster*, 864 F.3d 222 (2d Cir. 2017).....................................68

*Foster v. Love*, 522 U.S. 67 (1997) ..........................................................68

*Garris v. FBI*, 937 F.3d 1284 (9th Cir. 2019)..........................................60

*Gordon v. Softech Int'l, Inc.*, 726 F.3d 42 (2d Cir. 2013) ........................66

*Greater Birmingham Ministries v. Secretary of State*, 105 F.4th 1324 (11th Cir. 2024) ...............................................................37

*Hagen v. Utah*, 510 U.S. 399 (1994)........................................................42

*Husted v. A. Philip Randolph Institute*, 584 U.S. 756 (2018) ..........5, 6, 8

*In re Coleman*, 208 F. Supp. 199 (S.D. Miss. 1962), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963)..........56 n.110

*In re Gordon*, 218 F. Supp. 826 (S.D. Miss. 1963) ..................................74

*In re Wallace*, 170 F. Supp. 63 (M.D. Ala. 1959) ....................................38

*INS v. Pangilinan*, 486 U.S. 875 (1988)...................................................63

*Irons v. Bell*, 596 F.2d 468 (1st Cir. 1979) ..............................................61

*ISC Holding AG v. Nobel Biocare Finance AG*, 688 F.3d 98 (2d Cir. 2012) ........ 71

*Kennedy v. Bruce*, 298 F.2d 860 (5th Cir. 1962) ........ 36, 47, 56 n.110

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962) ........ passim

*Kennedy v. Owen*, 321 F.2d 116 (5th Cir. 1963) ........ 39

*Lamont v. Dep't of Justice*, 475 F. Supp. 761 (S.D.N.Y. 1979) ........ 61

*League of Women Voters v. United States Dept. of Homeland Sec.*, 835 F. Supp. 3d 79 (D.D.C. 2026) ........ 14, 15 n.41

*Londrigan v. FBI*, 670 F.2d 1164 (D.C. Cir. 1981) ........ 59, 62

*LULAC v. Executive Office of the President*, 818 F. Supp. 3d 34 (D.D.C. 2026) ........ 6, 12 n.31

*Marek v. Chesny*, 473 U.S. 1 (1985) ........ 71

*McCarthy v. United States*, 394 U.S. 459 (1969) ........ 56 n.109

*Mei Xing Yu v. Hasaki Restaurant, Inc.*, 944 F.3d 395 (2d Cir. 2019) ........ 72

*Microsoft Corp. v. United States (In re Warrant to Search a Certain E-Mail Account Controlled & Maintained by Microsoft Corp.)*, 829 F.3d 197 (2d Cir. 2016) ........ 35

*Munoz-Gonzalez v. D.L.C. Limousine Service*, 904 F.3d 208 (2d Cir. 2018) ........ 21

*Murphy Bros. v. Michetti Pipe Stringing*, 526 U.S. 344 (1999) ........ 35

*Nat'l Archives and Records Admin. v. Favish*, 541 U.S. 157 (2004) ........ 57

*New Hampshire Fire Ins. Co. v. Scanlon*, 362 U.S. 404 (1960) ........ 71, 74

*NLRB v. County Waste of Ulster, LLC*, 455 F. App'x 32 (2d Cir. 2012) ........ 57

*Oestereich v. Selective Serv. Sys. Local Bd.*, 393 U.S. 233 (1968) ........................................................................................ 63

*Palmer v. Amazon.com, Inc.*, 51 F.4th 491 (2d Cir. 2022) ..................... 19

*Parker Drilling Management Services v. Newton*, 587 U.S. 601 (2019) ............................................................................. 72 n.134

*Patterson v. FBI*, 893 F.2d 595 (3d Cir. 1990) ....................................... 63

*Public Int. Legal Foundation v. Benson*, 136 F.4th 613 (6th Cir. 2025) .................................................................................... 52

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012) ............................................................................... 34

*RNR Enterprises v. SEC*, 122 F.3d 93 (2d Cir. 1997) ...................... 76, 77

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966) ............. 2, 36, 43, 45

*United States DOJ v. Tax Analysts*, 492 U.S. 136 (1989) ...................... 26

*United States ex rel. Polansky v. Executive Health Resources, Inc.*, 599 U.S. 419 (2023) ............................................................. 70

*United States v. Amore*, 831 F. Supp. 3d 149 (D.R.I. 2026) ............ 41, 42

*United States v. Bellows*, 834 F. Supp. 3d 113 (D. Me. 2026) ........ passim

*United States v. Benson*, 179 F.4th 470 (6th Cir. 2026) ................ passim

*United States v. Benson*, 187 F.4th 462 (6th Cir. 2026) .................. 27, 34

*United States v. Benson*, 819 F. Supp. 3d 753 (W.D. Mich. 2026) ........................................................................................ 52 n.106

*United States v. Board of Elections*, Docket No. 1:25-CV-1338 (MAD/PJE), 2026 U.S. Dist. LEXIS 153474 (N.D.N.Y. July 10, 2026) ....................................................................................... 34, 50

*United States v. Caldwell*, Civil Action No. 26-2025 (ZNQ) (JTQ), 2026 U.S. Dist. LEXIS 168836, (D.N.J. July 29, 2026) ...................................................................................... 72 n.133

*United States v. DeMarinis*, Docket No. SAG-25-3934, 2026 U.S. Dist. LEXIS 137156 (D. Md. June 18, 2026)....23

*United States v. Duke*, 332 F.2d 759 (5th Cir. 1964)....69

*United States v. Evans*, Civil Action No. 25-4403 (RDM), 2026 U.S. Dist. LEXIS 175707 (D.D.C. Aug. 6, 2026).... passim

*United States v. Francisco*, Docket No. 3:25-cv-00728-ART-CLB, 2026 U.S. Dist. LEXIS 182806 (D. Nev. Aug. 14, 2026) ....51

*United States v. Galvin*, 830 F. Supp. 3d 122 (D. Mass. 2026)....56

*United States v. Hanzas*, Docket No. 2:25-cv-00903, 2026 U.S. Dist. LEXIS 212824 (D. Vt. Sept. 17, 2026)....37, 42, 73 n.135

*United States v. Hobbs*, Docket No. C25-6078-KKE, 2026 U.S. Dist. LEXIS 215438 (W.D. Wash. Sep. 22, 2026)....24, 73

*United States v. Koski*, Civil Action No. 3:26CV42 (RCY), 2026 U.S. Dist. LEXIS 156188 (E.D. Va. July 14, 2026)....34

*United States v. Matthews*, Docket No. 25-cv-3398, 2026 U.S. Dist. LEXIS 170351 (C.D. Ill. July 31, 2026)....25, 41, 45, 56

*United States v. Mississippi*, 229 F. Supp. 925 (S.D. Miss. 1964), *rev'd*, 380 U.S. 128 (1965)....69

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950)....75, 77

*United States v. Oliver*, Docket No. 1:25-cv-01193-JCH-JFR, 2026 U.S. Dist. LEXIS 155419 (D.N.M. July 14, 2026)....41, 69

*United States v. Oregon*, 828 F. Supp. 3d 1092 (D. Or. 2026)....55, 69

*United States v. Powell*, 379 U.S. 48 (1964).... passim

*United States v. Raffensperger*, Docket No. 5:25-cv-00548-CAR, 2026 U.S. Dist. LEXIS 12804 (M.D. Ga. Jan. 23, 2026) ....38, 69

*United States v. Scanlan*, 838 F. Supp. 3d 150, 2026 U.S. Dist. LEXIS 143053 (D.N.H. 2026) .......... 22, 25, 27, 70

*United States v. Schmidt*, 835 F. Supp. 3d 697 (W.D. Pa. 2026) .......... 38, 54

*United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026) .......... passim

*Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068 (10th Cir. 2025) .......... 68

*West Virginia v. EPA*, 597 U.S. 697 (2022) .......... 49

**Statutes**

5 U.S.C. § 552a(e)(4) .......... 61 n.119, 62 n.120

5 U.S.C. § 552a(e)(7) .......... 60 n.115, n.116, 61 n.117

18 U.S.C. § 2721(a) .......... 66

18 U.S.C. § 2721(b) .......... 66 n.128, 67 n.129

18 U.S.C. § 2721(b)(1) .......... 66

18 U.S.C. § 2721(d) .......... 66

42 U.S.C. § 1983 .......... 47

44 U.S.C. § 3518(c)(1)(B)(ii) .......... 65 n.125

44 U.S.C. § 3518(c)(2) .......... 65 n.126

44 U.S.C. § 3572 .......... 27

44 U.S.C. § 3572(a) .......... 27 n.68

44 U.S.C. § 3572(f) .......... 27 n.68

52 U.S.C. § 10101 .......... 43

52 U.S.C. § 20501(b) .......... 7 n.5

52 U.S.C. § 20503(a) .......... 8
52 U.S.C. § 20507(a)(1) .......... 7 n.6
52 U.S.C. § 20507(a)(3) .......... 7 n.6
52 U.S.C. § 20507(a)(4) .......... passim
52 U.S.C. § 20507(c)(1) .......... 8 n.8
52 U.S.C. § 20507(c)(1)(A) .......... 47
52 U.S.C. § 20507(c)(2)(A) .......... 32 n.82
52 U.S.C. § 20507(g) .......... 47
52 U.S.C. § 20507(i)(1) .......... 8 n.9
52 U.S.C. § 20510(a) .......... 8 n.10
52 U.S.C. § 20701 .......... passim
52 U.S.C. § 20702 .......... 25 n.67, 31 n.79, 32 n.84
52 U.S.C. § 20703 .......... passim
52 U.S.C. § 20705 .......... 38, 38 n.94
52 U.S.C. § 21083(a)(1)(A) .......... 9 n.11
52 U.S.C. § 21083(a)(1)(A)(i) .......... 31 n.80
52 U.S.C. § 21083(a)(1)(A)(ii) .......... 9 n.12
52 U.S.C. § 21083(a)(1)(A)(vi) .......... 9 n.15, 32 n. 81, 32 n. 85
52 U.S.C. § 21083(a)(2) .......... 32 n.82, n.85
52 U.S.C. § 21083(a)(4) .......... 32 n.82, n.85
52 U.S.C. § 21083(a)(5)(A) .......... 53 n.107
52 U.S.C. § 21083(a)(5)(A)(i) .......... 9 n.13, 11 n.26, 40 n.96

52 U.S.C. § 21083(a)(5)(A)(ii) .......... 9 n.13, 11 n.26

52 U.S.C. § 21083(a)(5)(A)(iii) .......... 9 n.14, 53 n.108, 61 n.118

52 U.S.C. § 21085 .......... 9 n.16

52 U.S.C. § 21111 .......... 10 n.17

1993 Conn. Pub. Act No. 93-230 .......... 40 n.96

Conn. Gen. Stat. § 7-37(a) .......... 11 n.23

Conn. Gen. Stat. § 7-42 .......... 11 n.23

Conn. Gen. Stat. § 9-19h .......... 66 n.127

Conn. Gen. Stat. § 9-19i .......... 11 n.25

Conn. Gen. Stat. § 9-20 .......... 66 n.127

Conn. Gen. Stat. § 9-23 .......... 11 n.25

Conn. Gen. Stat. § 9-23h .......... 11 n.27

Conn. Gen. Stat. § 9-3 .......... 10 n.18

Conn. Gen. Stat. § 9-32 .......... 11 n.25

Conn. Gen. Stat. § 9-35(a) .......... 11 n.23

Conn. Gen. Stat. § 9-35(b) .......... 11 n.23

Conn. Gen. Stat. § 9-50b .......... 10 n.20, 32 n.83

Conn. Gen. Stat. § 9-50b(a) .......... 30 n.75, n.76

Conn. Gen. Stat. § 9-50b(b) .......... 30 n.77

Conn. Gen. Stat. § 9-50c .......... 10 n.20

Conn. Gen. Stat. § 9-50d .......... 67 n.130

Conn. Gen. Stat. § 9-50d(c) .......... 67 n.131

Conn. Gen. Stat. § 9-189 .......... 10 n.19

Conn. Gen. Stat. § 9-190 .......... 10 n.19

Conn. Gen. Stat. § 54-240g.......... 67 n.131

Pub. L. No. 107-347, § 208(a) .......... 64 n.121

Pub. L. No. 107-347, § 208(b) .......... 64 n.122

Pub. L. No. 107-347, § 208(b)(1)(A)(i) .......... 65 n.124

Pub. L. No. 107-347, § 208(b)(1)(A)(ii)(II) .......... 65 n.123

U.S. Const. Art. I, § 2 .......... 6

U.S. Const. Art. I, § 4, cl. 1.......... 5

**Other Authorities**

Ballentine's Law Dictionary (3d ed. 1960).......... 41 n.99

Ballentine's Law Dictionary (3d ed. 1969).......... 56 n.109

Brennan Ctr. for Just., "Tracker of Justice Department Requests for Voter Information" (Oct. 26, 2026), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information. .......... 15n.43

Conference Report, Help America Vote Act of 2002, Cong. Rec. Vol. 148 No. 136, S10488, S10491 (Oct. 16, 2002) .......... 36 n.91

CT.gov, Office of the Secretary of the State, "Stephanie Thomas is Connecticut's 75th Secretary of the State" (last accessed Oct. 23, 2026), https://portal.ct.gov/sots/capitol/about-stephanie-thomas/the-biography-of-stephanie-thomas?archived=true....... 29 n.74

Devlin Barrett & Nick Corasaniti, Justice Dept. Explores Using Criminal Charges Against Election Officials, N.Y. Times (Jul. 2, 2025),

https://www.nytimes.com/2025/07/02/us/politics/justice-department-election-data.html ................................................33 n.88

DOJ.gov, Jurisdictions Previously Covered by Section 5 (last accessed Nov. 9, 2026), https://www.justice.gov/crt/jurisdictions-previously-covered-section-5.................................................................50 n.103

Elbert P. Tuttle, Equality and the Vote, 41 N.Y.U. L. Rev. 245 (Apr. 1966) ...................................................................................74

Jude Joffe-Block & Miles Parks, The Trump administration is building a national citizenship data system, NPR.org (Jun. 29, 2025), https://www.npr.org/2025/06/29/nx-s1-5409608/citizenship-trump-privacy-voting-database. ................13 n.32

Laurel Rosenhall & Shawn Hubler, Justice Dept. Demands That California Counties Help Identify Noncitizen Voters, N.Y. Times (Oct. 23, 2026), https://www.nytimes.com/2026/10/23/us/justice-dept-california-noncitizen-voters.html ..............................................34 n.89

Letter from T. McCotter, Acting Dep. Att'y Gen., to S. Thomas, Secretary of the State of Connecticut (Oct. 29, 2026), https://portal.ct.gov/-/media/sots/electionservices/2026/letter-to-secretary-thomas-regarding-obligations-under-52-usc-20701.pdf?rev=60c98cb96018444995a5671cae100dea&hash=37191FF5DD5B88EE559AA23E63106FCD ..........................33 n.87

*Misc. Bills Regarding the Civil Rights of Persons: Hr'gs before Subcomm. No. 5 of H. Comm. on Jud.*, 86th Cong. 1 (1959) ...... passim

News Releases, USCIS, USCIS Deploys Common Sense Tools to Verify Voters (May 22, 2025), https://www.uscis.gov/newsroom/news-releases/uscis-deploys-common-sense-tools-to-verify-voters.............................13 n.33

Nick Corasaniti, Justice Department Threatens Top Election Officials Over Noncitizen Voting, N.Y. Times (Jul. 7, 2026),

https://www.nytimes.com/2026/07/07/us/politics/justice-department-elections-noncitizen-voting.html ............................ 33 n.87

Preserving and Protecting the Integrity of American Elections, Exec. Order No. 14248, 90 Fed. Reg. 14005 (March 28, 2025) ........................................................ 12, 12 n.28, 13

Presidential Special Message to the Congress on Civil Rights (Feb. 5, 1959) ........................................................................ 44 n.101

Report of the U.S. Comm'n on Civil Rights, at 90 (1959), https://www.usccr.gov/files/historical/1959/59-001-U.pdf

.................................................................. 27 n.69, 28 n.71, n.72, n.73

The Grosset Webster Dictionary 46 (1966) ................................. 56 n.109

U.S. Dep't of Just., Justice Manual § 9-11.151 (2020), https://www.justice.gov/jm/jm-9-11000-grand-jury# .......................... 63

Webster's New World Dictionary (1960) ..................................... 56 n.109

**Rules**

Fed. R. Civ. P. 1 ........................................................................ 70 n.132

Fed. R. Civ. P. 1, adv. comm. notes .......................................... 70 n.132

Fed. R. Civ. P. 68 ........................................................................... 72

Fed. R. Civ. P. 81 ...................................................................... 70 n.132

Fed. R. Civ. P. 81(a)(5) ................................................................... 74

Fed. R. of Crim. P. 11 ................................................................. 56 n.109

## STATEMENT OF THE ISSUES

I. Whether the Court should affirm on the ground that the complaint fails to state an enforceable demand for records, under the Civil Rights Act of 1960, as determined by the District Court.

II. Whether the Court should affirm on the alternative ground that the demand for records is barred by federal and state privacy law, which the District Court did not reach.

III. Whether the complaint is exempt from the Federal Rules of Civil Procedure

## INTRODUCTION

As the District Court explained, this case involves a "fairly straightforward reading" of Title III of the Civil Rights Act of 1960 ("CRA").[1] Twenty-five federal district courts and the Sixth Circuit Court of Appeals agree, and have rejected claims nearly identical to those at issue here.[2]

---

[1] JA293 (Order).

[2] *See Common Cause v. United States DOJ*, Civil Action No. 26 - 1352 (SLS), 2026 U.S. Dist. LEXIS 232452, at *15 n.3 (D.D.C. Oct. 9, 2026) (citing cases).

Attempting to audit the voting records of 210 million Americans, the Department of Justice ("DOJ") claims that the CRA gives it a "sweeping authority" to demand every statewide voter registration list ("SVRL") in the country. (Br. 16). But the CRA does not extend to an SVRL—the law does not mention anything resembling an SVRL, no court has ever held that it applies to an SVRL, and Congress could not have had SVRLs in mind when it passed the CRA because SVRLs barely even existed at that time.

For similar reasons, DOJ's reason for requesting an SVRL under the CRA is plainly impermissible. There is no dispute that the CRA was intended to "g[i]ve the Attorney General access to local voting records … in areas of systematic discrimination." *South Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966). But DOJ seeks statewide records for an audit that has nothing to do with discrimination. As an apt example of the mismatch between the intentions of Congress in 1960 and DOJ today, a drafter of the CRA remarked that "[i]t is not the purpose of [the CRA] to

supervise State elections."[3] Here, however, DOJ's purpose in demanding the SVRLs is (quite literally) to "supervise State elections" by conducting line-by-line audits of each state's voter records and demanding that states remove any registrant DOJ deems ineligible. Uses like this fall far outside the CRA's scope.

Accepting DOJ's argument would also trample over Congress's clearly stated goals in other statutes beyond the CRA. Specifically, DOJ wants to audit each state's SVRL for compliance with two federal election laws: the National Voter Registration Act of 1993 ("NVRA") and the Help America Vote Act of 2002 ("HAVA").[4] But unlike the CRA, NVRA and HAVA unambiguously express Congress's intentions for SVRLs—they require a state to establish an SVRL, set out rules for maintenance, and impose their own strictly limited enforcement schemes that do not give DOJ auditing power. If Congress had wanted DOJ to be able to audit an SVRL for compliance with NVRA or HAVA, it would have said so in

---

[3] *Misc. Bills Regarding the Civil Rights of Persons: Hr'gs before Subcomm. No. 5 of H. Comm. on Jud.*, 86th Cong. 700 (1959) (*House CRA Hr'gs*) (statement of Rep. William M. McCulloch).

[4] *E.g.*, JA44 ("The purpose of this request is to ascertain Connecticut's compliance with the list maintenance requirements of the NVRA and HAVA.").

NVRA or HAVA. It did not. DOJ wishes it were otherwise, so it is now trying to use the CRA to get around the limits Congress deliberately established.

Likewise, DOJ's mass data collection effort is prohibited by a variety of laws Congress and Connecticut have enacted to ensure that Americans' personal information is protected and not mismanaged or misused by the federal government. DOJ blows past these safeguards and claims they do not apply.

At bottom, all of this is contrary to the limited role that the federal government takes in voter registration—a domain that belonged exclusively to the states for the vast majority of our Nation's history. More recently, through laws like NVRA and HAVA, Congress has allowed federal agencies to intervene—but only in targeted ways and for specific reasons. At no point has Congress ever authorized anything like the nationwide audit or the mass collection of sensitive data that DOJ proposes here.

Joining more than two dozen other federal courts, the District Court correctly dismissed DOJ's action. This Court should affirm.

## STATEMENT OF THE CASE

### I. Legal Background

Because DOJ seeks to audit Connecticut's voter rolls for compliance with NVRA and HAVA, Defendant, Secretary of the State of Connecticut Stephanie Thomas, describes what those laws require and how Connecticut follows them.

#### A. Federal Priorities for SVRL Maintenance

Federal voter registration laws reflect a careful balancing act between fundamental structural concerns (like federalism and separation of powers) and competing objectives (like increasing the number of registered eligible voters), which can be difficult to reconcile on a practical level.

Structurally, our Constitution gives states the primary responsibility to set the "Times, Places and Manner" of federal elections, including establishing procedures for voter registration. U.S. Const. Art. I, § 4, cl. 1. While Congress may set its own rules, *see id.*, it declined to intervene in voter registration for most of our nation's history. *See Husted v. A. Philip Randolph Institute*, 584 U.S. 756, 761 (2018) (until 1993, "Congress left it up to the States to maintain accurate lists of those eligible to vote in federal elections"). And regardless of whether Congress

makes registration laws for states to follow, implementation of those laws remains with the states. *See ACORN v. Edgar*, 56 F.3d 791, 795 (7th Cir. 1995) (the Elections Clause "authorizes Congress to alter the state's system--but it is still the state's system, manned by state officers and hence paid for by the state"). So does the authority to determine voter qualifications. *See* U.S. Const. Art. I, § 2.

Equally important, the Framers "assigned no role at all to the President. Put simply, our Constitution does not allow the President to impose unilateral changes to federal election procedures." *LULAC v. Executive Office of the President*, 818 F. Supp. 3d 34, 53 (D.D.C. 2026).

Practically, federal law tries to achieve two goals through SVRL maintenance: "increasing voter registration and removing ineligible persons." *Husted*, 584 U.S. at 761. But these goals can sometimes conflict. *See Bellitto v. Snipes*, 935 F.3d 1192, 1198 (11th Cir. 2019) ("These twin objectives -- easing barriers to registration and voting, while at the same time protecting electoral integrity and the maintenance of accurate voter rolls -- naturally create some tension.").

Congress appreciated the tension between these concepts—state versus Congressional authority over elections; protecting and promoting

the right to vote versus limiting opportunities for error—and struck a balance. Accordingly, federal voter registration laws set out a limited number of requirements but otherwise allow each state to make its own rules. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 5 (2013) ("Congress has erected a complex superstructure of federal regulation atop state voter-registration systems.").

**1. NVRA**

Congress's goals in passing NVRA included "ensur[ing] that accurate and current voter registration rolls are maintained."[5] A state must, for example, ensure "that any eligible applicant is registered to vote" and that a registrant is not "removed from the official list of eligible voters" except under specified circumstances.[6] A state must also "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of registered voters" due to a registrant's death or change of address.[7]

---

[5] 52 U.S.C. § 20501(b).
[6] *Id.* § 20507(a)(1), (3).
[7] *Id.* § 20507(a)(4).

Implementation rests with the states. NVRA provides some ways a state may comply with certain requirements,[8] but states are free to choose others. *E.g.*, *Husted*, 584 U.S. at 762 (describing "a variety of approaches" states take to meet NVRA requirements); *see also generally* 52 U.S.C. § 20503(a) (federal procedures are "in addition to any other method of voter registration provided for under State law").

A state must maintain "records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters" for at least two years, and make the records available for public inspection.[9] The Attorney General may bring an action for declaratory or injunctive relief to enforce NVRA.[10]

**2. HAVA**

HAVA builds upon NVRA's SVRL maintenance requirements. It requires a state to implement "a single, uniform, official, centralized,

---

[8] *E.g.*, *id.* § 20507(c)(1) (safe-harbor for change-of-address requirement).

[9] *Id.* § 20507(i)(1).

[10] *Id.* § 20510(a).

interactive computerized statewide voter registration list."[11] The list must "contain[] the name and registration information of every legally registered voter in the State."[12]

A state may not accept or process a voter registration application unless it has a driver's license number, the last four digits of a social security number, or another unique number assigned by the state.[13] But it is the state—not the federal government—that "determine[s] whether the information provided by an individual is sufficient to meet the requirements of this subparagraph, in accordance with State law."[14]

HAVA also requires substantial involvement at the local level. For example, local election officials must update the SVRL "on an expedited basis" upon receipt of any new information.[15]

Except for requirements like these that are expressly stated, "[t]he specific choices on the methods of complying with the requirements ... shall be left to the discretion of the State."[16] The Attorney General may

---

[11] *Id.* § 21083(a)(1)(A).
[12] *Id.* § 21083(a)(1)(A)(ii).
[13] *Id.* § 21083(a)(5)(A)(i)–(ii).
[14] *Id.* § 21083(a)(5)(A)(iii).
[15] *Id.* § 21083(a)(1)(A)(vi).
[16] *Id.* § 21085.

bring a civil enforcement action "to carry out the uniform and nondiscriminatory election technology and administration requirements" of HAVA.[17]

### B. Connecticut SVRL Maintenance

Although the Secretary is Connecticut's Chief Election Official,[18] the state's elections are largely administered on the local level by local officials in each of its 169 municipalities. Typically, each town has two Registrars of Voters ("ROVs")—one from each major party—and a Town Clerk who together administer elections.[19]

Connecticut ensures that its SVRL—known as its Centralized Voter Registration System or "CVRS"[20]—complies with NVRA and HAVA through the efforts of the Secretary and these local officials.[21] For instance, Connecticut complies with NVRA's requirement to "conduct a general program that makes a reasonable effort to remove" deceased voters.[22] It mandates that ROVs hold a meeting before each election to

---

[17] *Id.* § 21111.
[18] Conn. Gen. Stat. § 9-3.
[19] *Id.* §§ 9-189, 9-190; JA69 (Rosenberg Aff. ¶¶ 9–10).
[20] *Id.* §§ 9-50b, 9-50c; JA68 (Rosenberg Aff. ¶ 4).
[21] JA69–74, 84–88 (Rosenberg Aff. ¶¶ 11–23, 58–71).
[22] 52 U.S.C. § 20507(a)(4).

remove all ineligible electors, and specifically ensures that ROVs are promptly notified of voter deaths and that they timely remove the deceased from the rolls.[23] Likewise, Connecticut complies with NVRA's requirement to maintain a "general program that makes a reasonable effort" to update its voter rolls based on a registrant's change of address[24] by having an ROV ascertain address changes through annual canvasses, change-of-address forms at voter registration agencies, automatic mechanisms at the DMV, and the National Change of Address System.[25]

Connecticut also complies with HAVA. Under HAVA, for example, a state may not accept or process any application unless it has a driver's license number, the last four digits of a social security number, or another unique identifying number assigned by the state.[26] Connecticut requires this information.[27]

---

[23] Conn. Gen. Stat. §§ 7-37(a), 7-42, 9-35(a)–(b); JA70 (Rosenberg Aff. ¶ 14).

[24] 52 U.S.C. § 20507(a)(4).

[25] Conn. Gen. Stat. §§ 9-19i, 9-23, 9-32; JA85 (Rosenberg Aff. ¶¶ 60–61).

[26] 52 U.S.C. § 21083(a)(5)(A)(i)–(ii).

[27] Conn. Gen. Stat. § 9-23h; JA88 (Rosenberg Aff. ¶ 70).

## II. Factual Background

### A. The Federal Initiative to Collect and Audit State SVRLs

In March 2025, President Trump issued Executive Order 14248 ("Elections E.O."). In relevant part, it instructs the Attorney General to take actions related to criminal enforcement of federal voting laws. For example, he is to use "databases or information maintained by [the Department of Homeland Security ('DHS')]" and "State-issued identification records" for criminal enforcement.[28] And in a section titled "Prosecuting Election Crimes," the Attorney General is instructed to "enter into information-sharing agreements ... with the chief State election official."[29] If a state declines, he must "prioritize enforcement of Federal election integrity laws in such States."[30] Relatedly, the Elections E.O. also directs DHS and Department of Governmental Efficiency to "review each State's publicly available voter registration list and available records concerning voter list maintenance activities as required by [NVRA], alongside Federal immigration databases."[31]

---

[28] Elections E.O. 14248 § 2(e).
[29] *Id.* § 5(a).
[30] *Id.* § 5(b).
[31] *Id.* § 2(b)(iii). Courts have already enjoined other portions of the Elections E.O. *E.g.*, *LULAC*, 818 F. Supp. 3d at 53.

Implementation of the Elections E.O. began quickly. By April, DHS started to roll out what would be a series of drastic changes to its immigration database, known as Systematic Alien Verification for Entitlements ("SAVE").[32] And DHS soon started encouraging state election officials to use the expanded SAVE database for voter verification.[33]

Data collection followed, as DOJ "began requesting states' unredacted voter rolls."[34] "After obtaining unredacted SVRLs from the states who volunteered them," DOJ "shared that data with [DHS]. In turn, DHS would run that data through [SAVE]."[35] Ultimately, DOJ would inform these states "of any voters listed on the SVRLs whom it deemed to be noncitizens," and the states "agreed to 'clean' their SVRLs

---

[32] *See* Jude Joffe-Block & Miles Parks, The Trump administration is building a national citizenship data system, NPR.org (Jun. 29, 2025), https://www.npr.org/2025/06/29/nx-s1-5409608/citizenship-trump-privacy-voting-database.

[33] *See* News Releases, USCIS, USCIS Deploys Common Sense Tools to Verify Voters (May 22, 2025), https://www.uscis.gov/newsroom/news-releases/uscis-deploys-common-sense-tools-to-verify-voters.

[34] *Common Cause*, 2026 U.S. Dist. LEXIS 232452, at *14.

[35] *Id.* at *15.

… by removing those voters deemed ineligible by [DOJ]."[36] "At least 18 states fully cooperated, turning over their unredacted SVRLs."[37]

Following the rushed changes, however, SAVE's reliability and security were lacking.[38] Critics—including the Secretary—have remarked that it is "likely to produce unreliable results and subject eligible voters to unnecessary burdens, intrusive investigations, and even disenfranchisement."[39] Courts have noted problems, too. *E.g.*, *League of Women Voters v. United States Dept. of Homeland Sec.*, 835 F. Supp. 3d 79, 111 (D.D.C. 2026) ("the undisputed record shows that [individuals] have been injured by dissemination of … inaccurate information falsely indicating that they are non-citizens" (cleaned up)). Even DOJ and DHS acknowledge problems with its core functions, like citizenship verification.[40]

As one district court summarized it:

> The agencies were scrambling to comply with an Executive Order aimed at reshaping federal elections, which directed them to create a system

---

[36] *Id.* at *18.
[37] *Id.* at *14.
[38] JA110–138.
[39] JA112.
[40] *Common Cause*, 2026 U.S. Dist. LEXIS 232452, at *16.

> for mass voter verification. So they haphazardly combined and repurposed the private information of millions of Americans, including citizenship data that they knew to be unreliable. Since then, states have partnered with the federal government to access the database and are actively removing United States citizens from voter rolls based on inaccurate information.[41]

Recognizing these and other problems, most states "refused" to turn over their SVRLs, "leading DOJ to file a bevy of lawsuits seeking to compel compliance."[42] DOJ has yet to prevail in any.[43]

### B. DOJ Demands Connecticut's SVRL

Just as it has from almost every other state, DOJ demanded voter data from Connecticut. In July 2025, Senior Counsel from DOJ's Criminal Division contacted the Secretary's office via email "to discuss a potential information-sharing agreement."[44] The email's subject line was "Executive Order Implementation" and it sought information on ineligible voters, fraudulent registration statements, and other unlawful

---

[41] *League of Women Voters*, 835 F. Supp. 3d at 95.

[42] *Common Cause*, 2026 U.S. Dist. LEXIS 232452, at *14–15.

[43] *See* Brennan Ctr. for Just., "Tracker of Justice Department Requests for Voter Information" (Oct. 26, 2026), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information.

[44] JA95.

conduct connected to voting.[45] The Secretary's representatives responded and held a brief phone call with DOJ on August 21.[46] None of these communications referenced NVRA, HAVA, or the CRA.

In a separate correspondence, on August 6, 2025, DOJ's Civil Rights Division demanded that, within fourteen days, the Secretary provide extensive information about Connecticut's SVRL maintenance practices based on purported discrepancies in an Election Administration and Voting Survey ("EAVS") report.[47] The stated purpose of the letter was to assess Connecticut's NVRA compliance.[48] It did not request Connecticut's SVRL or cite HAVA or the CRA.

On August 20, 2025, the Secretary timely responded to each of DOJ's demands. She extensively explained the policies and procedures Connecticut employs to ensure the accuracy of its VRL.[49] Other information DOJ demanded would require substantial redactions, so the Secretary informed DOJ that she would provide it as soon as practical.

---

[45] *Id.*
[46] JA74, 78 (Rosenberg Aff. ¶¶ 25, 36).
[47] JA34–35.
[48] JA34.
[49] JA38–41; JA75–78 (Rosenberg Aff. ¶¶ 29–35).

DOJ took no enforcement action, sought no further assurances of Connecticut's compliance, and did not inform the Secretary that any of her responses were inadequate.

DOJ did not respond until its email from Attorney Brittney E. Bennett on December 10, 2025, with an attached demand letter dated December 12, 2025. DOJ demanded that the Secretary produce an electronic copy of Connecticut's SVRL within fourteen days, including sensitive information such as registrants' social security numbers, drivers' license numbers, full dates of birth, and residential addresses.[50] The stated "purpose" for the demand was to "ascertain Connecticut's compliance with the list maintenance requirements of the NVRA and HAVA."[51] It also claimed to have authority for the demand under the CRA, although the letter did not identify any discriminatory conduct that would be actionable under the CRA.[52] Attorney Bennett asked the Secretary to contact her "[s]hould further clarification be required."[53]

---

[50] JA43–45.
[51] JA44.
[52] *Id.*
[53] JA45.

On December 24, 2025, the Secretary's office responded that she could not comply with DOJ's demand without such clarification.[54] The letter noted that DOJ failed to identify any legal authority requiring the Secretary to share such sensitive voter information, and state and federal privacy law precluded her from doing so.[55] The response did, however, invite DOJ to provide additional authority or information that would support its request.[56] DOJ never responded.

### C. Procedural History

DOJ filed this action on January 6, 2026, seeking the same sensitive voter information sought in its December 12 demand.[57] On January 7, Plaintiff filed an associated Motion to Compel Production of Records pursuant to the CRA.[58] The following day, the Court ordered the Secretary to show cause why she should not be ordered to provide

---

[54] JA47–49.
[55] *Id.*
[56] JA49.
[57] JA81 (Rosenberg Aff. ¶ 47).
[58] JA28–31.

Connecticut's SVRL to DOJ.[59] After briefing and argument, the Court denied DOJ's Motion to Compel and dismissed the action in full.[60]

## STANDARD OF REVIEW

De novo. *Palmer v. Amazon.com, Inc.*, 51 F.4th 491, 503 (2d Cir. 2022).

## SUMMARY OF ARGUMENT

An SVRL is not a "record" subject to the CRA because it (1) is created by the Secretary, and so does not "come into [her] possession" from an external source; (2) is a living database, and so cannot be "retained and preserved," as required under the CRA; and (3) is substantially different in kind than the records Congress included in the CRA. *See* Part I.A.

DOJ's demand for Connecticut's SVRL does not state a valid "purpose" or "basis," as required under the CRA. *See* Parts I.B, I.C.

Substantive and procedural requirements under federal and state privacy law prohibit DOJ's collection of an SVRL, particularly of the sensitive personal information it contains. *See* Part II.

---

[59] *See* JA54–55.
[60] JA285–96 (Order).

The Federal Rules of Civil Procedure apply. A demand under the CRA does not trigger a "special statutory proceeding" that immunizes DOJ's demand from judicial review. *See* Part III.

## ARGUMENT

### I. DOJ's Demand Is Unenforceable

DOJ's demand is unenforceable because an SVRL is not a "record" that is subject to the CRA, *see* Part I.A, DOJ failed to state a "purpose" for its demand that is permissible under the CRA, *see* Part I.B, and DOJ failed to state a "basis" for its demand. *See* Part I.C.

#### A. An SVRL Is Not a "Record" under the CRA

This case involves a "fairly straightforward reading" of the CRA. JA293 (Order). As the district court held, an SVRL (1) is "a record created by the state," so it does not "come[] into the state's possession"; and (2) is "constantly being updated," which "demonstrates conclusively that it" cannot be "retained and preserved" under the CRA. *Id.* (cleaned up). In addition, (3) an SVRL—an electronic, statewide database, containing the highly sensitive personal information of millions of voters—did not exist in 1960 and is substantially different in kind than the records Congress contemplated and included in the CRA.

### 1. The Secretary Creates the SVRL, so It Does Not "Come Into the Secretary's Possession"

Under the CRA, a "record" is something that "come[s] into [an election official's] possession."[61] As every court to consider this issue has held, this does not include an SVRL. That is because to "come into … possession" of an object means to "acquire, obtain, or receive … from a third party," and an SVRL is "an internally generated electronic database, not a record acquired from an outside source." *United States v. Benson*, 179 F.4th 470, 478–79 (6th Cir. 2026) (*Benson II*).

The CRA does not define the term "come into … possession." So, courts look to its "ordinary meaning, starting … with contemporaneous dictionaries." *Munoz-Gonzalez v. D.L.C. Limousine Service*, 904 F.3d 208, 213 (2d Cir. 2018) (cleaned up). Around 1960 (as today), this phrase meant to "acquire," "obtain," or "receive."[62]

This connotes action—i.e., a *change* in possession. It "does not describe a static state of possession," since "'come into' is a prepositional verb phrase that implies there was a prior state when election officials

---

[61] 52 U.S.C. § 20701.
[62] *Benson II*, 179 F.4th at 478 (citing dictionary definitions).

did not have the record or paper, and a transition that changed that." *United States v. Scanlan*, 838 F. Supp. 3d 150, 2026 U.S. Dist. LEXIS 143053, *11 (D.N.H. 2026). Likewise, "come" is "an active verb" connoting a "record or paper that reached or arrived in the possession of the [election official], and not a record or paper that originated there." *United States v. Evans*, Civil Action No. 25-4403 (RDM), 2026 U.S. Dist. LEXIS 175707, at *17 (D.D.C. Aug. 6, 2026).

Common usage is in accord.[63] "An ordinary English speaker would not say that she has come into possession of something that she created, established, and maintained." *Benson II*, 179 F.4th at 479.

> A baker may purchase ingredients from a grocery store (flour, eggs, etc.) and then proceed to bake cakes. It would be rather strange to say that the baker has "come into" possession of the cakes after pulling them out of the oven. True, the baker did "come into" possession of the ingredients she used to make the cakes by acquiring those items from the grocery store. But the baker did not "come into" possession of the cakes—she created them.

*Id.* The Court has "come into" possession of this brief; the Attorney General's Office "created" it. *Id.*

---

[63] *Comcast Corp. v. National Assn. of African American-Owned Media*, 589 U.S. 327, 333 (2020).

Neighboring text within § 20701 confirms this, as well. *E.g.*, *Alabama Assn. of Realtors v. HHS*, 594 U.S. 758, 763 (2021) ("The Government contends that the first sentence of §361(a) gives the CDC broad authority .... But the second sentence informs the grant of authority by illustrating the kinds of measures that could be necessary ...."). The statute references "com[ing] into ... possession" of records "relating to any application, registration, payment of poll tax, or other act requisite to voting in such election."[64] These are "records that election officials *receive*, rather than *create*." *United States v. DeMarinis*, Docket No. SAG-25-3934, 2026 U.S. Dist. LEXIS 137156, at *12 (D. Md. June 18, 2026) (cleaned up; emphasis in original).

The phrase "related to" does not change this. Although "related to" can have an expansive meaning, its context is critical. *See Dubin v. United States*, 599 U.S. 110, 119 (2023) ("'In relation to' is ... context sensitive.... [T]he kind of relationship required, its nature and strength, will be informed by context." (cleaned up)). Read in context, § 20701 only "relate[s] to" documents "officials receive from prospective voters to

[64] 52 U.S.C. § 20701.

support the exercise of the suffrage," rather than "lists or other tools created by election officials for the purpose of preserving the information provided by voters and ensuring that persons appearing to vote are registered." *United States v. Bellows*, 834 F. Supp. 3d 113, 123 (D. Me. 2026).

So, "come into ... possession" is a source-specific condition. "By limiting Title III's application to documents that 'come into' an election officer's possession, Congress crafted 52 U.S.C. § 20701 to apply to a subset of documents acquired by the State, rather than all documents in the State's possession." *United States v. Hobbs*, Docket No. C25-6078-KKE, 2026 U.S. Dist. LEXIS 215438, at *10 (W.D. Wash. Sep. 22, 2026).

DOJ offers six arguments to the contrary. None are persuasive. First, it argues that "come into ... possession" is only a temporal condition "'identifying when the statutory duty [to 'retain and preserve' a record] attached.'" (Br. 33) (cleaned up). But this would conflict with other parts of § 20701 that *already* identify when the statutory duty to "retain and preserve" a record attaches.[65] By its plain terms, the duty attaches on

[65] 52 U.S.C. § 20701.

the "date of any general, special, or primary election" for federal office and extends "for a period of twenty-two months."[66]

Second, in its eagerness to expand the meaning of "come into ... possession" to include an SVRL, DOJ offers no limiting principle. "[I]f 'come into possession' were purely temporal, as the United States contends, [the CRA] would cover every record that an election official touches at any point in time." *Scanlan*, 838 F. Supp. 3d 150, 2026 U.S. Dist. LEXIS 143053, * 17. This would represent "an expansive grant of authority" that "is not clear from the text of the statute." *United States v. Matthews*, Docket No. 25-cv-3398, 2026 U.S. Dist. LEXIS 170351, at *11 (C.D. Ill. July 31, 2026). It would also be excessively penal. *Evans*, 2026 U.S. Dist. LEXIS 175707, at *22. Failure to preserve every version of every memorandum, email, text, meeting invite, voicemail, agenda, or draft relating to a federal election—for nearly two years—would lead to criminal exposure.[67] DOJ ignores the consequences of its position and identifies nothing to suggest that Congress meant to, or even could,

---

[66] *Id.*
[67] *Id.* § 20702.

impose such a burdensome record-keeping requirement with such harsh consequences.

Third, DOJ argues that *United States DOJ v. Tax Analysts*, 492 U.S. 136 (1989) supports its view that a "record" under the CRA can be created by an election official. (Br. 34). In that case, the Court stated that an "agency record" could "come into [an] agency's possession" regardless of whether it was "create[d] or obtain[ed]" by the agency. *Tax Analysts*, 492 U.S. at 144–45. This is immaterial for purposes of the CRA. *Tax Analysts* was interpreting "agency records" under the Freedom of Information Act ("FOIA"). *Id.* at 145. But the CRA does not include a qualifier like FOIA does—i.e., it does not use the term "election official's record" or anything similar. Moreover, *Tax Analysts* only used the term "come into possession" in its general discussion—not as statutory term. *E.g.*, *Benson II*, 179 F.4th at 481 ("*Tax Analysts* provides no insight about the narrower term 'come into h[er] possession,' as Title III uses it.").

Fourth, DOJ points to other statutes that use phrases similar to "come into ... possession." (Br. 34–35). But they are inapt because they invoke the concept of acquiring information from an outside source. Look no farther than DOJ's lead example, which discusses "*acquiring*

information" and pertains to "information *supplied by individuals or organizations to an agency*."[68] District courts reject these analogies. *E.g.*, *Scanlan*, 838 F. Supp. 3d 150, 2026 U.S. Dist. LEXIS 143053, *14. Even some of the few judges sympathetic to DOJ's other arguments have noted that statutes like § 3572 are poor comparators because they "expressly limit their reach to materials received from outside the government." *United States v. Benson*, 187 F.4th 462, 472 (6th Cir. 2026) (Griffin, J., dissenting) (*Benson III*).

Fifth, DOJ says that Congress meant to include internally created records within the scope of the CRA because voucher indices are mentioned in the report that preceded the CRA. (Br. 37). A voucher system was a county-level policy under which a prospective voter needed a registered voter to "vouch" for his or her qualifications.[69] A registered voter could only vouch for a limited number of prospective voters per year,[70] so a county using this system might keep a "voucher card index"

---

[68] 44 U.S.C. § 3572(a), (f) (emphasis added).

[69] *See* Report of the U.S. Comm'n on Civil Rights, at 90 (1959), https://www.usccr.gov/files/historical/1959/59-001-U.pdf.

[70] *Id.*

to track the number of times each registered voter vouched for someone.[71] But the 557-page report that DOJ relies upon cites just one index and never says it was meant to be included in the CRA.[72] This one possible exception notwithstanding, the report's emphasis is squarely on documents that voters submit—not documents that the government creates.[73]

Sixth, DOJ argues that even if "come into ... possession" is a source-based condition, it is still an "*officer-specific*" one. (Br. 36) (emphasis in original). In other words, DOJ says, "even accepting ... that a record must come from some external source ... that requirement was satisfied when Secretary Thomas received the SVRL from someone else in her office, or when she assumed office." (Br. 37).

But the Secretary assumed office in January 2023.[74] Even under DOJ's reading, the twenty-two month retention period for Connecticut's

---

[71] *Id.* at 93.
[72] *Id.* at 94.
[73] *E.g.*, *id.* at 95 (lamenting passage of law permitting destruction of "applications and questionnaires of rejected applicants for registration").
[74] *See* CT.gov, Office of the Secretary of the State, "Stephanie Thomas is Connecticut's 75th Secretary of the State" (last accessed Oct.

SVRL would have expired well before DOJ demanded it. This interpretation would also lead to odd results. Every time a new chief election official is elected and put in charge of that state's SVRL, the SVRL would "come into [the new official's] possession" and would trigger a new twenty-two month window where DOJ could request it. DOJ provides no evidence Congress intended an arbitrary retention schedule that turns on state election results.

In arguing that the Secretary "came into … possession" of the SVRL when she "received the SVRL from someone else in her office," DOJ also misunderstands how databases like this actually work. (Br. 37). Connecticut's SVRL, known as CVRS, is possessed by the Office of the Secretary, not by Stephanie Thomas individually. If Secretary Thomas were to resign, no one would seriously contend that she would continue to possess CVRS personally until a successor is appointed.

For similar reasons, CVRS does not change hands. So it is not possible for her to "receive the SVRL from someone else in her office."

---

23, 2026), https://portal.ct.gov/sots/capitol/about-stephanie-thomas/the-biography-of-stephanie-thomas?archived=true.

(Br. 37). By law, CVRS is "maintained" by the Secretary.[75] Through a process the Secretary "design[s],[76] other election officers can modify CVRS (e.g., modify a voter's address),[77] but the act of modifying an entry in CVRS is not a change in possession. Said another way, a local election official does not take possession of CVRS from the Secretary, make a change, and then give it back. At all times, it is the Secretary's. *E.g.*, *Evans*, 2026 U.S. Dist. LEXIS 175707, at *29 n.8 ("[t]he government cannot plausibly suggest that Congress intended the availability of state voter registration lists to turn on the staffing practices of state election bodies").

### 2. An SVRL Cannot Be "Retained and Preserved" for Twenty-Two Months because It Is Constantly Updated

DOJ's expansive interpretation of the CRA also conflicts with the statutory scheme for SVRLs Congress enacted. Because NVRA and HAVA require constant updates to an SVRL, an SVRL is not something that can be "retain[ed] and preserve[d]" for twenty-two months, as the

---

[75] Conn. Gen. Stat. § 9-50b(a).
[76] *Id.*
[77] *Id.* § 9-50b(b).

CRA requires.[78] Multiple courts have concluded that "construing § 20701 in a manner that subjects the qualified voter file to Title III would place Title III on a collision course with the NVRA and HAVA." *Benson II*, 179 F.4th at 480.

The CRA contemplates static records. A record must be "retain[ed] and preserve[d]" for twenty-two months and "alter[ing]" a record is prohibited.[79]

In sharp contrast to the CRA's focus on *static* records, HAVA and NVRA ensure that an SVRL is a *dynamic* database. HAVA mandates that each state maintain an SVRL—a "computerized list," which must be "the single system for storing and managing the official list of registered voters throughout the State."[80] Frequent, "expedited" updates are required: "All voter registration information obtained by any local election official in the State shall be electronically entered into the computerized list on an expedited basis at the time the information is

---

[78] 52 U.S.C. § 20701.
[79] *Id.* § 20701, 20702
[80] *Id.* § 21083(a)(1)(A)(i).

provided to the local official."[81] So is "regular" list maintenance.[82] DOJ identifies nothing in either law compelling a state to retain records of these changes.

As described above, *see* Statement of the Case, Part I.B, Connecticut complies these requirements through CVRS, which is a living database of local voter registration lists updated by officials in each of the state's 169 municipalities.[83]

These federally mandated processes are incompatible with DOJ's reading of the CRA. If CVRS is a record that must be "retain[ed] and preserve[d]" for twenty-two months and cannot be "alter[ed]," then local officials would be *prohibited* from updating it.[84] Instead, Congress *requires* them to update it "on an expedited basis at the time the information is provided" to them and at "regular" intervals thereafter.[85] DOJ's reading would create an obvious conflict and expose countless local election officials across the country to criminal liability.

---

[81] *Id.* § 21083(a)(1)(A)(vi).

[82] *Id.* §§ 21083(a)(2); *see also, e.g.*, *id.* §§ 21083(a)(4), 20507(c)(2)(A).

[83] *See, e.g.*, Conn. Gen. Stat. §§ 9-50b; JA69 (Rosenberg Aff. ¶¶ 9–11).

[84] 52 U.S.C. §§ 20701, 20702.

[85] *Id.* § 21083(a)(1)(A)(vi), (a)(2), (a)(4).

Concerns about criminal liability are not speculative. At the time of the CRA's passage, the Attorney General opined that a local election official who "destroy[s]" records pursuant to a state law "would be guilty" of a "Federal crime."[86] And currently, DOJ is using the threat of criminal punishment to enforce its SVRL maintenance priorities. Among other things, federal officials have twice told the Secretary that she could face criminal liability for CVRS maintenance practices,[87] have reportedly been exploring theories for prosecuting state and local officials for conduct related to election administration,[88] and have declared that local

---

[86] *See House CRA Hr'gs*, 86th Cong. 229 (1959) (statement of William P. Rogers, Att'y Gen. of the United States) (agreeing that registrar who "destroy[s]" records pursuant to state law "would be guilty" of "Federal crime").

[87] Letter from T. McCotter, Acting Dep. Att'y Gen., to S. Thomas, Secretary of the State of Connecticut (Oct. 29, 2026), https://portal.ct.gov/-/media/sots/electionservices/2026/letter-to-secretary-thomas-regarding-obligations-under-52-usc-20701.pdf?rev=60c98cb96018444995a5671cae100dea&hash=37191FF5DD5B88EE559AA23E63106FCD; Nick Corasaniti, Justice Department Threatens Top Election Officials Over Noncitizen Voting, N.Y. Times (Jul. 7, 2026), https://www.nytimes.com/2026/07/07/us/politics/justice-department-elections-noncitizen-voting.html.

[88] Devlin Barrett & Nick Corasaniti, Justice Dept. Explores Using Criminal Charges Against Election Officials, N.Y. Times (Jul. 2, 2025), https://www.nytimes.com/2025/07/02/us/politics/justice-department-election-data.html.

election officials in California would "risk significant federal scrutiny" and "legal jeopardy" if they counted votes from individuals DOJ believes are potential noncitizens.[89]

Accordingly, DOJ's reading violates a wide variety of interpretive rules. *E.g.*, *United States v. Board of Elections*, Docket No. 1:25-CV-1338 (MAD/PJE), 2026 U.S. Dist. LEXIS 153474, at *28 (N.D.N.Y. July 10, 2026) (absurd-consequences canon); *United States v. Koski*, Civil Action No. 3:26CV42 (RCY), 2026 U.S. Dist. LEXIS 156188, at *14–15 (E.D. Va. July 14, 2026) (harmonious-reading canon); *Benson III*, 187 F.4th at 468 (Murphy, J., concurring) (rule of lenity); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (later-in-time canon); *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (general/specific canon).

Whatever the doctrinal basis, the answer is the same: there is no evidence Congress meant to enact dueling statutory schemes, particularly in a manner that could put election officials in federal prison.

---

[89] Laurel Rosenhall & Shawn Hubler, Justice Dept. Demands That California Counties Help Identify Noncitizen Voters, N.Y. Times (Oct. 23, 2026), https://www.nytimes.com/2026/10/23/us/justice-dept-california-noncitizen-voters.html.

### 3. An SVRL Is Not the Type of "Record" Congress Contemplated in the CRA because It Is Statewide, Electronic, and Includes Sensitive Data

A statute "cannot be read to govern a situation that Congress clearly did not contemplate." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 171 (2003); *see also, e.g.*, *Murphy Bros. v. Michetti Pipe Stringing*, 526 U.S. 344, 353 n.5 (1999) ("Congress could not have foreseen the situation posed by this case, for ... in 1949 Congress did not anticipate use of facs[i]mile transmissions." (cleaned up)); *Microsoft Corp. v. United States (In re Warrant to Search a Certain E-Mail Account Controlled & Maintained by Microsoft Corp.)*, 829 F.3d 197, 205–06 (2d Cir. 2016) ("When it passed the Stored Communications Act almost thirty years ago, Congress had as reference a technological context very different from today's Internet-saturated reality. This context affects our construction of the statute now.").

The CRA was enacted at a time when election records were almost exclusively local, existed on paper, and contained relatively harmless information. Considering these criteria—the (1) amount; (2) format; and (3) sensitivity of the information at issue—Congress "clearly did not

contemplate" anything like an SVRL when it passed the CRA. *Barnhart*, 537 U.S. at 171.

First, the amount of information Congress had in mind in 1960 was exponentially smaller. Statewide election records were uncommon as of 1960[90] and continued to exist only in small numbers for decades, until HAVA required states to implement them in 2002.[91] Unsurprisingly then, all the early CRA litigation DOJ relies upon dealt with local records and concerned a relatively small number of voters. *E.g.*, *Kennedy v. Bruce*, 298 F.2d 860, 863 (5th Cir. 1962) (seeking records from Wilcox County, Alabama, which had 8,719 eligible voters). And other authority flatly states that the CRA only "gave the Attorney General access to local voting records." *Katzenbach*, 383 U.S. at 313.

Second, Congress intended the CRA to capture only physical, paper records. If the Attorney General makes a valid demand, retained records

---

[90] *E.g.*, *House CRA Hr'gs*, 86th Cong. 702 (1959) (statement of Joe T. Patterson, Att'y Gen. of Mississippi) (explaining that Mississippi had "no central agency in the State government whereby the number of qualified electors are reported").

[91] *E.g.*, Conference Report, Help America Vote Act of 2002, Cong. Rec. Vol. 148 No. 136, S10488, S10491 (Oct. 16, 2002) ("In most States, registration will be maintained for the first time on a statewide basis rather than jurisdiction by jurisdiction.").

must be "made available for inspection, reproduction, and copying at the principal office of such custodian."[92] Here, DOJ demanded that the Secretary produce an electronic copy of Connecticut's SVRL via email or a file-transfer system. Requiring an official to affirmatively deliver a record (which is not "ma[king it] available for inspection, reproduction, [or] copying") electronically to the Attorney General in the District of Columbia (which is not "at the principal office of" the Secretary) would read this provision out of the statute. *See United States v. Hanzas*, Docket No. 2:25-cv-00903, 2026 U.S. Dist. LEXIS 212824, at *14–15 (D. Vt. Sept. 17, 2026) ("requesting an electronic copy of Vermont's SVRL," "goes beyond what the statute contemplated in its plain language"); *accord Greater Birmingham Ministries v. Secretary of State*, 105 F.4th 1324, 1332 (11th Cir. 2024) ("[E]lectronic production is neither public inspection nor photocopying; it is an entirely different method of disclosure.").

[92] 52 U.S.C. § 20703.

The Secretary's reading of § 20703 is also consistent with other provisions of the CRA.[93] Section 20705 emphasizes the physical location of records by limiting jurisdiction to a federal court in the district where "a record or paper so demanded is located."[94] So, DOJ cannot sue wherever electronic records can be accessed—jurisdiction is only where the records are physically held. *See United States v. Raffensperger*, Docket No. 5:25-cv-00548-CAR, 2026 U.S. Dist. LEXIS 12804 (M.D. Ga. Jan. 23, 2026); *United States v. Schmidt*, 835 F. Supp. 3d 697, 700 (W.D. Pa. 2026).

Historical practice further supports the point. The CRA effectively codified the district court's order in *In re Wallace*, 170 F. Supp. 63 (M.D. Ala. 1959), in which the Civil Rights Commission sought to obtain certain voting records under the CRA of 1957. Rather than compel production, the court "relieve[d] movants ... of any obligation to produce the records" and ordered them "to make said records available at their present location." *Id.* at 69–70. Courts in the 1960s followed suit, no matter how

---

[93] *See Am. International Group v. Bank of Am. Corp.*, 712 F.3d 775, 783 (2d Cir. 2013) ("parallel statutory provisions should be read in pari materia" (cleaned up)).

[94] 52 U.S.C. § 20705.

cumbersome it might be for DOJ. *E.g.*, *Kennedy v. Owen*, 321 F.2d 116, 117 (5th Cir. 1963) (ordering "inspection, reproduction and copying to take place in accordance with a schedule to be established ... county by county and in consecutive order" across seven counties). So did the Attorney General, who feared the specter of too much federal intrusion: "[W]e thought the subp[o]ena power might be construed as an interference with the State's power over voting, and we wanted to limit it merely to the right of inspection ...."[95]

Third, Congress did not consider that the CRA might be used to seize election records with sensitive personal information. *United States v. Weber*, 816 F. Supp. 3d 1168, 1183 (C.D. Cal. 2026). Even DOJ's own cases indicate that voting records would not have had personal information like social security numbers in 1960. *Kennedy v. Lynd*, 306 F.2d 222, 231 (5th Cir. 1962) ("we are not discussing confidential, private papers and effects"). Connecticut, for example, did not even begin

---

[95] *House CRA Hr'gs*, 86th Cong. 212 (1959) (statement of William P. Rogers, Att'y Gen. of the United States).

requesting social security numbers from voters until 1993, and the federal government did not do so until 2002.[96]

### B. DOJ's Demand Lacks a Valid "Purpose"

DOJ's demand fails to include a sufficient statement of purpose because (1) the stated purpose for a demand under the CRA must be consistent with the intent of the CRA; (2) the CRA is intended to facilitate investigations into voting discrimination; (3) in this litigation, DOJ's stated purpose is to audit Connecticut's SVRL for compliance with NVRA and HAVA, which has nothing to do with voting discrimination; and (4) outside of this litigation, DOJ is using SVRLs for other purposes that also have nothing to do with voting discrimination.

#### 1. DOJ's Reason for the Demand Must Be Consistent with the Purpose of the CRA

A "demand shall contain a statement of ... the purpose therefor."[97] "The" is a "definite article," which denotes a reference to one—and only one—thing.[98] "Purpose" as used in the CRA means legal objective. *E.g.*, *United States v. Oliver*, Docket No. 1:25-cv-01193-JCH-JFR, 2026 U.S.

---

[96] P.A. 93-230; 52 U.S.C. § 21083(a)(5)(A)(i).
[97] 52 U.S.C. § 20703.
[98] *See Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262, 272 (2019).

Dist. LEXIS 155419, at *21 (D.N.M. July 14, 2026) ("'the purpose' is rooted in the DOJ's legal rationale").[99]

The stated purpose of a CRA demand must be consistent with Congress's intentions for the CRA. *United States v. Amore*, 831 F. Supp. 3d 149, 157 (D.R.I. 2026) ("Congress cannot have intended Title III as permitting such a demand based on a statement of *any* purpose." (emphasis in original)). Unless the Attorney General is required to "state a *legitimate* purpose" that "relates to Congress's rationale" for the CRA, "the requirement that he specify his purpose ... would be pointless." *Matthews*, 2026 U.S. Dist. LEXIS 170351, at *16 (emphasis in original). So, the purpose requirement is "not merely perfunctory—it is a critical safeguard that ensures the request is legitimately related to the purpose of the statute." *Weber*, 816 F. Supp. 3d at 1184.

---

[99] *See also, e.g.*, Ballentine's Law Dictionary (3d ed. 1960) ("An aim. A design or plan. An intention.").

### 2. The Purpose of the CRA Is to Prevent Voting Discrimination

As numerous courts have held, "[t]he purpose of Title III is to detect voting-related racial discrimination." *Weber*, 816 F. Supp. 3d at 1182; *see also, e.g.*, *Amore*, 831 F. Supp. 3d at 156 ("Title III's purpose is to enable the federal government to detect voting-related racial discrimination."). "[T]he purpose of the Attorney General's demand, therefore, would have to be related to racial discrimination." *Hanzas*, 2026 U.S. Dist. LEXIS 212824, at *16.

All of the evidence points to this conclusion. For instance, the Court should read the CRA of 1960 in light of the CRA of 1957. *E.g.*, *Hagen v. Utah*, 510 U.S. 399, 415–16 (1994) ("The 1905 Act did not repeat these essential features … because they were already spelled out in the 1902 Act. The two statutes ... must therefore be read together."). The CRA of 1957 expressly addressed "voting discrimination" and the CRA of 1960 simply enacted "[p]erfecting amendments":

> Congress has repeatedly tried to cope with the problem by facilitating case-by-case litigation against voting discrimination. The Civil Rights Act of 1957 authorized the Attorney General to seek injunctions against public and private interference with the right to vote on racial grounds. Perfecting amendments in the Civil

> Rights Act of 1960 permitted the joinder of States as parties defendant, gave the Attorney General access to local voting records, and authorized courts to register voters in areas of systematic discrimination.

*South Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966) (cleaned up).

DOJ's own cases agree. The "purpose [of authorizing demands under § 20703] is to enable the Attorney General to determine whether [42 U.S.C.] § 1971 [currently codified as amended at 52 U.S.C. § 10101] suits or similar actions should be instituted," which concern denials of the right "to vote at all ... without distinction of race, color, or previous condition of servitude." *Lynd*, 306 F.2d at 228.

Legislative history also shows that the CRA's document demand provision was intended to prevent voting discrimination. Among others espousing this view were Representative William McCullough (who

drafted it),[100] President Eisenhower (who signed it into law),[101] and Attorney General William Rogers (who enforced it).[102]

DOJ does not argue otherwise. It concedes that "Congress enacted the CRA ... to tr[y] to cope with the problem of racial discrimination in voting." (Br. 20) (cleaned up).

#### 3. DOJ's Stated Purpose for Its Demand Is Unrelated to Voting Discrimination

Against the reality that the CRA was specifically and unambiguously enacted to address voting discrimination, DOJ claims that the CRA "provides no limitation on the permissible purpose" of a

---

[100] *House CRA Hr'gs*, 86th Cong. 700 (1959) (statement of Rep. William M. McCulloch, drafter of Title III) ("The purpose of title III is, first of all, to require that States preserve, for a reasonable length of time, the records upon which is based the decision of whether or not a person is a qualified elector and then to inspect those records, if need be ....").

[101] Presidential Special Message to the Congress on Civil Rights (Feb. 5, 1959) ("Access to registration records is essential to determine whether the denial of the franchise was in furtherance of a pattern of racial discrimination.").

[102] *House CRA Hr'gs*, 86th Cong. 211 (1959) (statement of William P. Rogers, Att'y Gen. of the United States) ("The purpose of the bill is to make possible more effective protection of the right of all qualified citizens to vote without discrimination on account of race.... But the Attorney General's authority may be rendered relatively ineffective so long as there is lacking a suitable provision for access to voting records ....").

CRA demand and insists that it can be used for generalized SVRL audits. (Br. 56). Not so. DOJ's argument is inconsistent with (1) the text of the CRA; (2) NVRA and HAVA; (3) the Constitution; (4) its own past practices; and (5) its own allegations.

First, DOJ does not point to anything in the CRA itself that suggests a legitimate "purpose" of the CRA is to allow collection and auditing of the voting records of 210 million Americans—the CRA "did not confer a general auditing power to the DOJ over state election officials." *Matthews*, 2026 U.S. Dist. LEXIS 170351, at *16–17. "Congress does not ... hide elephants in mouseholes." *Epic Systems Corp. v. Lewis*, 584 U.S. 497, 515 (2018). Said another way, "[i]t is highly unlikely that Congress authorized such a sweeping ... program through such a subtle device." *Biden v. Nebraska*, 600 U.S. 477, 496 (2023) (cleaned up).

Second, the thrust of DOJ's main argument is that NVRA and HAVA expanded the CRA by implication—subsequently, indirectly, and without mentioning it by name. *E.g.*, (Br. 20) ("Although Congress enacted the CRA ... to 'tr[y] to cope with the problem' of racial discrimination in voting, *Katzenbach*, 383 U.S. at 313, Congress has since

enacted additional laws that affect" it). But this ignores the choices Congress made in passing NVRA and HAVA.

"The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001). "[W]hen Congress did address voter registration list maintenance in the NVRA and HAVA, it did not give the Attorney General administrative subpoena authority to investigate violations of those statutes." *Evans*, 2026 U.S. Dist. LEXIS 175707, at *30. So, construing the CRA "to implicitly provide the United States a right to every state's SVRL on demand for purposes of conducting a comprehensive, line-by-line audit" would "take a sledgehammer to the balance Congress struck when it required states to create and maintain computerized lists of registered voters in the first place" in NVRA and HAVA. *Bellows*, 834 F. Supp. 3d at 126–27. "[W]hatever investigatory purposes may support a Title III records demand, voter list maintenance is not among them." *Id.* at 124.

Courts have used this same reasoning to conclude that Congress's decision to provide certain remedies under NVRA and HAVA precludes others. *E.g.*, *American Civil Rights Union v. Philadelphia City*

*Commissioners*, 872 F.3d 175, 185 (3d Cir. 2017) (no private right of action under HAVA); *Assn. of Community Organizations for Reform Now v. Fowler*, 178 F.3d 350, 367 n.11 (5th Cir. 1999) (cannot use NVRA as basis for claim under 42 U.S.C. § 1983).

Similarly, allowing DOJ to conduct SVRL audits is inconsistent with how Congress envisioned the federal government and states would interact regarding SVRLs. Regarding the CRA, Congress and courts both agreed that "[i]t is not the purpose of title III to supervise State elections." *House CRA Hr'gs*, 86th Cong. 700 (1959) (statement of Rep. William M. McCulloch); *see also Bruce*, 298 F.2d at 863 n.2 (noting that "failures to purge voters who have moved away or have died" is "a matter which does not bear any particular importance to the present inquiry"). And in NVRA and HAVA, Congress provided very narrow, defined avenues for collaboration. *See* 52 U.S.C. § 20507(c)(1)(A) (Postal Service may provide information regarding change of address); *id.* § 20507(g) (United States Attorney may provide information on federal convictions). These avenues do not remotely resemble the "sweeping authority" over states that DOJ now claims. (Br. 16).

Moreover, Congress could not have specifically intended for the CRA to be used to enforce NVRA and HAVA because those laws did not exist in 1960. Nor, for most states, did the SVRLs that NVRA and HAVA mandated. As explained above, *see* Part I.A.3, statewide voting records were rare in 1960. *See Evans*, 2026 U.S. Dist. LEXIS 175707, at *24 ("Title III predates the NVRA and HAVA by more than three decades and was not drafted with the issue of list maintenance in mind.").

Third, the audit DOJ proposes is unconstitutional. *See Da Cunha v. Freden*, 175 F.4th 61, 93 (2d Cir. 2026) ("when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems" (cleaned up)). To the extent DOJ seeks to dictate that a voter must be removed from Connecticut's voter rolls, DOJ would be claiming its own authority to determine whether a voter is qualified to vote. But that determination is reserved to the states. *See Arizona*, 570 U.S. at 17 ("Prescribing voting qualifications ... forms no part of the power to be conferred upon the national government by the Elections Clause"); *see also, e.g.*, *Bellows*, 834 F. Supp. 3d at 126 ("[G]iving Title III the construction that the United

States requests would also require me to turn a blind eye to traditional principles of federalism and how those principles have found expression in American elections ....”). DOJ recognizes the problem and generically disclaims intent to remove voters from Connecticut’s rolls. (Br. 62). But it fails to explain how compelling Connecticut officials to remove voters under threat of prosecution is any different than if the federal government were to remove those voters on its own.

Fourth, DOJ’s stated purpose is inconsistent with its own past practices. Courts are skeptical when an agency claims “to discover in a long-extant statute an unheralded power representing a transformative expansion in [its] ... authority.” *West Virginia v. EPA*, 597 U.S. 697, 724 (2022) (cleaned up).

Here, DOJ is proposing a novel expansion of its power under the CRA that stands in sharp contrast to its prior use over the last six decades. As described above, DOJ had previously used the CRA almost exclusively (1) at the local level, (2) to access records of hundreds or thousands of voters, (3) to combat racial discrimination, and (4) to increase the number of registered voters. But now, DOJ wants to use it (1) on a national scale, (2) to examine the personal information of 210

million voters, (3) while disclaiming any connection to discrimination, and (4) to decrease the number of registered voters.

DOJ does not argue that it has used the CRA for these purposes before. Nor could it. Its "[m]odern practice" has almost always "invoked Title III ... to obtain discrete categories of records keyed to a specific, preexisting, and articulated enforcement concern." Brief of Amici Curiae Former Employees of the U.S. DOJ, *United States v. N.Y. Board of Elections, et al.*, No. 26-2060, pp. 29–32 (Oct. 13, 2026) (D.E. 123.1).

Instead, DOJ points to three inapt examples. (Br. 67). This type of limited, sporadic enforcement is nothing like the comprehensive national audit DOJ now proposes. And a closer look at these examples also casts doubt on their applicability here. The Texas and Georgia examples DOJ provides appear to involve allegations of discrimination,[103] so DOJ's

---

[103] For instance, at the time, both states were covered by the preclearance requirements of the Voting Rights Act. *See* DOJ.gov, Jurisdictions Previously Covered by Section 5 (last accessed Nov. 9, 2026), https://www.justice.gov/crt/jurisdictions-previously-covered-section-5. Documents in these matters also reference "race" and concerns with registering voters (which is traditionally linked with discrimination), as opposed to removing voters from the rolls (which is not). *E.g.*, ECF No. 76-2, p. 2 (United States-Texas MOU) (May 13, 2008) (requesting "race" information and allegations concerning "voter

demand in those cases could conceivably align with the purpose of the CRA. The Alabama example is also a poor comparator because it involved records obtained from an external source (not internal records, like an SVRL), was at the county level (not the state level), concerned only a limited subset of voters (voters under the Uniformed and Overseas Citizens Absentee Voting Act), and DOJ did not openly express an intent to use the records for other purposes.[104] Moreover, because none of these three CRA demands were litigated, district courts have rejected DOJ's reliance on them. *E.g.*, *United States v. Francisco*, Docket No. 3:25-cv-00728-ART-CLB, 2026 U.S. Dist. LEXIS 182806, at *15 (D. Nev. Aug. 14, 2026) ("[t]he fact that other states agreed to provide their voter registration lists is irrelevant to a statutory interpretation of Section 20701").

Fifth, even if NVRA and HAVA compliance could theoretically serve as a proper purpose under the CRA, it does not here. It is unclear how

---

registration"); ECF No. 76-3, p. 5 (Compl., *United States. v. Georgia*, No. 1:06-cv-2442) (Oct. 12, 2006) (allegations concerning "voter registration").

[104] Order, *United States v. Alabama*, No. 2:08-cv-920, p. 2 (M.D. Ala. Mar. 27, 2009) (ECF No. 24).

access to Connecticut's SVRL will help DOJ actually assess Connecticut's compliance.

DOJ does not even allege a NVRA or HAVA violation. Instead, the Complaint cites one substantive provision of NVRA, which requires a state to "conduct a *general program* that makes a *reasonable effort* to remove the names of ineligible voters from the official lists of registered voters" due to the registrant's death or change in residence.[105] DOJ argues that an SVRL is relevant to this determination. (Br. 54).

But it fails to explain how. If DOJ wants to evaluate Connecticut's "general program" for removal of ineligible voters, Connecticut's laws and policies provide the evidence—not CVRS.[106] Likewise, Connecticut need only make a "reasonable effort" at removal—not one that is "perfect, or even optimal, so long as it remains within the bounds of rationality." *Public Int. Legal Foundation v. Benson*, 136 F.4th 613, 625 (6th Cir. 2025); *see also Bellitto v. Snipes*, 935 F.3d 1192, 1205 (11th Cir. 2019).

---

[105] JA21 (ECF No. 1 ¶ 11) (quoting 52 U.S.C. § 20507(a)(4)) (emphasis added).

[106] *Accord Weber*, 816 F. Supp. 3d at 1195*; United States v. Benson*, 819 F. Supp. 3d 753, 762 (W.D. Mich. 2026) (*Benson I*) (NVRA's disclosure provision "encompasses only records about the process that a state uses to maintain their voter list—not the underlying list itself").

DOJ does not allege that Connecticut's SVRL maintenance laws or practices are insufficient, so a voter-by-voter analysis of CVRS is excessive on its face.

Nor does DOJ allege a HAVA violation. It only cites one substantive provision, which prohibits a state from accepting an application unless it includes the applicant's driver's license number, last four digits of a social security number, or another unique identifying number assigned by the state.[107] But the state—not the federal government—gets to determine sufficiency: "The State shall determine whether the information provided by an individual is sufficient to meet the requirements of this subparagraph, in accordance with State law."[108] So DOJ does not need Connecticut's SVRL to determine compliance with this provision either. *E.g.*, *Bellows*, 834 F. Supp. 3d at 125 ("Both statutes could not be clearer: each individual state, and not the U.S. Department of Justice, is the master of its voter list, entrusted with its administration and maintenance."); *Common Cause*, 2026 U.S. Dist. LEXIS 232452, at *73 ("Consistent with our constitutional structure, the

---

[107] JA22 (ECF No. 1 ¶ 14) (quoting 52 U.S.C. § 21083(a)(5)(A)).
[108] 52 U.S.C. § 21083(a)(5)(A)(iii).

NVRA and HAVA place states at the helm of maintaining their voter rolls.").

#### 4. The Federal Government Has Stated that It Has Other Purposes that Are Clearly Outside the Scope of the CRA

Outside of communications with the Secretary and the pleadings in this action, the Attorney General and others in federal government have openly conceded that DOJ is seeking SVRLs for other purposes beyond NVRA and HAVA audits, which also fall outside the scope of the CRA.

As numerous courts have explained, "[i]t appears that the DOJ is on a nationwide quest to gather the sensitive, private information of millions of Americans for use in a centralized federal database." *Weber*, 816 F. Supp. 3d at 1184. "Public statements from government officials reveal its intentions: to create a nationwide voter-database, for potential weaponization in future elections; as a 'fishing expedition,' hoped to advance unsubstantiated claims of non-citizen voting; and as a tool for immigration enforcement." *Schmidt*, 835 F. Supp. 3d at 699–700; *see also, e.g.*, *Common Cause*, 2026 U.S. Dist. LEXIS 232452, at *91 ("The record reflects that the Civil Rights Division is disclosing entire SVRLs with records of millions of voters to ICE." (cleaned up)).

Courts "are not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Comm. v. New York*, 588 U.S. 752, 785 (2019) (cleaned up). So, district courts have refused to ignore these overt statements of purpose and accept DOJ's representations to the contrary. *E.g.*, *Weber*, 816 F. Supp. 3d at 1184 ("The Court is not required to accept pretextual, formalistic explanations untethered to the reality of what the government has said outside of the courtroom."); *United States v. Oregon*, 828 F. Supp. 3d 1092, 1106–07 (D. Or. 2026) ("Plaintiff has continued to engage in conduct raising suspicion about the purposes for which it seeks statewide unredacted voter registration lists.... The presumption of regularity that has been previously extended to Plaintiff that it could be taken at its word—with little doubt about its intentions and stated purposes—no longer holds.").

### C. DOJ's Demand Lacks a "Basis"

Even if DOJ's demand states a valid "purpose," it states no "basis" whatsoever, as the CRA requires. DOJ argues that "basis" means "statutory" support, but provides no authority for its argument. (Br. 52). And every court to consider the issue disagrees—"basis" means *factual*

support.[109] *E.g.*, *Matthews*, 2026 U.S. Dist. LEXIS 170351, at *14–15. The CRA "is not an outlier in this regard. To invoke all (or virtually all) investigatory tools and compulsory process, the law requires some showing ...." *United States v. Galvin*, 830 F. Supp. 3d 122, 130 (D. Mass. 2026).

Again, the legislative history is in accord. *E.g.*, *House CRA Hr'gs*, 86th Cong. 700 (1959) (statement of Rep. William M. McCulloch) (Attorney General could "inspect those records, if need be, if reasonable cause is thought to exist that any person qualified to vote has been improperly denied that right."). So is historical practice. In the Fifth Circuit cases DOJ cites, the Attorney General routinely stated a "basis" by pointing to "information in the possession of the Attorney General."[110]

---

[109] *E.g.*, Ballentine's Law Dictionary, "basis" (3d ed. 1969); Webster's New World Dictionary (1960) ("the base, foundation, or chief supporting factor"); The Grosset Webster Dictionary 46 (1966) ("foundation" or "cause"). Courts used the term in the same way, often with specific references to facts supporting an argument. *E.g.*, *McCarthy v. United States*, 394 U.S. 459, 467 (1969) (considering "factual basis" of plea under Federal Rule of Criminal Procedure 11 requires "examination of the relation between the law and the acts the defendant admits having committed").

[110] *E.g.*, *Bruce*, 298 F.2d at 861; *Lynd*, 306 F.2d at 229 n.6; *In re Coleman*, 208 F. Supp. 199, 199 (S.D. Miss. 1962), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963).

Here, Plaintiff's December 12 demand does not even offer a conclusory basis.[111] There are no factual allegations in the demand at all—much less a plausible foundation to believe that Connecticut was violating federal law.

Nor is any basis apparent. On their face, Connecticut's list maintenance procedures exceed the "reasonable effort" required by federal law.[112] And the Court must presume that Connecticut's officials carried out these duties, absent "clear evidence to the contrary." *NLRB v. County Waste of Ulster, LLC*, 455 F. App'x 32, 35 (2d Cir. 2012) (quoting *Nat'l Archives and Records Admin. v. Favish*, 541 U.S. 157, 174 (2004)). DOJ refuses to acknowledge this presumption of regularity, much less point to anything that undermines it.

Attempting to plug this hole, DOJ argues that its August 6 letter implicitly provided a basis for the December 12 demand. (Br. 50). It cannot. Because the text of the CRA so clearly requires a statement of both the "the basis *and* the purpose" of a demand,[113] district courts have

---

[111] JA43–45.

[112] 52 U.S.C. § 20507(a)(4); *see also* JA84–88 (Rosenberg Aff. ¶¶ 58–71).

[113] 52 U.S.C. § 20703 (emphasis added).

consistently rejected DOJ's attempt to use a "patchwork" of communications to meet this requirement—the demand's purpose and basis must be stated together. *E.g.*, *Benson II*, 179 F.4th at 483 ("None of the three letters contains both a statement of the basis along with the purpose .... [A]ny demand must contain both."). DOJ's December 12 demand made no reference to the August 6 letter or the alleged EAVS data discrepancies that the August 6 letter recited.

In any event, the Secretary responded to the August 6 letter and thoroughly explained why DOJ's concerns about the alleged EAVS data discrepancies were misplaced.[114] Although DOJ now claims that the Secretary's response was inadequate and its December 12 demand was effectively a follow-up communication, (Br. 53), this excuse does not withstand scrutiny. It ignores the fact that "[o]ver the summer of 2025, the United States demanded election records from nearly every State and the District of Columbia." *Benson II*, 179 F.4th at 474. In other words, DOJ's December 12 demand had nothing to do with the Secretary's

---

[114] JA38–41; *see also* JA75–80 (Rosenberg Aff. ¶¶ 27–45).

earlier response—it would have made exactly the same demand regardless of what she had said.

## II. Federal and State Privacy Law Prohibit Disclosure

Disclosure of the personal data of more than 2 million Connecticut voters in the manner DOJ demands violates the Privacy Act, *see* Part II.A, the e-Government Act, *see* Part II.B, the Driver's Privacy Protection Act, *see* Part II.C, and state law. *See* Part II.D.

### A. DOJ's Demand Violates the Privacy Act

"Congress enacted the Privacy Act of 1974 for the stated purpose of safeguarding individual privacy against Government invasion." *FAA v. Cooper*, 566 U.S. 284, 304 (2012) (Sotomayor, J., dissenting). Passed after Watergate, *see id.* at 315, it was designed "'to prevent ... illegal, unwise, overbroad investigation and record surveillance of law-abiding citizens ... from actions of over-zealous investigators[.]'" *Londrigan v. FBI*, 670 F.2d 1164, 1169 (D.C. Cir. 1981) (cleaned up). Even more particularly, Congress wanted "to prevent the creation of 'formal or de facto national data banks' or 'centralized Federal information systems.'" *Weber*, 816 F. Supp. 3d at 1194 (cleaned up).

Two specific protections of the Privacy Act are relevant here. First, it prohibits a federal agency from maintaining "record[s] describing how

any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute ... or unless pertinent to and within the scope of an authorized law enforcement activity."[115] DOJ concedes that its demand implicates First Amendment activity, and does not contend that any statute "expressly authorizes" its efforts, but argues that its collection of the personal information of 210 million registered voters is "an authorized law enforcement activity."[116] (Br. 69). DOJ cites no supporting authority. (*See id.*).

"DOJ cannot evade the Privacy Act's free-speech protections by attempting a dragnet investigation of the entire country." *Common Cause*, 2026 U.S. Dist. LEXIS 232452, at *104; *Clarkson v. IRS*, 678 F.2d 1368, 1374 (11th Cir. 1982) ("Congress did not intend to dilute the guarantees of the First Amendment by authorizing the maintenance of files on persons who are merely exercising their constitutional rights." (cleaned up)). So, to further the goals of the Privacy Act, the law-enforcement exception is "narrow." *Garris v. FBI*, 937 F.3d 1284, 1296 (9th Cir. 2019). Mere information-gathering does not qualify. *See*

---

[115] 5 U.S.C. § 552a(e)(7).
[116] *Id.*

*Common Cause*, 2026 U.S. Dist. LEXIS 232452, at *103 (exception does not apply to "generic investigative and informative purposes" (cleaned up)); *see also, e.g.*, *Becker v. IRS*, 34 F.3d 398, 409 (7th Cir. 1994) (does not apply to information that merely "could be helpful in future enforcement activity" at "some uncertain date"); *Irons v. Bell*, 596 F.2d 468, 470 (1st Cir. 1979) (does not apply to "general monitoring"); *Lamont v. Dep't of Justice*, 475 F. Supp. 761, 775 (S.D.N.Y. 1979) (does not apply to "generalized monitoring and information-gathering").

Moreover, as described above, *see* Part I.B, DOJ does not explain how an SVRL audit is "pertinent to and within the scope of" an investigation into NVRA or HAVA compliance.[117] The relevant evidence is found in a state's laws and policies (not its SVRL) and compliance is determined by states (not DOJ).[118]

Second, the Privacy Act requires an agency to "publish ... a notice of the existence and character of the system of records" ("SORN").[119] A

[117] 5 U.S.C. § 552a(e)(7).
[118] *E.g.*, 52 U.S.C. § 21083(a)(5)(A)(iii)
[119] 5 U.S.C. § 552a(e)(4).

SORN must include, among other things, "the categories of individuals on whom records are maintained."[120]

DOJ contends that a SORN published in 2003 suffices, known as the "Central Civil Rights Division Index File" ("2003 SORN"). (Br. 70–73). It argues that the 2003 SORN—which encompasses "categories of individuals" like "subjects" and "victims"—covers its current demands because the millions of voters whose data DOJ wants to collect are either "subjects" of its "investigation into," or "victims" of, potential noncompliance with NVRA or HAVA. (Br. 71–72). In other words, DOJ would stretch the 2003 SORN to encompass "*every* voter in *every* corner of the country." *Common Cause*, 2026 U.S. Dist. LEXIS 232452, at *84–85 (emphasis in original).

This "is nonsensical." *Id.* at *84. It would turn the Privacy Act's purpose—"to *prevent* ... overbroad investigation"—on its head and *enable* "unwise ... surveillance of law-abiding citizens." *Londrigan*, 670 F.2d at 1169 (emphasis added). "This SORN does nothing to put a member of the American public on notice that specifically, their voter registration

---

[120] *Id.*

data is going to be collected on an unprecedented level and used for a plethora of government activity—some identified to this Court and others not." *Weber*, 816 F. Supp. 3d at 1193–94.

In contending that all voters "appear[ing] in a statewide voter registration list are '[s]ubjects of investigations,'" (Br. 71), DOJ also misunderstands the term "subject." Quoting from its own Justice Manual, DOJ says that a "subject" includes "anyone whose 'conduct is within the scope of the ... investigation.'" (Br. 71) (DOJ's alteration). But the ellipses omit a key phrase: "grand jury." U.S. Dep't of Just., Justice Manual § 9-11.151 (2020), https://www.justice.gov/jm/jm-9-11000-grand-jury#. DOJ does not identify a "grand jury investigation" covering the conduct of every single registered voter. *Id.*

Recognizing the problems with the 2003 SORN, DOJ argues that is not required to "plead and prove" that its actions are lawful. (Br. 58). Courts disagree. *E.g.*, *Patterson v. FBI*, 893 F.2d 595, 603 (3d Cir. 1990). Moreover, a court cannot grant relief that is "blatantly lawless." *Oestereich v. Selective Serv. Sys. Local Bd.*, 393 U.S. 233, 238 (1968); *see also INS v. Pangilinan*, 486 U.S. 875, 883 (1988) (a court "cannot ... create a remedy in violation of law").

### B. DOJ's Demand Violates the E-Government Act

The E-Government Act protects "the privacy of personal information."[121] Under the Act, agencies must conduct a "privacy impact assessment" ("PIA") when they (1) procure information technology that maintains identifiable information, or (2) initiate with information technology a new collection of identifiable information that would permit the identification of individuals, so long as identical questions or reporting requirements have been posed to ten or more individuals.[122]

DOJ concedes it has not conducted a PIA and instead makes three meritless arguments that it does not need to.

First, it says the requirement does not apply because "the Attorney General" has "not asked identical questions of nor imposed any reporting requirements on any persons in connection with the ... demand[.]" (Br. 74). But Congress used the passive voice. It did not require *DOJ to ask* the questions. Rather, it required a PIA when questions *are asked by anyone*—i.e., "if identical questions have been posed to, or identical

---

[121] Pub. L. No. 107-347, § 208(a).
[122] *Id.* § 208(b).

reporting requirements imposed on, 10 or more persons."[123] An SVRL—representing the answers to identical questions asked of millions of voters—clearly meets this definition. But even if DOJ's reading were correct, it would still need to complete a PIA because it is attempting to "procure" information technology including identifiable information.[124]

Second, DOJ argues that the PIA requirement does not extend to information collected during an "investigation involving an agency against specific individuals or entities." (Br. 75). But DOJ's cited exemption applies to investigations against "*specific* individuals or entities," not the entire voting population of the United States.[125] And the PIA requirement expressly "applies to the collection of information during the conduct of general investigations ... undertaken with reference to a category of individuals or entities such as a class of licensees or an entire industry."[126]

Third, DOJ argues that the PIA requirement does not apply because it is not "initiating" a "new" collection of information—it is only

---

[123] *Id.* § 208(b)(1)(A)(ii)(II).
[124] *Id.* § 208(b)(1)(A)(i).
[125] 44 U.S.C. § 3518(c)(1)(B)(ii) (emphasis added).
[126] *Id.* § 3518(c)(2).

asking the Secretary to share information already known to *her*. (Br. 76–77). Not so. The PIA requirement applies because the information is new *to DOJ*. *See Weber*, 816 F. Supp. 3d at 1194.

### C. DOJ's Demand Violates the Driver's Privacy Protection Act

The Driver's Privacy Protection Act ("DPPA") prohibits a state from "disclosing personal information drawn from motor vehicle records," absent express permission of the individual. *Gordon v. Softech Int'l, Inc.*, 726 F.3d 42, 45 (2d Cir. 2013); 18 U.S.C. § 2721(a), (d). DOJ does not dispute that this includes "personal information" collected when electors register to vote at the Connecticut DMV.[127]

DOJ argues that it is exempt from DPPA's prohibition under 18 U.S.C. § 2721(b)(1), which provides that information "may be disclosed ... [f]or use by any government agency ... in carrying out its functions[.]" (Br. 77). But that exception is discretionary—information "*may* be disclosed" at the state's pleasure.[128] Although DOJ argues that this exception becomes "mandatory" when used in conjunction with the CRA,

---

[127] Conn. Gen. Stat. §§ 9-19h, 9-20.
[128] 18 U.S.C. § 2721(b).

(Br. 78), this would ignore other parts of the DPPA, which make disclosure mandatory in certain circumstances,[129] but not in response to a CRA demand.

### D. The CRA Does Not Preempt State Privacy Law Prohibiting Disclosure of Sensitive Information

Connecticut law bars production of the sensitive information in the SVRL and nothing in federal law preempts it.

If voter registration information is disclosed, the Secretary must redact the voter's month and day of birth, social security number, motor vehicle operator's license number, and/or identity card number.[130] Under certain circumstances, the Secretary cannot even disclose a voter's name or address.[131]

DOJ argues that these state laws are preempted. (Br. 63–68). But state law is preempted only "to the extent of any conflict with a federal statute." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).

---

[129] *Id.* ("Personal information … shall be disclosed … to carry out the purposes of titles I and IV of the Anti Car Theft Act of 1992, the Automobile Information Disclosure Act …, the Clean Air Act … , and chapters 301, 305, and 321–331 of title 49" (cleaned up)).

[130] Conn. Gen. Stat. § 9-50d.

[131] *Id.* §§ 9-50d(c), 54-240g.

For federal legislation under the Elections Clause, "the statutory text accurately communicates the scope of Congress's pre-emptive intent." *Arizona*, 570 U.S. at 14. If there is a direct, textual conflict between federal and state laws, the state regulation ceases to be operative—but only "so far as the conflict extends." *Foster v. Love*, 522 U.S. 67, 69 (1997).

Here, there is no express preemption. DOJ identifies no provision of federal law that requires producing sensitive personal information.

There is no implied preemption, either. Where a state law is alleged to be an obstacle to federal authority, implied preemption "precludes state law that poses an actual conflict with the overriding federal purpose and objective." *Figueroa v. Foster*, 864 F.3d 222, 234–35 (2d Cir. 2017). Conflicts are "informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Id.* at 235. There is no preemption issue "unless the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together." *Id.* (cleaned up).

DOJ has not identified any specific conflict between Connecticut's privacy laws and the federal laws at issue. *E.g.*, *Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1083 n.14 (10th Cir. 2025); *Weber*, 816 F.

Supp. 3d at 1188; *Oliver*, 2026 U.S. Dist. LEXIS 155419, at *13; *Oregon*, 828 F. Supp. 3d at 1108.

The CRA cases cited by DOJ, *United States v. Duke*, 332 F.2d 759 (5th Cir. 1964) and *United States v. Mississippi*, 229 F. Supp. 925 (S.D. Miss. 1964), *rev'd*, 380 U.S. 128 (1965), concerned the destruction of voter records and discriminatory application requirements—not redaction or voter privacy. And *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962), recognized that the CRA was respectful of privacy interests, explaining "we are not discussing confidential, private papers and effects. We are, rather dealing with public records which ought ordinarily to be open to legitimate reasonable inspection ...." *Id.* at 232. DOJ does not explain why it could do without confidential records then but requires them now. *United States v. Raffensperger*, Civil Action No. 1:26-cv-00485-VMC, 2026 U.S. Dist. LEXIS 231527, at *32 (N.D. Ga. Sep. 30, 2026) ("It would not make sense for the Court to endorse Plaintiff's reliance on the general language of Title III of the CRA, which was enacted decades earlier, to get information that is not specifically subject to disclosure by the NVRA or HAVA").

## III. The CRA Does Not Authorize a Summary Proceeding

The Federal Rules of Civil Procedure apply to a demand under the CRA, particularly where—as here—DOJ has proceeded as such. *See* Part III.A. Even if the CRA modifies the Federal Rules, it only does so by treating a demand as an administrative subpoena. *See* Part III.B.

### A. The Federal Rules of Civil Procedure Apply

DOJ argues that the CRA contemplates a "special statutory proceeding," which "leaves no room" for judicial review. (Br. 45, 63). But "no district court has adopted the United States' view that resolving its CRA claim requires a 'special statutory proceeding.'" *Scanlan*, 838 F. Supp. 3d 150, 2026 U.S. Dist. LEXIS 143053, *3 n.2. That is because "[t]he Federal Rules are the default rules in civil litigation." *United States ex rel. Polansky v. Executive Health Resources, Inc.*, 599 U.S. 419, 436 (2023).[132] "Congress may override that command," "[b]ut we do not lightly infer that Congress has done so; and silence on the subject is seldom enough." *Id.*

Instead, Congress must give a "clear expression" of intent or "express statutory authorization" to displace the Federal Rules. *Marek*

---

[132] *See also* Fed. R. Civ. P. 1 & adv. comm. notes; Fed. R. Civ. P. 81.

*v. Chesny*, 473 U.S. 1, 11–12 (1985); *New Hampshire Fire Ins. Co. v. Scanlon*, 362 U.S. 404, 407 (1960). This includes details about an alternative procedure, like "*who*" may participate, "*when*" it is to occur, and "*how*" it should be conducted. *Burch v. P.J. Cheese, Inc.*, 861 F.3d 1338, 1349 (11th Cir. 2017) (emphasis in original); *see also, e.g.*, *ISC Holding AG v. Nobel Biocare Finance AG*, 688 F.3d 98, 112 (2d Cir. 2012) (Congress displaced Federal Rules by providing specific requirements for notice, service, hearing, issues to be resolved, timing, and remedies).

In relevant part, the CRA only says three words: "by appropriate process." This is hardly a "clear expression" of intent to displace the Federal Rules. *Marek*, 473 U.S. at 11–12. The Supreme Court agrees. *United States v. Powell*, 379 U.S. 48 (1964), concerned a statute that allowed a district court to compel production of records "by appropriate process." The Court declared that it "contains no provision specifying the procedure to be followed," so "the Federal Rules of Civil Procedure apply." *Id.* at 58 n.18. The same language produces the same result

under the CRA. District courts have rejected DOJ's attempts to distinguish *Powell*.[133]

A broader look at the CRA supports the point—compare Title III of the CRA with Title VI.[134] In Title VI, Congress provided a 1,646-word instruction manual directing courts and parties how to conduct special proceedings related to voting registration. Contrasted with the detailed guidance in Title VI, there is no reason to believe Congress meant to adopt an entirely new procedural framework in Title III with the phrase "by appropriate process." *E.g.*, *Mei Xing Yu v. Hasaki Restaurant, Inc.*, 944 F.3d 395, 408 (2d Cir. 2019) (refusing to displace Federal Rule 68 by requiring judicial review of settlements, where Congress gave "painstaking attention" to certain issues, but was "silent" on judicial review of settlements).

DOJ offers four general arguments why this Court should displace the Federal Rules in this action, but none are persuasive.

---

133 *E.g.*, *United States v. Caldwell*, Civil Action No. 26-2025 (ZNQ) (JTQ), 2026 U.S. Dist. LEXIS 168836, at *20 n.4 (D.N.J. July 29, 2026).

134 *See Parker Drilling Management Services v. Newton*, 587 U.S. 601, 608 (2019).

First, DOJ wrongly asserts that it "initiated a special statutory proceeding" in the district court. (Br. 45) (cleaned up). Not quite. DOJ largely proceeded as if the Federal Rules applied. For example, it filed a complaint and did not object to the intervention of other parties—conduct typical in actions under the Federal Rules, but foreign to summary enforcement proceedings. It litigated like this across the country and courts refused to allow DOJ to change course midstream.[135]

Second, DOJ ignores the reach of its own preferred standard. That is, even its own cases say that a "special proceeding" still allows a court to decide whether DOJ's demand falls within Title III (e.g., whether an SVRL is a "record"[136]) and whether DOJ's demand is sufficient.[137] *Lynd*, 306 F.2d at 226. Elsewhere, DOJ has even conceded this. *Hobbs*, 2026 U.S. Dist. LEXIS 215438, at *7 n.6 ("[E]ven if the Federal Rules did not apply, the outcome would not change .... [T]he Government's counsel agreed ...." (cleaned up)).

---

[135] *E.g.*, *United States v. Hanzas*, Docket No. 2:25-cv-00903, 2026 U.S. Dist. LEXIS 212824, at *8 (D. Vt. Sept. 17, 2026).

[136] 52 U.S.C. § 20701.

[137] *Id.* § 20703.

Third, DOJ offers Fifth Circuit cases that predate *Powell*. But these are nonbinding and were overruled by *Powell*. They are also unpersuasive, as they lack—sometimes admittedly—textual basis. *In re Gordon*, 218 F. Supp. 826, 826 (S.D. Miss. 1963) ("The Act is rather scant. It does not provide guideposts for many perplexing questions which are presented ...."). Even the then-Chief Judge of the Fifth Circuit, Elbert P. Tuttle, remarked that the basis for ordering a summary proceeding was only "implicit in the enactment," rather than expressly stated. Elbert P. Tuttle, Equality and the Vote, 41 N.Y.U. L. Rev. 245, 255 (Apr. 1966). *Compare id. with Scanlon*, 362 U.S. at 407 (requiring "express statutory authorization").

Fourth, DOJ's only case that postdates *Powell*—*Donaldson v. United States*, 400 U.S. 517 (1971)—is inapt. (Br. 46). While noting that the Federal Rules "are not inflexible," *Donaldson* explained how a district court may bend them: by "local rule or by order." *Id.* at 528 (citing what is now Fed. R. Civ. P. 81(a)(5)). Here, DOJ identifies no local rule or order displacing the Federal Rules.

### B. Alternatively, the CRA Demand Should Be Enforced as an Administrative Subpoena

Even if the CRA modifies the Federal Rules, it only does so by permitting an administrative subpoena. But this, too, limits what DOJ may demand and how it must do so. While a federal agency might have broad investigative authority, "a court may not permit its process to be abused." *Powell*, 379 U.S. at 58.[138]

To prevent abuse, the target of an investigation "is entitled" to an "adversary hearing" and "may challenge the summons on any appropriate ground"; the court may "inquire into the underlying reasons for the examination." *Id.* (cleaned up). The agency cannot "harass" or "pressure" the target. *Id.* And the demand cannot be "of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power." *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950).

So, the agency bears a burden. Among other things, "the [agency] must show" that its demand is for "a legitimate purpose," is "relevant to

---

[138] While most courts to analyze the issue apply the Federal Rules in full, a few have "[a]nalogiz[ed]" a "demand under Title III to an administrative subpoena." *Bellows*, 834 F. Supp. 3d at 122.

the purpose," and that required "administrative steps ... have been followed." *RNR Enterprises v. SEC*, 122 F.3d 93, 96 (2d Cir. 1997) (cleaned up). The demand must be "within the authority of the agency" and the information sought "reasonably relevant" to the permissible investigation. *Id.* at 97.

If the agency makes a sufficient showing, the respondent can still preclude enforcement by "showing that the subpoena is 'unreasonable' or was issued in bad faith or for an 'improper purpose,' or that compliance would be 'unnecessarily burdensome.'" *Id.* (cleaned up). Discovery may also be warranted.[139]

For the reasons described above, DOJ has not shown that its demand is for a "legitimate purpose," it is "relevant" to that purpose, and it followed the required "administrative steps" by including a valid "basis and purpose." *See* Parts I.B, I.C. Likewise, the Secretary has shown that the demand is "unreasonable" because it falls outside the scope of the CRA and was issued "in bad faith or for an 'improper purpose.'" *See* Parts I.A, I.B.4. If this Court reverses the dismissal, it should remand to, at a

---

[139] *E.g.*, *Conner v. United States*, 434 F.3d 676, 682 (4th Cir. 2006).

minimum, allow discovery into DOJ's true purpose for the demand, its intended uses, and how it intends to comply with federal privacy law. Below, the Secretary identified the specific types of information subject to discovery, along with a supporting affidavit.[140]

DOJ argues that the *RNR Enterprises* standard is inapplicable because the demand in that case was made "pursuant to a statute that mandates a judicial reviewable relevance requirement," while the CRA does not have a similar requirement. (Br. 49). This misreads both *RNR Enterprises* and the CRA. In *RNR Enterprises*, the protections available to the target of a subpoena did not flow from the Securities and Exchange Acts of 1933 or 1934, as DOJ contends—the Court referred to protections from "governmental investigation[s]" generally, established in *Powell* and *Morton Salt*. 122 F.3d at 97. But even if a statutory toehold was required for there to be protections, the CRA provides it. The law does not give DOJ a free-floating subpoena power—as described above, it limits what DOJ may demand and how it may do so.

---

[140] *See* JA90–92 (Rosenberg Aff. ¶¶ 72–88).

## CONCLUSION

The Court should affirm.

Respectfully submitted,

STEPHANIE THOMAS
DEFENDANT-APPELLEE

WILLIAM TONG
ATTORNEY GENERAL

By: */s/ Michael Rondon*

Michael Rondon (ct31022)
Blake Sullivan (ct30289)
Elizabeth Lewis (ct32141)
Assistant Attorneys General
165 Capitol Avenue
Hartford, CT 06106
Tel: (860) 808-5020
Fax: (860) 808-5347
Email: Michael.Rondon@ct.gov
Email: Blake.Sullivan@ct.gov
Email: Elizabeth.Lewis@ct.gov

## CERTIFICATE OF COMPLIANCE

As required by Federal Rule of Appellate Procedure (FRAP) 32(g)(1), I hereby certify that this brief complies with the type-volume limitations of FRAP 32(a)(7)(B), as modified by Second Circuit Local Rule 32.1(a)(4), in that this brief contains 12,737___ words, excluding the parts of the brief exempted by FRAP 32(f). I further certify that this brief complies with the typeface requirements of FRAP 32(a)(5) and the type style requirements of FRAP 32 (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Century Schoolbook font.

*/s/ Michael Rondon*

______________________________

Michael Rondon
Assistant Attorney General

Dated: November 12, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of November, 2026, I caused the foregoing brief to be filed electronically with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Michael Rondon*

Michael Rondon
Assistant Attorney General