# No. 26-2064

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff - Appellant,*

v.

STEPHANIE THOMAS,

*Defendant - Appellee,*

CLAIRE EWING, COMMON CAUSE, SEIU DISTRICT 1199NE, CONNECTICUT ALLIANCE FOR RETIRED AMERICANS, CONNECTICUT CITIZEN ACTION GROUP, BETTE MARAFINO,

*Intervenor-Defendants - Appellees.*

On Appeal from the United States District Court for the District of Connecticut
Case No. 3:26-cv-21
The Honorable Kari A. Dooley

**BRIEF OF INTERVENOR DEFENDANTS-APPELLEES COMMON CAUSE AND CLAIRE EWING**

[*Counsel listed on inside cover*]

Joseph Gaylin
Dan Barrett
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF
CONNECTICUT
80 State House Square
P.O. Box 230178
Hartford, CT 06123
jgaylin@acluct.org
dbarrett@acluct.org

William Hughes
Theresa J. Lee
Sophia Lin Lakin
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2500
whughes@aclu.org
tlee@aclu.org
slakin@aclu.org

*Counsel for Intervenor Defendants-Appellees Common Cause and Claire Ewing*

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .................... iii

PRELIMINARY STATEMENT .................... 1

APPELLEES' JURISDICTIONAL STATEMENT .................... 3

STATEMENT OF THE ISSUES .................... 3

STATEMENT OF THE CASE .................... 4

I. Legal Background .................... 4

II. Factual Background .................... 7

A. The United States seeks to force the disclosure of voter data in Connecticut and nationwide. .................... 7

B. The United States seeks to build a national voter database to engage in list maintenance. .................... 10

III. Procedural Background .................... 15

SUMMARY OF ARGUMENT .................... 17

LEGAL STANDARD .................... 18

ARGUMENT .................... 19

I. The SVRL Falls Outside Title III Because It Is Not a Record That "Comes Into" an Election Official's Possession .................... 19

A. To "come into" possession means to acquire a record from an external source—and Secretary Thomas acquires the SVRL from no one. .................... 20

B. Reading the SVRL into Title III would make a federal crime of the list maintenance the NVRA and HAVA require—an absurdity the plain text avoids. .................... 31

II. DOJ's Request Is Legally Deficient Because It Offers an Inadequate and Pretextual Statement of Its Basis and Its Purpose. .................... 36

A. The Federal Rules of Civil Procedure govern this civil action. .................... 36

B. DOJ's demand fails to satisfy Title III's basis-and-purpose requirements. .... 42

III. Connecticut Voters' Constitutional Rights Require Redaction, so the Requested Relief Fails. .... 59

CONCLUSION .... 64

CERTIFICATE OF COMPLIANCE .... 65

## TABLE OF AUTHORITIES

### Cases

*Alabama v. United States*,
304 F.2d 583, (5th Cir. 1962) .......... 6

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 18, 19

*Bell Atlantic Corporation v. Twombly*,
550 U.S. 544 (2007) .......... 18

*Bellin v. Zucker*,
6 F.4th 463 (2d Cir. 2021) .......... 19

*Bloom v. Azar*,
976 F.3d 157 (2d Cir. 2020) .......... 38

*Bryan v. United States*,
524 U.S. 184 (1998) .......... 34

*Carroll v. Trump*,
124 F.4th 140 (2d Cir. 2024) .......... 18, 36

*Clark v. Hanley*,
89 F.4th 78 (2d Cir. 2023) .......... 18

*Donaldson v. United States*,
400 U.S. 517 (1971) .......... 39, 40

*Federal Election Commission v. Larouche Campaign*,
817 F.2d 233(2d Cir. 1987) .......... 39

*Global Network Communications, Inc. v. City of New York*,
458 F.3d 150 (2d Cir. 2006) .......... 57

*Griffin v. Oceanic Contractors, Inc.*,
458 U.S. 564 (1982) .......... 31

*Honeycutt v. United States*,
581 U.S. 443 (2017) .......... 21

*In re Coleman*,
208 F. Supp. 199 (S.D. Miss. 1962) .......... 6, 62

*In re Gimbel*,
77 F.3d 593 (2d Cir. 1996) .......... 39

*In re Nortel Networks Corporation Securities Litigation*,
539 F.3d 129 (2d Cir. 2008) .......... 45

*Kalyanaram v. American Association of University Professors at New York Institute of Technology Inc.*,
742 F.3d 42(2d Cir. 2014) ........ 58

*Kennedy v. Lewis*,
325 F.2d 210 (5th Cir. 1963) ........ 28

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962) ........ passim

*Kennedy v. Owen*,
321 F.2d 116 (5th Cir. 1963) ........ 28

*Krause v. Kelahan*,
161 F.4th 66 (2d Cir. 2025) ........ 45

*Loughrin v. United States*,
573 U.S. 351 (2014) ........ 26

*New York Times Co. v. United States Department of Justice*,
756 F.3d 100 (2d Cir. 2014) ........ 57

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021) ........ 58

*Polselli v. Internal Revenue Service*,
598 U.S. 432 (2023) ........ 40

*Project Vote/Voting for America, Inc. v. Long*,
682 F.3d 331, (4th Cir. 2012) ........ 61, 62

*Public Interest Legal Foundation v. Benson*,
136 F.4th 613 (6th Cir. 2025) ........ 52

*Public Interest Legal Foundation, Inc. v. Bellows*,
92 F.4th 36 (1st Cir. 2024) ........ 61, 62

*Public Interest Legal Foundation, Inc. v. Dahlstrom*,
673 F. Supp. 3d 1004 (D. Alaska 2023); ........ 61

*Public Interest Legal Foundation, Inc. v. Matthews*,
589 F. Supp. 3d 932(C.D. Ill. 2022) ........ 61

*Public Interest Legal Foundation, Inc. v. North Carolina State Board of Elections*,
996 F.3d 257(4th Cir. 2021) ........ 61

*RNR Enterprises Inc. v. Securities and Exchange Commission*,
122 F.3d 93 (2d Cir. 1997) ........ 39

*Sheetz v. County of El Dorado*,
601 U.S. 267(2024) ........ 63

*Sierra Club v. Marsh*,
907 F.2d 210 (1st Cir. 1990) ........ 33

*Smith v. Spizzirri*,
601 U.S. 472 (2024) ........ 42

*United States Department of Justice v. Tax Analysts*,
492 U.S. 136 (1989) ........ 27

*United States Department of Commerce v. New York*,
588 U.S. 752 (2019) ........ 58

*United States v. Adams*,
837 F. Supp. 3d 881 (E.D. Ky. 2026) ........ 15, 20, 37

*United States v. Aguilar*,
No. 25-cv-748, 2026 WL 2364502
(D. Nev. Aug. 14, 2026) ........ passim

*United States v. Albence*,
No. 25-cv-1453, 2026 WL 3407115
(D. Del. Nov. 10, 2026) ........ 15, 20

*United States v. Amore*,
831 F. Supp. 3d 149 (D.R.I. 2026) ........ passim

*United States v. Bellows*,
834 F. Supp. 3d 113 (D. Me. 2026) ........ passim

*United States v. Benson*,
179 F.4th 470 (6th Cir. 2026) ........ passim

United States v. Benson,
187 F.4th 462 (6th Cir. 2026) ........ 20, 34

*United States v. Benson*,
819 F. Supp. 3d 753 (W.D. Mich. 2026) ........ 15, 20, 23

*United States v. Board of Elections of the State of New York*,
No. 25-cv-1338, 2026 WL 1999921
(N.D.N.Y. July 10, 2026) ........ 16, 20, 37, 41

*United States v. Caldwell*,
No. 26-cv-2025, 2026 WL 2186515
(D.N.J. July 29, 2026) ........ 16, 20, 37

*United States v. Cartwright*,
230 F. Supp 873 (M.D. Ala. 1964) ........ 6

*United States v. Coonan*,
143 F.4th 119 (2d Cir. 2025) .......... 60

*United States v. DeMarinis*,
No. 25-cv-3934, 2026 WL 1780586
(D. Md. June 18, 2026) .......... 16, 20, 32, 37

*United States v. Edwards*,
996 F.2d 1213 (4th Cir. 1993) .......... 33

*United States v. Evans*,
No. 25-cv-4403, 2026 WL 2267774
(D.D.C. Aug. 6, 2026) .......... passim

*United States v. Fontes*,
832 F. Supp. 3d 944 (D. Ariz. 2026) .......... 15, 20, 23, 37

*United States v. Galvin*,
830 F. Supp. 3d 122 (D. Mass. 2026) .......... passim

*United States v. Griswold*,
No. 25-cv-3967, 2026 WL 2235374
(D. Colo. Aug. 3, 2026) .......... passim

*United States v. Hanzas*,
No. 25-cv-903, 2026 WL 2754349
(D. Vt. Sep. 17, 2026) .......... 15, 20

*United States v. Henderson*,
No. 26-cv-166, 2026 WL 3181405
(D. Utah Oct. 23, 2026) .......... 15, 20

*United States v. Hobbs*,
No. 25-cv-6078, 2026 WL 2833713
(W.D. Wash. Sept. 22, 2026) .......... 15, 20

*United States v. Koski*,
No. 26-cv-42, 2026 WL 2032532
(E.D. Va. July 14, 2026) .......... passim

*United States v. Logue*,
344 F.2d 290 (5th Cir. 1965) .......... 29

*United States v. Matthews*,
No. 25-cv-3398, 2026 WL 2212877
(C.D. Ill. July 31, 2026) .......... passim

*United States v. Mayton*,
335 F.2d 153 (5th Cir. 1964) .......... 4

*United States v. Oliver*,
No. 25-cv-1193, 2026 WL 2031479
(D.N.M. July 14, 2026) ........ passim

*United States v. Oregon*,
828 F. Supp. 3d 1092, (D. Or. 2026) ........ passim

*United States v. Powell*,
379 U.S. 48 (1964) ........ 38, 39

*United States v. Raffensperger*,
No. 26-cv-485, 2026 WL 3002013
(N.D. Ga. Sept. 30, 2026) ........ 15

*United States v. Scanlan*,
838 F. Supp. 3d 150 (D.N.H. 2026) ........ passim

*United States v. Schmidt*,
835 F. Supp. 3d 697 (W.D. Pa. 2026) ........ passim

*United States v. Simon*,
No. 25-cv-3761, 2026 WL 2389778
(D. Minn. Aug. 17, 2026) ........ 15, 20, 37

*United States v. Warner*,
840 F. Supp. 3d 446 (S.D.W. Va. 2026) ........ passim

*United States v. Weber*,
816 F. Supp. 3d 1168 (C.D. Cal. 2026) ........ passim

*United States v. Wisconsin Elections Commission*,
833 F. Supp. 3d 949 (W.D. Wis. 2026) ........ 15, 20, 34, 41

**Statutes**

13 U.S.C. § 214 ........ 22

18 U.S.C. § 654 ........ 22

18 U.S.C. § 1703(a) ........ 22

26 U.S.C. § 7604(a) ........ 38

44 U.S.C. § 2107 ........ 26

50 U.S.C. § 217 ........ 22

52 U.S.C. § 20501 ........ 8

52 U.S.C. § 20507 ........ passim

52 U.S.C. § 20701 ........ passim

52 U.S.C. § 20702 ........ 31, 34

52 U.S.C. § 20703 ........ passim

52 U.S.C. § 20705 ........ 5, 28, 36, 39

52 U.S.C. § 20901 ........ 8

52 U.S.C. § 21083 ........ passim

52 U.S.C. § 21085 ........ 51, 53

Conn. Gen. Stat. § 9-50b ........ 19, 23, 30

**Other Authorities**

106 Cong. Rec. 5,326 (daily ed. March 11, 1960) ........ 5

Devlin Barrett & Nick Corasaniti,
*Trump Administration Quietly Seeks to Build National Voter Roll*,
N.Y. TIMES, Sept. 9, 2025,
https://perma.cc/2RGY-RCJT ........ 10

Emily Bazelon & Rachel Poser,
*The Unraveling of the Justice Department*,
N.Y. TIMES MAG., Nov. 16, 2025,
https://perma.cc/L39A-S5VZ ........ 12, 56

Executive Order No. 14,399,
91 Fed. Reg. 17125 (Mar. 31, 2026) ........ 56

*Federal Protection of Negro Voting Rights*,
51 Virginia Law Review (1965) ........ 29

H.R. Rep. No. 86-956 (1959) ........ 4, 24, 30

Jonathan Shorman,
*DOJ Is Sharing State Voter Roll Lists with Homeland Security*,
STATELINE, Sept. 12, 2025,
https://perma.cc/8HCR-S45F ........ 11

Jonathan Shorman,
*Trump's DOJ Offers States 'Confidential' Deal to Wipe Voters Flagged by Feds*,
STATELINE, Dec. 18, 2025,
https://perma.cc/QXF5-PWJB ........ 14

Jude Joffe-Block,
*Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's*

*Flagging U.S. Citizens Too*,
NPR, Dec. 10, 2025,
https://perma.cc/6P7X-NZXL ........ 11

Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry,
*Tracker of Justice Department Requests for Voter Information*,
Brennan Center for Justice (updated Nov. 10, 2026),
https://perma.cc/FH9V-M5FL ........ 9, 13

Kyle Cheney,
*Trump Administration Concedes DOGE Team May Have Misused Social Security Data*,
POLITICO, Jan. 20, 2026,
https://perma.cc/4FTL-F7KQ ........ 12

Letter to Secretary Markwayne Mullin from Senator Alex Padilla (Sept. 13, 2026),
https://perma.cc/2LAD-25KV ........ 14

Miles Parks & Jude Joffe-Block,
*Trump's DOJ focuses in on voter fraud, with a murky assist from DOGE*,
NPR, May 22, 2025,
https://perma.cc/6QPB-NLZ8 ........ 11

Notice of Corrections to the Record,
*American Federation of State, County & Municipal Employees, AFLCIO v. Social Security Administration*,
No. 25-cv-596 (D. Md. Jan. 16, 2026), Dkt. No. 197 ........ 12, 13, 56, 59

*Read Bondi's Letter to Minnesota's Governor*,
N.Y. Times, Jan. 24, 2026,
https://perma.cc/H5GY-ZKBS ........ 57

Sarah N. Lynch,
*Justice Dept. Close to Finalizing Deal to Hand over States' Voter Roll Data to Homeland Security, Sources Say*,
CBS News. Mar. 26, 2026,
https://perma.cc/T66C-RYRC ........ 11

United States Commission on Civil Rights,
*Report of the U.S. Commission on Civil Rights 1959* (1959),
https://www.usccr.gov/files/historical/1959/59-001-U.pdf ........ 24, 29

United States Commission on Civil Rights,
*Report of the U.S. Commission on Civil Rights 1961* (1961),
https://perma.cc/E8F8-QMU6 ........ 29

United States Election Assistance Commission,
*Election Administration and Voting Survey 2024 Comprehensive*

*Report* (2025),
https://perma.cc/9M99-STAY .......... 52

**Rules**

Fed. R. Civ. P. 1 .......... 37, 40

Fed. R. Civ. P. 81 .......... 37, 40

## PRELIMINARY STATEMENT

The United States, through the Department of Justice (DOJ), seeks to compel Connecticut to turn over its complete and unredacted statewide voter registration list (SVRL)—including the sensitive personal information of millions of Connecticut voters—over the state's objection. DOJ claims that Title III of the Civil Rights Act of 1960 (CRA), 52 U.S.C. § 20701 *et seq.*, authorizes that demand.

In a remarkable display of judicial unanimity, every federal court to consider DOJ's efforts to compel unwilling states to turn over their unredacted SVRLs—twenty-nine as of this filing, including the court below—have rejected them. Those courts have identified multiple, independent defects in DOJ's demands, including that SVRLs are not records covered by Title III and that DOJ has failed to comply with the statute's requirement that its written demand contain "a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. This Court should affirm the district court's dismissal on any or all of those same grounds.

*First*, Connecticut's SVRL does not fall within the "records" subject to DOJ document demands under Title III. The statute covers records that "come into [the] possession" of elections officials—such as voter

registration applications that local officials in the Jim Crow South received from Black voters and refused to process. 52 U.S.C. § 20701. The SVRL, by contrast, is a record created and continuously updated by Connecticut, not one it obtained from voters or other sources.

*Second*, DOJ failed to provide the written "statement of the basis and the purpose" that Title III expressly requires. 52 U.S.C. § 20703. DOJ's stated *basis* is legally insufficient: it identifies no factual grounds for the demand and instead merely invokes DOJ's asserted authority under Title III. DOJ's stated *purpose* is equally deficient: it offers no grounds as to why DOJ needs Connecticut's complete, unredacted SVRL and, in any event, is an obvious pretext for interfering with state voter-list-maintenance processes and creating an unauthorized national voter database.

*Third*, even if Title III otherwise authorized DOJ's demand, the relief it seeks—forced disclosure of millions of Connecticut voters' sensitive personal data—would impermissibly burden voting and privacy rights. The requested disclosure would expose sensitive voter information without a demonstrated need for doing so, threatening to chill voters' participation in political activity and the electoral process.

The district court therefore correctly dismissed the Complaint. Title III does not entitle the federal government to whatever voter information it wants, whenever it wants, based on a conclusory demand. This Court should affirm.

## APPELLEES' JURISDICTIONAL STATEMENT

The jurisdictional summary provided in Appellant's brief is complete and correct.

## STATEMENT OF THE ISSUES

1. Whether a state's SVRL, which is a database created by state elections officials, is a "record[] . . . which come[s] into [their] possession," within the meaning of Title III of the CRA, 52 U.S.C. § 20701?
2. Whether the United States can obtain a covered record under Title III of the CRA where its written "statement of the basis and the purpose therefor," 52 U.S.C. § 20703, does not include any factual basis and is pretextual?
3. Whether, prior to production under Title III, the redaction of sensitive personal information from Connecticut's SVRL would be

required to avoid a constitutional violation or a violation of federal privacy law?

## STATEMENT OF THE CASE

### I. Legal Background

Congress enacted Title III of the CRA to protect Black Americans' constitutional right to vote and stop former Confederate states from denying thousands of citizens the ability to register to vote. *See, e.g.*, H.R. Rep. No. 86-956, at 7 (1959). The CRA followed the Civil Rights Act of 1957, Congress's first attempt since Reconstruction to enforce the voting guarantees of the Fourteenth and Fifteenth Amendments. *United States v. Mayton*, 335 F.2d 153, 159 (5th Cir. 1964). However, Congress "found it necessary to legislate again in 1960 with respect to this problem of assuring full rights of suffrage to all Americans." *Id.* Title III sought to empower DOJ "to require the production of [election] records during any investigation it conducts as to complaints that qualified persons have been denied the right to vote in violation of Federal law." *United States v. Oregon*, 828 F. Supp. 3d 1092, 1097 (D. Or. 2026). The statute requires that state and local elections officials retain and preserve "all records and papers which come into [their] possession relating to any application,

registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. These records "shall, upon demand in writing by the Attorney General or his representative . . . be made available for inspection, reproduction, and copying at the principal office of [the] custodian." *Id.* § 20703.

While Congress intended that the Attorney General investigate violations of constitutional rights, some, including Florida Congressman William Cramer, were also concerned about DOJ using the powers granted by Title III for "fishing expedition[s]." 106 Cong. Rec. 5,326 (daily ed. March 11, 1960). To address these concerns, Congress adopted Representative Cramer's amendment to Title III, *see id.*, which added a requirement that the Attorney General's demand for records include "a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. And Congress expressly authorized judicial review over such statements of basis and purpose by specifying that "[t]he United States district court for the district in which a demand is made pursuant to section 20703 of this title, or in which a record or paper so demanded is located, shall have jurisdiction by appropriate process to compel the production of such record or paper." 52 U.S.C. § 20705.

The federal government initially used Title III as intended, to investigate jurisdictions that had effectively denied Black Americans the right to register to vote. *See, e.g.*, *Alabama v. United States*, 304 F.2d 583, 585–86 (5th Cir. 1962) (describing registration documents produced under the CRA showing that discriminatory practices led to less than 10% of Black citizens being registered to vote while nearly 100% of white citizens were registered), *aff'd*, 371 U.S. 37 (1962); *United States v. Cartwright*, 230 F. Supp 873, 875 (M.D. Ala. 1964) (reviewing data from a Title III investigation which revealed racially discriminatory practices resulting in 89% of white citizens being registered to vote but only 7.5% of Black citizens being registered). And in conducting those investigations, DOJ adhered to the statutory requirement to set forth in writing "the basis and the purpose" for its records demands, 52 U.S.C. § 20703—that is, the factual basis for why DOJ suspected a potential legal violation as well as its investigatory purpose of how the requested records would bear upon that suspicion. *See, e.g.*, *Kennedy v. Lynd*, 306 F.2d 222, 229 n.6 (5th Cir. 1962); *In re Coleman*, 208 F. Supp. 199, 199–200 (S.D. Miss. 1962), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963).

This robust use of Title III of the CRA was short lived. Only a few years later, Congress passed the Civil Rights Act of 1964, which outlawed racial segregation. Then, in 1965, Congress passed the Voting Rights Act, the crown jewel of the civil rights movement, which established broad new voter protections, eliminated literacy tests, and led to the enfranchisement of millions of Black citizens. Because Congress enacted more effective voting rights laws, federal court assessment of Title III had largely been silent since 1965. Until the past year, all jurisprudence analyzing the CRA arose during the 1960s in former Confederate states and pertained to investigations into state and local officials unlawfully denying Black citizens their right to register to vote.

## II. Factual Background

### A. The United States seeks to force the disclosure of voter data in Connecticut and nationwide.

On December 12, 2025, DOJ sent a letter to Connecticut Secretary of State Stephanie Thomas (Secretary Thomas), demanding an electronic copy of Connecticut's SVRL. App. 43–45 (December 12 Letter).[1] DOJ requested that the voter file be produced with "all fields" included. *Id.*

[1] "App." refers to the parties' joint appendix, filed in connection with the United States' opening brief.

(emphasis omitted). The Letter cited the National Voter Registration Act (NVRA), 52 U.S.C. § 20501 *et seq.*, the Help America Vote Act (HAVA), 52 U.S.C. § 20901 *et seq.*, and Title III of the CRA in support of the request. App. 43–44. It further stated "[t]he purpose of this request is to ascertain Connecticut's compliance with the list maintenance requirements of the NVRA and HAVA." App. 44. The letter did not elaborate further on this point, nor did it refer to any compliance deficiencies with respect to those statutes, suspected or actual, or any other factual basis for any concerns with Connecticut's list maintenance practices. *Id.*

On December 24, 2025, Secretary Thomas' office responded, notifying the DOJ that Secretary Thomas could not comply with the request because it "offer[ed] no authority that require[d] or permit[ted] her to" comply. App. 47–49. This response noted that neither the NVRA nor HAVA requires production of documents to the federal government and that, without such authorization, Connecticut law barred disclosure. App. 47–48. The response continued that the December 12 Letter did not identify a "basis" nor provide a valid "purpose," as required by the CRA. *Id.*

On January 6, 2026, the United States filed a civil action against Secretary Thomas. App. 8. The suit, seeking to compel Secretary Thomas to hand over sensitive voter data, was one of thirty-one nearly identical lawsuits DOJ has initiated against states and election officials across the country.[2] Its Complaint included one claim, a demand for records under

[2] *See* Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (updated Nov. 10, 2026), https://perma.cc/FH9V-M5FL. In addition to the case under review here, the cases are: *United States v. McGrane*, No. 26-cv-197 (D. Idaho filed Apr. 1, 2026); *United States v. Adams*, No.26-cv-19 (E.D. Ky. filed Feb. 26, 2026); *United States v. Caldwell*, No. 26-cv-2025 (D.N.J. filed Feb. 26, 2026); *United States v. Henderson*, No. 26-cv-166 (D. Utah filed Feb. 26, 2026); *United States v. Ziriax*, No. 26-cv-361 (W.D. Okla. filed Feb. 26, 2026); *United States v. Warner*, No. 26-cv-156 (S.D. W. Va. filed Feb. 26, 2026); *United States v. Raffensperger*, No. 26-cv-485 (N.D. Ga. filed Jan. 23, 2026); *United States v. Koski*, No. 26-cv-42 (E.D. Va. filed Jan. 16, 2026); *United States v. Fontes*, No. 26-cv-66 (D. Ariz. filed Jan. 6, 2026); *United States v. Evans*, No. 25-cv-4403 (D.D.C. filed Dec. 18, 2025); *United States v. Matthews*, No. 25-cv-3398 (C.D. Ill. filed Dec. 18, 2025); *United States v. Wisconsin Elections Comm'n*, No. 25-cv-1036 (W.D. Wis. filed Dec. 18, 2025); *United States v. Griswold*, No. 25-cv-3967 (D. Colo. filed Dec. 11, 2025); *United States v. Nago*, No. 25-cv-522 (D. Haw. filed Dec. 11, 2025); *United States v. Galvin*, No. 25-cv-13816 (D. Mass. filed Dec. 11, 2025); *United States v. Aguilar*, No. 25-cv-728 (D. Nev. filed Dec. 11, 2025); *United States v. Albence*, No. 25-cv-1453 (D. Del. filed Dec. 2, 2025); *United States v. Oliver*, No. 25-cv-1193 (D.N.M. filed Dec. 2, 2025); *United States v. Amore*, No. 25-cv-639 (D.R.I. filed Dec. 2, 2025); *United States v. Hobbs*, No. 25-cv-6078 (W.D. Wash. filed Dec. 2, 2025); *United States v. DeMarinis*, No. 25-cv-3934 (D. Md. filed Dec. 1, 2025); *United States v. Hanzas*, No. 25-cv-903 (D. Vt. filed Dec. 1, 2025); *United States v. Benson*, No. 25-cv-1148 (W.D. Mich. filed Sept. 25, 2025); *United States v.*

Title III; it did not include any counts under the NVRA or HAVA or allege any violations thereof. App. 25.

### B. The United States seeks to build a national voter database to engage in list maintenance.

DOJ's requests for private, sensitive voter data from Connecticut and other states appear to be in connection with novel efforts to construct a national voter database, and to otherwise use untested forms of database analysis to scrutinize state voter rolls and challenge voters' eligibility.

DOJ officials "have been clear that they are interested in a central, federal database of voter information."[3] Within months of the new Administration's taking office, DOJ officials asked staffers from the new

*Scanlan*, No. 25-cv-371 (D.N.H. filed Sept. 25, 2025); *United States v. Simon*, No. 25-cv-3761 (D. Minn. filed Sept. 25, 2025); *United States v. Bd. of Elections of New York*, No. 25-cv-1338 (N.D.N.Y. filed Sept. 25, 2025); *United States v. Schmidt*, No. 25-cv-1481 (W.D. Pa. filed Sept. 25, 2025); *United States v. Weber*, No. 25-cv-9149 (C.D. Cal. filed Sept. 25, 2026); *United States v. Bellows*, No. 25-cv-468 (D. Me filed Sept. 16, 2025); *United States v. Oregon*, No. 25-cv-1666 (D. Or. filed Sept. 16, 2025). DOJ additionally filed a suit in the Middle District of Georgia, which was dismissed for improper venue. *See United States v. Raffensperger*, No. 25-cv-548, 2026 WL 184233 (M.D. Ga. Jan. 23, 2026).

[3] *E.g.*, Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. TIMES, Sept. 9, 2025, https://perma.cc/2RGY-RCJT.

"Department of Governmental Efficiency" (DOGE) to identify supposed noncitizens in state voter rolls by matching voter data with data from the Social Security Administration (SSA), efforts which have incorrectly flagged numerous U.S. citizens as ineligible to vote.[4] DOJ has also been coordinating in these novel efforts with the federal Department of Homeland Security (DHS), according to reported statements from both agencies.[5]

Around the time that DOJ first began filing these lawsuits, one article extensively quoted a lawyer who had recently left DOJ's Civil Rights Division, describing DOJ's aims in these cases with respect to the collection and aggregation of voter data:

> We were tasked with obtaining states' voter rolls, by suing them if necessary. Leadership said they had a DOGE person who could go through all the data and compare it to the [DHS] data and Social Security data . . . I had never before told an

[4] *E.g.*, Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NPR, Dec. 10, 2025, https://perma.cc/6P7X-NZXL; Miles Parks & Jude Joffe-Block, *Trump's DOJ focuses in on voter fraud, with a murky assist from DOGE*, NPR, May 22, 2025, https://perma.cc/6QPB-NLZ8.

[5] *See* Sarah N. Lynch, *Justice Dept. Close to Finalizing Deal to Hand over States' Voter Roll Data to Homeland Security, Sources Say*, CBS News. Mar. 26, 2026, https://perma.cc/T66C-RYRC; Jonathan Shorman, *DOJ Is Sharing State Voter Roll Lists with Homeland Security*, STATELINE, Sept. 12, 2025, https://perma.cc/8HCR-S45F.

> opposing party, Hey, I want this information and I'm saying I want it for this reason, but I actually know it's going to be used for these other reasons. That was dishonest. It felt like a perversion of the role of the Civil Rights Division.[6]

Administration officials have also been working with outside "election integrity" advocates, apparently mishandling sensitive personal data in the process. For example, as detailed in a federal court filing by DOJ on behalf of the SSA:

> [I]n March 2025, a political advocacy group contacted two members of SSA's DOGE Team with a request to analyze state voter rolls that the advocacy group had acquired. The advocacy group's stated aim was to find evidence of voter fraud and to overturn election results in certain States. In connection with these communications, one of the DOGE team members signed a "Voter Data Agreement," in his capacity as an SSA employee, with the advocacy group. He sent the executed agreement to the advocacy group on March 24, 2025.

Notice of Corrections to the R. at 5, *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. 25-cv-596 (D. Md. Jan. 16, 2026), Dkt. No. 197 (*AFSCME* Notice).[7] The filing, which does not specify

---

[6] Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. TIMES MAG., Nov. 16, 2025, https://perma.cc/L39A-S5VZ.

[7] *See also* Kyle Cheney, *Trump Administration Concedes DOGE Team May Have Misused Social Security Data*, POLITICO, Jan. 20, 2026, https://perma.cc/4FTL-F7KQ.

the terms of the "Voter Data Agreement" or the activities these DOGE actors or others undertook pursuant to it, also indicates that, around the same period, DOGE actors shared unknown amounts of Social Security data on an unapproved third-party server, in a "manner [that] is outside SSA's security protocols." *Id.* at 6.

DOJ has also made clear what it plans to do with this collected data, asking states to sign a memorandum of understanding (MOU) in connection with its requests. *See* App. 100–08.[8] The MOU purports to vest the United States with substantial new authority to identify supposedly ineligible voters and to compel states to remove these voters from the rolls, depriving them of the franchise. App. 101, 104. Under the MOU's terms, federal officials may take custody of the voter rolls, identify supposed "ineligible voters," and then compel states to "remov[e]" these voters "within forty-five (45) days" and then resubmit their voter lists for additional analysis. App. 103–04. These removals are purportedly required by the MOU despite the procedural protections afforded by the

[8] In addition to the Texas version of the MOU included in the Joint Appendix, the copies provided to many other states are aggregated and posted in Martinez-Ochoa, O'Connor, & Berry, *Tracker of Justice Department Requests*, *supra* n.2.

NVRA, which requires voters to be notified prior to removal and bars systematic removal programs within ninety days of an election, 52 U.S.C. § 20507.[9] The MOU would thereby turn states' own voter rolls into a tool for unlawfully and improperly mass-challenging voters and interfering with the democratic process in the states.

In parallel, DHS has launched an "Unlawful Voter Initiative," tasking hundreds of employees with trying to identify allegedly ineligible registered voters.[10] Staff must gather voter information from state government sources, using identifying information held by DHS, and if necessary, falsely attesting to that state government that they are the voter or are authorized to access the voter's information. In trainings on the new initiative, officials have acknowledged that the data sources underpinning this effort erroneously list U.S. citizens as noncitizens. This new Initiative clarifies the administration's actual plans with the information it seeks in this case.

---

[9] *See also* Jonathan Shorman, *Trump's DOJ Offers States 'Confidential' Deal to Wipe Voters Flagged by Feds*, STATELINE, Dec. 18, 2025, https://perma.cc/QXF5-PWJB.

[10] *See* Letter to Sec'y Markwayne Mullin from Sen. Alex Padilla (Sept. 13, 2026), https://perma.cc/2LAD-25KV.

## III. Procedural Background

As noted, the United States has filed thirty-one lawsuits seeking to obtain state SVRLs under the purported authority of Title III of the CRA. Every court that has yet passed upon the validity of these actions—now twenty-nine courts in all, including the Sixth Circuit—has held that DOJ's demand is unlawful and accordingly dismissed the United States's claims.[11]

[11] *See* App. 285–96; *United States v. Benson*, 179 F.4th 470 (6th Cir. 2026); *United States v. Adams*, 837 F. Supp. 3d 881 (E.D. Ky. 2026); *United States v. Warner*, 840 F. Supp. 3d 446 (S.D.W. Va. 2026); *United States v. Scanlan*, 838 F. Supp. 3d 150 (D.N.H. 2026); *United States v. Schmidt*, 835 F. Supp. 3d 697 (W.D. Pa. 2026); *United States v. Bellows*, 834 F. Supp. 3d 113 (D. Me. 2026); *United States v. Wisconsin Elections Comm'n*, 833 F. Supp. 3d 949 (W.D. Wis. 2026); *United States v. Fontes*, 832 F. Supp. 3d 944 (D. Ariz. 2026); *United States v. Amore*, 831 F. Supp. 3d 149 (D.R.I. 2026); *United States v. Galvin*, 830 F. Supp. 3d 122 (D. Mass. 2026); *United States v. Benson*, 819 F. Supp. 3d 753 (W.D. Mich. 2026); *United States v. Oregon*, 828 F. Supp. 3d 1092 (D. Or. 2026); *United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026); *United States v. Albence*, No. 25-cv-1453, 2026 WL 3407115 (D. Del. Nov. 10, 2026); *United States v. Henderson*, No. 26-cv-166, 2026 WL 3181405 (D. Utah Oct. 23, 2026); *United States v. Raffensperger*, No. 26-cv-485, 2026 WL 3002013 (N.D. Ga. Sept. 30, 2026); *United States v. Hobbs*, No. 25-cv-6078, 2026 WL 2833713 (W.D. Wash. Sept. 22, 2026); *United States v. Hanzas*, No. 25-cv-903, 2026 WL 2754349 (D. Vt. Sep. 17, 2026); *United States v. Simon*, No. 25-cv-3761, 2026 WL 2389778 (D. Minn. Aug. 17, 2026); *United States v. Aguilar*, No. 25-cv-748, 2026 WL 2364502 (D. Nev. Aug. 14, 2026); *United States v. Evans*, No. 25-cv-4403, 2026 WL 2267774 (D.D.C. Aug. 6, 2026); *United States v. Griswold*, No. 25-cv-3967, 2026 WL 2235374 (D. Colo. Aug. 3, 2026); *United States v. Matthews*, No. 25-

The district court below is one of them. On January 27, 2026, Common Cause, a pro-democracy membership organization that fights for voter privacy in Connecticut, *see* App. 56–62; and Claire Ewing, a Connecticut voter who, as a naturalized citizen, is at particular risk for improper removal from the rolls, *see* App. 63–66, moved to intervene as Defendants. App. 12. They were granted intervention on January 29, 2026. *Id.* Secretary Thomas, the Common Cause Intervenors, and another set of Intervenor Defendants—the Connecticut Alliance for Retired Americans, Connecticut Citizen Action Group, Bette Marafino, and SEIU District 1199NE—each moved to dismiss. App. 14.

On July 17, 2026, the district court granted the Common Cause Intervenors' motion and denied the additional motions to dismiss as moot. App. 286. It held that DOJ sought records outside the scope of Title III: because the state created the SVRL, it "is not a record that comes into

---

cv-3398, 2026 WL 2212877 (C.D. Ill. July 31, 2026); *United States v. Caldwell*, No. 26-cv-2025, 2026 WL 2186515 (D.N.J. July 29, 2026); *United States v. Oliver*, No. 25-cv-1193, 2026 WL 2031479 (D.N.M. July 14, 2026); *United States v. Koski*, No. 26-cv-42, 2026 WL 2032532 (E.D. Va. July 14, 2026); *United States v. Bd. of Elections of the State of N.Y.*, No. 25-cv-1338, 2026 WL 1999921 (N.D.N.Y. July 10, 2026); *United States v. DeMarinis*, No. 25-cv-3934, 2026 WL 1780586 (D. Md. June 18, 2026).

the state's possession," and thus is not covered by the statute. App. 293. It further reasoned that SVRLs are outside the scope of Title III because Title III "clearly contemplates" that records subject to production are "fixed in time . . . such that they cannot . . . legally be altered, damaged, or destroyed," while, under the NVRA and HAVA, SVRLs are "constantly being 'altered.'" App. 295.

On July 23, the district court entered judgment in favor of all Defendants against the United States. App. 297. The same day, the United States noticed this appeal, App. 298, and on October 6, filed its opening brief, *see* Dkt. No. 74 (DOJ Br.).

## SUMMARY OF ARGUMENT

This Court should affirm the district court's dismissal because DOJ has failed to plead a viable Title III claim. That conclusion accords with the decisions of twenty-eight federal district courts and one federal court of appeals addressing the United States' substantially identical demands for statewide voter files. No court has upheld such a demand.

The Complaint fails to state a viable Title III claim for three independent reasons. *First*, Title III does not reach Connecticut's SVRL because Connecticut created that record rather than obtaining it from an

external source, as the statute requires. 52 U.S.C. § 20701. *Second*, DOJ failed to provide the required statement of "the basis and the purpose" for its demand because it identified no factual basis and offered a pretextual purpose that does not justify its demand for the complete, unredacted voter file. 52 U.S.C. § 20703. *Finally*, the relief the United States seeks cannot lawfully be granted because compelling disclosure of Connecticut voters' sensitive personal information would impermissibly burden their constitutional and privacy rights.

## LEGAL STANDARD

This Court "review[s] a district court's grant of a motion to dismiss the complaint on the pleadings *de novo*." *Clark v. Hanley*, 89 F.4th 78, 90 (2d Cir. 2023). The Court is "free to affirm on any ground that finds support in the record, even if it was not the ground upon which the trial court relied." *Carroll v. Trump*, 124 F.4th 140, 161 n.13 (2d Cir. 2024) (citation omitted).

A motion to dismiss should be granted when the allegations in the complaint fail to set forth facts that, if true, would entitle the plaintiff to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In adjudicating a motion to dismiss,

a court need not accept a complaint's legal conclusions, nor must it credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. In addition to the factual allegations contained in the complaint, courts may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (citation omitted).

## ARGUMENT

### I. The SVRL Falls Outside Title III Because It Is Not a Record That "Comes Into" an Election Official's Possession

Title III obligates elections officials to retain only those "records and papers which come into [their] possession." 52 U.S.C. § 20701. Connecticut's statewide voter registration list is not such a record, because Secretary Thomas does not receive the SVRL from anyone. Instead, her office "design[s] and maintain[s]" it. Conn. Gen. Stat. § 9-50b(a). And her office, along with local registrars of voters, rewrites it regularly by adding new registrants, removing those who move or die, and correcting errors, in accordance with federal law. *See* 52 U.S.C. § 20507(a)(4), § 21083(a)(4). As the district court below, the Sixth Circuit, and every other court to construe the phrase has held, a database that an

office itself creates and continuously updates is not one that "comes into [that office's] possession." App. 293; *United States v. Benson*, 179 F.4th 470, 478–81 (6th Cir. 2026) (*Benson II*), *reh'g en banc denied*, 187 F.4th 462 (*Benson III*).[12] This means it is not covered by Title III's retention provision or, in turn, DOJ's demand authority. *See* 52 U.S.C. §§ 20701, 20703.

### A. To "come into" possession means to acquire a record from an external source—and Secretary Thomas acquires the SVRL from no one.

The text, structure, and purpose of Title III make clear that Connecticut's SVRL is not a covered record.

Start with the text. Title III requires elections officials to "retain and preserve, for a period of twenty-two months from the date of any"

[12] *See also Adams*, 837 F. Supp. 3d at 886–87; *Scanlan*, 838 F. Supp. 3d at 156–59; *Schmidt*, 835 F. Supp. 3d at 699–700; *Bellows*, 834 F. Supp. 3d at 122–24; *WEC*, 833 F. Supp. 3d at 954; *Fontes*, 832 F. Supp. 3d at 948–52; *Benson*, 819 F. Supp. 3d at 770; *Albence*, 2026 WL 3407115, at *5–9; *Henderson*, 2026 WL 3181405, at *6–10; *Hobbs*, 2026 WL 2833713, at *4–5; *Hanzas*, 2026 WL 2754349, at *4–5; *Simon*, 2026 WL 2389778, at *8–11; *Aguilar*, 2026 WL 2364502, at *5; *Evans*, 2026 WL 2267774, at *5, *11; *Griswold*, 2026 WL 2235374, at *4–5; *Matthews*, 2026 WL 2212877, at *4–5; *Caldwell*, 2026 WL 2186515, at *6–8; *Koski*, 2026 WL 2032532, at *6; *Bd. of Elections of N.Y.*, 2026 WL 1999921, at *11; *DeMarinis*, 2026 WL 1780586, at *5.

federal election, "all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. It then requires officials to turn over "[a]ny record or paper required by [Section 20701] to be retained and preserved." *Id.* § 20703. Congress, however, did not require officials to retain every record they possess. It required them to retain records that "come into" their possession. *Id.* § 20701.

That language matters. Around the time Congress enacted Title III, to "come into . . . possession" meant to "acquire," "obtain," or "receive." *See Benson II*, 179 F.4th at 478; *see also Honeycutt v. United States*, 581 U.S. 443, 449 (2017) (defining "obtain" as "to get or acquire" and "to come into possession of" (citation omitted)); *accord, e.g.*, *Evans*, No. 25-cv-4403, 2026 WL 2267774, at *6 (D.D.C. Aug. 6, 2026); *United States v. Koski*, No. 26-cv-42, 2026 WL 2032532, at *5 (E.D. Va. July 14, 2026). Reading Title III to reach whatever an official happens to possess would replace "'all records and papers *which come into* h[er] possession'" with "all records and papers which *they possess*," rendering "come into" surplusage. *Benson II*, 179 F.4th at 480 (citation omitted).

Congress "has consistently employed the phrase 'comes into possession' to describe the process by which a person receives something from an external source," *United States v. Scanlan*, 838 F. Supp. 3d 150, 158 (D.N.H. 2026). *See, e.g.*, 13 U.S.C. § 214 (information that "comes into [a census employee's] possession"); 18 U.S.C. § 654 (money or property that "comes into [one's] possession"); *id.* § 1703(a) (mail that "come[s] into [an employee's] possession"); 50 U.S.C. § 217 (abandoned property that "comes into [a servicemember's] possession"). These provisions all use the phrase to describe something received or acquired from elsewhere—not something the person creates himself. The phrase thus describes something that arrives from an external source. A record does not "come into" an official's possession merely because the official creates it and thereafter possesses it.

Ordinary usage confirms this point. As the Sixth Circuit explained, "an ordinary English speaker would not say that she has come into possession of something that she created, established, and maintained." *Benson II*, 179 F.4th at 478. One does not "come into possession" of the meal one cooks, the notes one writes, or the painting one paints. As another court put it, "the Mona Lisa 'came into the possession' of the

Louvre around 1797"; one would not say that it "'came into the possession' of Leonardo da Vinci when he completed it around 1517." *Evans*, 2026 WL 2267774, at *6. The SVRL is Connecticut's own creation in exactly that sense: state and local officials generate it, populate it, and keep it current. *See* Conn. Gen. Stat. § 9-50b(b)–(d). It is not handed to Secretary Thomas; it is the product of her office's own ongoing work. 52 U.S.C. § 21083(a)(1)(A).

The structure of Title III points in the same direction. The records covered by Section 20701 are those "relating to any application, registration, payment of poll tax, or other act requisite to voting." 52 U.S.C. § 20701. Each item on that list is "something that the voter submits or does as part of the registration process"—and thus something "that election officials *receive*, rather than *create*." *United States v. Benson*, 819 F. Supp. 3d 753, 768–69 (W.D. Mich. 2026), *aff'd*, 179 F.4th 470 (6th Cir. 2026); *accord United States v. Fontes*, 832 F. Supp. 3d 944, 950 (D. Ariz. 2026). The SVRL—a comprehensive, state-generated database—is a stranger to that list.

Indeed, when Congress wants to reach records without regard to their source, it knew how to say so: the National Voter Registration Act

("NVRA"), for example, requires disclosure of "all records concerning the implementation of programs and activities" for list maintenance, 52 U.S.C. § 20507(i)(1), with no "come into possession" limitation. Congress's use of "narrower language" in Title III must be given effect. *Benson II*, 179 F.4th at 480; *Koski*, 2026 WL 2032532, at *5.

Title III's purpose confirms that Congress drew that line intentionally. Congress enacted the statute against a documented practice of Southern registrars destroying or refusing to retain voter-registration materials submitted by Black voters. *See, e.g.*, U.S. Comm'n on Civil Rights, *Report of the U.S. Commission on Civil Rights 1959,* at 93 (1959), *available at* https://www.usccr.gov/files/historical/1959/59-001-U.pdf (1959 USCCR Report) (describing how rejected applications were destroyed approximately thirty days after rejection, making accurate review impossible); H.R. Rep. 86-956 at 7 (1959) (describing the importance of viewing materials submitted by voters to elections officials as "an essential step in the process of enforcing and protecting the right to vote"). Title III responded by requiring officials to preserve the materials that came into their hands that "relat[e] to any application, registration, payment of poll tax, or other act requisite to voting," 52

U.S.C. § 20701—materials that could reveal whether would-be voters were being denied the franchise on racial grounds.

DOJ's textual counterarguments fall short. Its principal argument (at 15–21) is to read the "come into possession" language out of the statute, insisting that the phrase merely identifies "how and when" an official begins possessing a record, rather than whether the record was created by the official or received from an external source. But that reading has no textual foothold. The statute "says nothing about when or how" an official acquires a record; "[t]he time at which or the character of the source from which a record is acquired . . . do not define the phrase 'come into possession.'" *Evans*, 2026 WL 2267774, at *7. And Title III already supplies an express temporal limitation: officials must retain covered records for twenty-two months. 52 U.S.C. § 20701. There is no reason to manufacture a second, hidden temporal function for the phrase "come into possession." *See Koski*, 2026 WL 2032532, at *6. The phrase does different work: It specifies the records that enter an official's possession from elsewhere. The SVRL does not.

DOJ also points (at 17 n.3) to statutes that, it claims, establish that an entity can come into possession of a document it creates. Those

statutes prove the opposite. The Civil Rights Cold Case Records Collection Act and the JFK Assassination Records Collection Act each reach records that were "created *or* made available for use by, obtained by, or otherwise came into the possession of" a covered entity. 44 U.S.C. § 2107 (note) (emphasis added). DOJ reads that language to mean that a record's creation by an entity is simply one way the record can "come into" its possession. But the statutes instead distinguish between records the entity *created* and records *made available to, obtained by, or otherwise coming into its possession*—separating the two categories with the word "or." Those categories are separated by "or," and therefore "are to be given separate meanings." *Loughrin v. United States*, 573 U.S. 351, 357–58 (2014). Indeed, if being "created" were simply one way a record could "come into" an entity's possession, there would be no reason to separate "created" from "made available for use by" with an "or." Congress would instead have written: "created, made available for use by, obtained by, or otherwise came into the possession of." And "otherwise" is a catchall within the second category; it does not reach back across the "or" to encompass records the entity itself creates. These statutes thus confirm that Congress knew how to distinguish records an entity creates from

records that come into its possession. Title III contains no comparable language. It reaches only records that "come into" an election official's possession—and the SVRL that Connecticut itself creates is not such a record.

Nor does *U.S. Department of Justice v. Tax Analysts*, 492 U.S. 136 (1989), support DOJ's suggestion (at 19) that the Supreme Court has "demonstrated a similar understanding" of the phrase "come into possession." *Tax Analysts* did not interpret the phrase "come into possession" at all; instead, it interpreted "agency records" under FOIA, holding that the term encompasses both records obtained by an agency and records generated internally. *Id.* at 145–46. The Court used "come[s] into the agency's possession" only in describing one subset of records within FOIA's broader category—records that come into an agency's control in the legitimate conduct of its official duties. *Id.* at 145. Indeed, the premise of *Tax Analysts* was that records coming into an agency's possession are distinct from records the agency itself generates. That distinction matters here. FOIA defines a broad category—"agency records"—that encompasses both. Title III does not. It expressly covers

records that "come into [officials'] possession." 52 U.S.C. §§ 20701, 20705. Different statutory text produces different statutory scope.

DOJ's reliance (at 20–21) on *Kennedy v. Owen*, 321 F.2d 116 (5th Cir. 1963), and *Kennedy v. Lewis*, 325 F.2d 210, 212 (5th Cir. 1963) (per curiam), fares no better. DOJ reads those cases as requiring election officials to produce every document in their possession, whether or not the documents "come into" their possession. But they say no such thing. *Owen*, for example, ordered production of "any record or paper required by Section 1974 of Title 42 [now codified at 52 U.S.C. § 20701] to be retained and preserved." 321 F.2d at 117. And Section 20701, then as now, limits that category to records and papers that "come into" an election official's possession. *Owen* confirms, rather than undercuts, the statutory limitation.

DOJ claims that Title III must cover "at least some government-generated records" in order to reach supposed "indices" created by Jim Crow registrars to track which White voters had "vouched" for a new registrant. DOJ Br. at 22–23 (citing *Benson II*, 179 F.4th at 486 (Nalbandian, J., dissenting)). The fatal problem is that there is no evidence that these voucher lists actually existed. To be sure, some Jim

Crow jurisdictions used voucher requirements—requiring that a voter who was already registered (who was presumably White) appear in person and orally testify to vouch for any new registrant—to prevent Black registration. *See* 1959 USCCR Report at 76, 90, 93–94 (describing use of voucher qualification in two counties); *see also* U.S. Comm'n on Civil Rights, *Report of the U.S. Commission on Civil Rights 1961* at 52-53 (1961), https://perma.cc/E8F8-QMU6 (describing another county); Note, *Federal Protection of Negro Voting Rights*, 51 Virginia L. Rev. 1051, 1077–78, 1097–99 (1965). But neither DOJ nor the Sixth Circuit dissent on which DOJ relies cites any evidence that physical lists of voters who vouched for registrants, created by elections officials, actually existed, let alone that they were considered important by the framers of Title III.[13]

[13] Election officials in one county in Alabama made notations on the individual index cards corresponding to county voters indicating how frequently the voters had vouched for new registrants. 1959 USCCR Report at 90, 93–94. This appears to be the source of the reference to "indices" of vouchers. *See Benson II*, 179 F.4th at 486 (Nalbandian, J., dissenting). It is not clear that these index cards were purely internal documents. But even if they were, maintaining them appears to have been a practice specific to a single county, as voucher rules were local practices and not mandated by state law. *See, e.g.*, *United States v. Logue*, 344 F.2d 290, 291 (5th Cir. 1965).

The aim of Title III was not to reach supposed voucher indices, but the actual voter registration applications of Black would-be registrants, which Jim Crow registrars were rejecting and then destroying. H.R. Rep. 86-956 at 7. Congress identified these as the "essential" evidence needed to show that Black citizens were being denied the right to register to vote. *Id.* That evidence could then support the initiation of formal litigation and the discovery process, which could reach purely internal materials if necessary.

Finally, DOJ claims (at 21–22) that it should prevail because Title III imposes "an officer-specific duty," so the SVRL comes into Secretary Thomas' possession when she took office or received it from her staff. But that argument fares no better. Connecticut law requires that Secretary Thomas "design[] and maintain[]" the SVRL, Conn. Gen. Stat. § 9-50b(a), and imposes a continuing obligation to "update" it based on changes to, e.g., districting lines and in response to discovered errors, *id.* § 9-50b(d). At no point does Secretary Thomas acquire the SVRL; instead, her office, as well as local registrars, contribute to a living, continually updated document. To hold that she obtains the SVRL from her staff would make Title III's application turn on the happenstance of "staffing practices of

state election bodies." *Evans*, 2026 WL 2267774, at *10 n.8. Indeed, DOJ's theory would allow states to evade Title III's coverage simply by reorganizing responsibility for maintaining the SVRL—an absurd result that Congress cannot reasonably be understood to have intended. *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 574–75 (1982).

In sum, Title III requires election officials to preserve records that come into their possession—not every record they happen to possess. Because Connecticut created and maintains the SVRL itself, the database falls outside the statute's plain terms.

### B. Reading the SVRL into Title III would make a federal crime of the list maintenance the NVRA and HAVA require—an absurdity the plain text avoids.

Even if the text left room for doubt, the surrounding scheme would resolve it against DOJ. Title III does not merely require officials to keep covered records; it makes it a crime to "willfully steal[], destroy[], conceal[], mutilate[], or alter[]" them. 52 U.S.C. § 20702. At the same time, federal law otherwise affirmatively commands election officials to change the voter list—continuously. The NVRA requires a "reasonable effort to remove" ineligible registrants, 52 U.S.C. § 20507(a)(4), and HAVA requires the state to keep its computerized list "updated

regularly," *id.* § 21083(a)(4). The NVRA and HAVA thus "require [state] election officials to alter the qualified voter file routinely as part of their 'reasonable effort[s]' to ensure accuracy"—the very voter file DOJ says Title III freezes. *Benson II*, 179 F.4th at 479.

Those two commands cannot both be obeyed if the SVRL is a record covered by Title III. Covering the SVRL would put Title III "on a collision course with the NVRA and HAVA," *id.* at 480, "criminaliz[ing] the same conduct that the NVRA and HAVA require"—this is "such an absurd result" that courts decline to read the statute to produce it, *United States v. DeMarinis*, No. 25-cv-3934, 2026 WL 1780586, at *5 (D. Md. June 18, 2026). The reading that harmonizes the scheme is the one the text already supplies: the SVRL does not "come into" Secretary Thomas' possession, so altering it to keep it accurate is no crime.

DOJ concedes (at 24–25) that election officials need not preserve a "new, static version" of the SVRL every time the database changes, an administrative impossibility required by their reading. DOJ attempts (at 25 n.5) to evade that problem by baldly asserting that election officials must instead preserve each version of the SVRL "distributed to local election offices for the conduct of each specific federal election." But the

SVRL is not "distributed" to local election officials in advance of elections; instead, "[l]ocal officials continuously update [Connecticut's SVRL] throughout the year." App. 69. If, as DOJ contends, the SVRL itself is a record covered by Title III, the statute would presumably require preservation of every version that falls within its terms—not merely some supposed version "distributed" before each federal election. DOJ's arbitrary line, drawn to avoid the consequences of its own statutory interpretation, has no grounding in Title III's text. Instead, that text has a much cleaner reading that avoids these administrative impossibilities: Secretary Thomas does not "come into possession" of the SVRL that her office creates and maintains.

DOJ's attempts to talk its way out of this conflict only deepen it. It first suggests (at 25–26) that "alter" reaches only changes that impair a record's integrity, not routine updates. But "alter" ordinarily means to "modify," *see Sierra Club v. Marsh*, 907 F.2d 210, 212 (1st Cir. 1990) (citation omitted), or "to change some of the elements . . . without substituting an entirely new thing," *United States v. Edwards*, 996 F.2d 1213 (4th Cir. 1993) (unpublished table decision) (citation omitted).

DOJ's narrower gloss means "alters" would add nothing to the "steals, destroys, conceals, [and] mutilates" that precede it. 52 U.S.C. § 20702.

Conversely, DOJ's interpretation suffers from its own surplusage problem. What does it mean to alter an SVRL in a way that constitutes "minor tampering with or corruption of the document's integrity," DOJ Br. at 26 (quoting *Benson III*, 187 F.4th at 473 (Griffin, J., dissenting)), and why would that activity not be covered by the various other verbs included already in Section 20702? And regardless, "there is still tension in a statutory construction that applies Title III's requirements to non-permanent records like voter registration lists," *WEC*, 833 F. Supp. 3d at 955, in large part because Title III's requirements to "'retain' and 'preserve'" covered records does not map on well to an "SVRL, which is continuously updated," *Koski*, 2026 WL 2032532, at *6.

DOJ next invokes (at 26–27) Section 20702's willfulness requirement, as though no official could "willfully" perform mandated maintenance. But willfulness requires only that the actor act "with knowledge that his conduct was unlawful." *Bryan v. United States*, 524 U.S. 184, 191–92 (1998). On DOJ's own reading, then, an official who updates the list knowing Title III forbids altering covered records would

act willfully—leaving officials whipsawed between statutes that command the same act and punish it. *See Koski*, 2026 WL 2032532, at *6. The sensible reading—the one that avoids the whole dilemma—is that the SVRL is not a record covered by Title III at all.

Finally, DOJ falls back (at 27–28) on the Attorney General's alleged need to compare SVRLs against applications to register to vote, in order to assess compliance with federal law. But DOJ has not demanded any registration applications, making this argument entirely beside the point. Even leaving that aside, whether Connecticut's SVRL may be useful in proving an imagined set of violations of federal law is not the question; instead, it is whether an SVRL is a record that comes into Secretary Thomas' possession.

The plain text and the statutory scheme point to a single answer. The SVRL is a record Connecticut creates and maintains, not one that "comes into" anyone's possession. It falls outside Title III, DOJ's demand fails as a matter of law, and the judgment should be affirmed.

## II. DOJ's Request Is Legally Deficient Because It Offers an Inadequate and Pretextual Statement of Its Basis and Its Purpose.

Even were Connecticut's SVRL covered under Title III—which it is not—DOJ's demand fails because it does not comply with Title III's requirement that the Attorney General set forth a "demand in writing" that "shall contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. This Court may affirm on this alternate basis. *Carroll*, 124 F.4th at 161 n.13.

### A. The Federal Rules of Civil Procedure govern this civil action.

As an initial matter, the Federal Rules of Civil Procedure govern this civil action. The text of Title III does not create any special exception from the Federal Rules, *see* 52 U.S.C. § 20705, and binding Supreme Court precedent confirms that reading. DOJ relies (at 29–35) heavily on a decades-old, non-binding, and plainly distinguishable case, *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962), to assert that a Title III demand is "a special statutory proceeding" and that the district court erred in applying the Federal Rules to its federal civil action. This attempt to end-run the Federal Rules, including Rule 12, must be rejected—as eighteen federal

courts, including the court below, to consider the question have correctly concluded.[14]

Start with the text. Title III provides: "The United States District Court for the district in which a demand is made pursuant to section 20703 of this title, or in which a record or paper so demanded is located, shall have jurisdiction *by appropriate process* to compel the production of such record or paper." 52 U.S.C. § 20705 (emphasis added). This "appropriate process" is set forth in the Federal Rules of Civil Procedure, which "govern the procedure in *all* civil actions and proceedings in the United States district courts," Fed. R. Civ. P. 1 (emphasis added), subject to a narrow set of express exceptions which does not include Title III requests, Fed. R. Civ. P. 81. *See United States v. Griswold*, No. 25-cv-3967, 2026 WL 2235374, at *3 (D. Colo. Aug. 3, 2026) ("The CRA says

[14] *See Benson*, 179 F.4th at 483 n.2; *Adams*, 837 F. Supp. 3d at 883–85; *Warner*, 840 F. Supp. 3d at 450; *Scanlan*, 838 F. Supp. 3d at 153 n.2; *Bellows*, 834 F. Supp. 3d at 127; *Fontes*, 832 F. Supp.3d at 947 & n.1; *Amore*, 831 F. Supp. 3d at 154–55; *Oregon*, 828 F. Supp. 3d at 1102–03; *Weber*, 816 F. Supp. 3d at 1182; *Simon*, 2026 WL 2389778, at *8; *Aguilar*, 2026 WL 2364502, at *2–3; *Griswold*, 2026 WL 2235374, at *3; *Matthews,* 2026 WL 2212877, at *2; *Caldwell*, 2026 WL 2186515, at *5; *Oliver*, 2026 WL 2031479, at *7; *Koski*, 2026 WL 2032532, at *1 n.2; *Bd. of Elections of N.Y.*, 2026 WL 1999921, at *6–7; *DeMarinis*, 2026 WL 1780586, at *3.

nothing suggesting the inapplicability of the Federal Rules of Civil Procedure."); *United States v. Caldwell*, No. 26-cv-2025, 2026 WL 2186515, at *5 (D.N.J. July 29, 2026) ("Nothing in the CRA displaces the [Federal Rules of Civil Procedure] or precludes the Court from determining whether the DOJ's demand complies with all applicable statutory requirements."). Under the canon of construction *expressio unius est exclusio alterius*—when one is mentioned, the other is excluded—the fact that Rule 81 enumerates specific exceptions to the applicability of the Rules implies that there are no other proceedings under which the Rules are not applicable. *See Bloom v. Azar*, 976 F.3d 157, 161–62 (2d Cir. 2020).

The Supreme Court's binding decision in *United States v. Powell*, 379 U.S. 48 (1964)—decided *after Lynd*, 306 F.2d 222, the non-binding case on which DOJ principally relies—requires the same conclusion. Like Title III, the statute at issue in *Powell* confers jurisdiction on district courts "by appropriate process to compel" compliance with federal document demands. *See* 26 U.S.C. § 7604(a). Interpreting that statute, the Supreme Court explained that "[b]ecause [§] 7604(a) contains no provision specifying the procedure to be followed in invoking the court's

jurisdiction, the Federal Rules of Civil Procedure apply" and the court may "inquire into the underlying reasons for the examination [of records]." *Powell*, 379 U.S. at 58 & n.18.[15] The same dispositive language in Section 7604(a) is included also in the CRA: "[t]he United States district court . . . shall have jurisdiction *by appropriate process*." 52 U.S.C. § 20705 (emphasis added). In other words, the Supreme Court held in *Powell* that the Federal Rules of Civil Procedure apply due to statutory language that appears, in identical form, in the CRA. *See United States v. Matthews*, No. 25-cv-3398, 2026 WL 2212877, at *2 (C.D. Ill. July 31, 2026); *Griswold*, 2026 WL 2235374, at *3.

[15] Tellingly, DOJ relegates *Powell* to a footnote (at 32 n.7), suggesting the case is limited to the context of IRS summons. Not so. This Court has repeatedly applied *Powell*'s rule—that where a statute authorizes judicial enforcement of a records demand by "appropriate process" but does not prescribe a different procedure, the Federal Rules of Civil Procedure govern—to administrative subpoenas issued under statutes wholly unrelated to the tax laws. *See, e.g.*, *RNR Enters. v. SEC*, 122 F.3d 93, 96–97 (2d Cir. 1997) (SEC subpoena) *In re Gimbel*, 77 F.3d 593, 596 (2d Cir. 1996) (FDIC subpoena); *Federal Election Comm'n v. Larouche Campaign*, 817 F.2d 233, 234 (2d Cir. 1987) (FEC subpoena). DOJ also argues that *Donaldson v. United States*, 400 U.S. 517 (1971), undercuts *Powell*. Yet all *Donaldson* indicates is that—as with any other case governed by the Federal Rules—district courts retain the ability to tailor and streamline the procedural path a case takes, including by limiting the scope of any necessary discovery, provided that core protections, such as scrutiny under Rule 12, are observed. *See id.* at 528–29.

To the extent *Powell* leaves any ambiguity—which it does not—the Supreme Court further confirmed this interpretation in subsequent cases. *See Donaldson v. United States*, 400 U.S. 517, 528 (1971) ("The Civil Rules, of course, do have an application to a summons proceeding." (citing Fed. R. Civ. P. 81)), *superseded by statute on unrelated grounds sub nom. Polselli v. IRS*, 598 U.S. 432 (2023). The language quoted in *Donaldson*—from what was then Federal Rule of Civil Procedure 81(a)(3)—is materially identical to the language in current Federal Rule of Civil Procedure 81(a)(5), which governs this case today. Fed. R. Civ. P. 81(a)(5) ("These rules apply to proceedings to compel . . . the production of documents through a subpoena issued by a United States officer or agency under a federal statute, except as otherwise provided by statute, by local rule, or by court order in the proceedings."). DOJ fails to square its interpretation with these decisions and the Federal Rules themselves. *See generally United States v. Aguilar*, No. 25-cv-728, 2026 WL 2364502, at *2 (D. Nev. Aug. 14, 2026) ("Neither the text of the statute nor the weight of precedent support the Government's position.").

Finally, the United States affirmatively chose to commence this action by filing a Complaint. *See* Fed. R. Civ. P. 1. The United States

invoked the Rules to initiate this litigation and to defend its pleadings elsewhere, and it cannot now disclaim those choices because the results proved unfavorable. *See United States v. Bd. of Elections of N.Y.*, 2026 WL 1999921, at *7 (N.D.N.Y. July 10, 2026) ("[DOJ] commenced the instant action by filing a complaint and proceeding through ordinary litigation. . . . The [c]ourt rejects [DOJ]'s belated attempt to recharacterize this matter."); *Oregon*, 828 F. Supp. 3d at 1102 n.1 ("Even if *Lynd* applied here, the [c]ourt doubts its applicability here where [the United States] made an affirmative choice to file a complaint and proceed through ordinary litigation."); *United States v. Amore*, 831 F. Supp. 3d 149, 155 n.1 (D.R.I. 2026) (similar).

DOJ's demand is therefore subject to the protections of Rule 12. Regardless, for the reasons discussed below, DOJ's demand was so meritless that the dismissal should be affirmed under *any* standard.[16]

[16] *See, e.g.*, *Oliver*, 2026 WL 2031479, at *7 n.17 (holding that the Federal Rules apply but finding that "[w]ere the Court to conclude otherwise, its analysis of the dispositive issue" in the case "would be the same"); *WEC*, 833 F. Supp. 3d at 953 (similar); *Galvin*, 830 F. Supp. 3d, at 128–29 & n.8 (similar).

### B. DOJ's demand fails to satisfy Title III's basis-and-purpose requirements.

To comply with Title III, the Attorney General must set forth a "demand in writing" that "shall contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. There are three particularly notable aspects of Title III's text. *First*, Title III's use of the phrase "*shall* contain" demonstrates that "the requirement that the Attorney General state 'the basis'" and the purpose "is mandatory, not a mere formality with which the federal government or this Court is free to dispense." *United States v. Galvin*, 830 F. Supp. 3d 122, 127 (D. Mass. 2026); *see also Benson*, 179 F.4th at 483 (noting the word "shall" "creates an obligation impervious to judicial discretion" (quoting *Smith v. Spizzirri*, 601 U.S. 472, 476 (2024))); *United States v. Warner*, 840 F. Supp. 3d 446, 453 (S.D. W.Va. 2026) (similar).

*Second*, the demand must be made "in writing," meaning that the basis and the purpose "must be made express." *Galvin*, 830 F. Supp. 3d at 128. In this way, "[t]he statute therefore directs the Court to the Attorney General's written demand—rather than the United States' subsequent court filings—to determine whether that demand" satisfies the basis and purpose requirements. *Id.*

*Third*, the statute's requirement that the demand "'contain a statement of the basis and the purpose thereof,' employ[s] the definite article 'the' before each noun and join[s] the two with the conjunctive 'and.'" *Scanlan*, 838 F. Supp. 3d at 159. As such, "[o]n its plain terms, this construction signals that 'basis' and 'purpose' are separate, non-overlapping requirements, each of which must independently be satisfied." *Id.*; *accord Benson*, 179 F.4th at 483; *Aguilar*, 2026 WL 2364502, at *5; *Warner*, 840 F. Supp. 3d at 453; *Galvin*, 830 F. Supp. 3d at 128 (finding that "the statutory text clearly conveys that 'the basis' and 'the purpose' are conceptually distinct."); *United States v. Weber*, 816 F. Supp. 3d 1168, 1182 (C.D. Cal. 2026) ("The DOJ is required to offer a written statement of *both* the purpose and basis for its demands.").

DOJ's written demand does not satisfy either of Title III's separate requirements that the Attorney General state "the basis" and "the purpose" for the demand. Each is an independent reason to affirm dismissal.

1. *DOJ fails to satisfy the basis requirement.*

To begin, the basis contemplated by Title III is a factual, not legal basis. *See Matthews*, 2026 WL 2212877, at *5.[17] "To read 'basis' as meaning a legal basis would conflate that requirement with the required statement of the demand's 'purpose.'" *Amore*, 831 F. Supp. 3d at 156; *Galvin*, 830 F. Supp. 3d at 128.

DOJ has all but conceded throughout this litigation that it does not have a factual basis for its demand. In the December 12 Letter, as well as its briefing at the district court, DOJ argued that the CRA, the NVRA, and HAVA were its basis. App. 44; U.S. Consol. Mem. at 17, Dist. Ct. Dkt. 76. This is DOJ's purported legal authority, not a factual basis. Now, on appeal, DOJ argues for the first time (at 35–36) that it actually *did* provide an adequate factual basis for its demand. That argument comes too late, and DOJ "cannot now claim that the District Court erred in

---

[17] *Accord Warner*, 840 F. Supp. 3d at 452; *Scanlan*, 838 F. Supp. 3d at 161 (noting this textual "reading also accords with the Attorney General's own historical practice under Title III. . ."); *Amore*, 831 F. Supp. 3d at 156; *Galvin*, 830 F. Supp. 3d at 127 (noting dictionary definitions for "basis" include the "foundation" or "'chief supporting factor' 'for' the demand" (citation omitted)); *Oregon*, 828 F. Supp. 3d at 1103; *Weber*, 816 F. Supp. 3d at 1184; *Aguilar*, 2026 WL 2364502, at *5.

failing to reach in issue that [it] did not squarely present." *Krause v. Kelahan*, 161 F.4th 66, 86 (2d Cir. 2025); *accord In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 132 (2d Cir. 2008) ("It is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal."). DOJ has forfeited any argument that its demand contains a statutorily compliant factual basis and this Court should not consider this argument.

Regardless, DOJ's claim to a factual basis fails on the merits. DOJ points (at 35–36) to a letter sent on August 6—more than four months prior to its December 12 Letter demanding production—that requested information regarding Connecticut's list maintenance. *See* App. 34–36 (August 6 Letter). This fails for two reasons. *First*, as many federal courts have held, the plain text of Title III requires that *one* written demand contain *both* the basis and the purpose for the demand, rather than a basis and purpose spread across multiple letters. *See Benson*, 179 F.4th at 483 (Title III requires "that any [single] demand must contain both" a basis and purpose); *Griswold*, 2026 WL 2235374, at *4; *United States v. Oliver*, No. 25-cv-1193, 2026 WL 2031479, at *9 (D.N.M. July 14, 2026) ("[B]ased on the CRA's plain language, the measure of the [US]DOJ's

written demand is the Demand Letter alone[.]"); *Oregon*, 828 F. Supp. 3d at 1104 (rejecting DOJ's "patchwork and post hoc effort to stitch together a legally sufficient 'statement of the basis'" by attempting to combine two letters that it sent to the state). Here, the written demand was contained in the December 12 Letter, which does not mention any evidence of anomalies or anything amiss whatsoever with Connecticut's list maintenance. *See* App. 43–45. Indeed, DOJ acknowledged at oral argument in the district court that "[t]here was no connection" between the August and December letters. App. 226:19–23.

*Second*, even if DOJ could point to the August 6 Letter to retroactively supply a "basis"—even though the letter never invokes or even mentions Title III—that letter's contents do not supply the required statement of the basis. The August 6 Letter requested Connecticut's voter registration list pursuant to NVRA's public disclosure provision, and set forth various queries relating to a 2024 Election Assistance Commission Election Administration and Voting Survey (EAVS) report. App. 34. DOJ now characterizes (at 35) the August 6 Letter as "cit[ing] numerous concerns" based on the EAVS-reported data, but that is not what the August 6 Letter says. The letter asks questions about Connecticut's

EAVS responses, but it never frames them as discrepancies or suggests any factual basis to think that the state's list maintenance procedures might fail to comply with the NVRA or any other law. Indeed, the letter does not provide any evidence inconsistent with reasonable list-maintenance efforts in the EAVS data. *See Weber*, 816 F. Supp. 3d at 1176–77 (holding that DOJ failed to provide an adequate basis even where demand letter cited EAVS data).[18]

DOJ has provided no factual basis to support its demand for Connecticut's complete unredacted voter list, and this Court should therefore affirm dismissal.

*2. DOJ fails to satisfy the purpose requirement.*

DOJ's specified purpose is to "ascertain Connecticut's compliance with the list maintenance requirements of the NVRA and HAVA." App. 44. This purpose is invalid and, in any event, is undercut by the abundant

[18] For example, the August 6 Letter demands data regarding duplicate registrations, including "a list of all duplicate registrants who were removed from the statewide voter registration list," but does not identify anything amiss in Connecticut's treatment of duplicate registrations. App. 35. Instead, it acknowledges that Connecticut does not track information about duplicate registrations, yet still demands extensive records regarding such registrations. *Id.*

evidence in the record of DOJ's *actual* purpose of superintending list maintenance—meaning DOJ has not provided a statement of "the purpose" for its request.[19]

The statutorily required "purpose" is an explanation of how the requested records would help determine if there is a legal violation. *See, e.g.*, *Lynd*, 306 F.2d at 229 n.6. Title III requires an "assessment of the sufficiency of . . . the purpose asserted," *Bellows*, 834 F. Supp. 3d 113, 124 (D. Me. 2026); otherwise, "[i]f *any* purpose . . . would suffice, then the requirement of stating the demand's purpose would serve no function," *Oregon*, 828 F. Supp. 3d at 1104; *see also Bellows*, 834 F. Supp. 3d at 124.

DOJ's demand fails Title III's purpose requirement for five main reasons. *First*, DOJ's stated purpose is outside the scope of Title III. The CRA and Title III were not designed to compel list maintenance, but rather, to investigate violations of individuals' voting rights. *Oregon*, 828 F. Supp. 3d at 1105; *Amore*, 831 F. Supp. 3d at 157–58; *Weber*, 816 F.

[19] *Accord Warner*, 840 F. Supp. 3d at 453–55; *Schmidt*, 835 F. Supp. 3d at 699; *Bellows*, 834 F. Supp. 3d. at 118; *Amore*, 831 F. Supp. 3d at 158; *Oregon*, 828 F. Supp. 3d at 1104–05; *Weber*, 816 F. Supp. 3d at 1183–84; *Griswold*, 2026 WL 2235374, at *4; *Matthews*, 2026 WL 2212877, at *5–6.

Supp. 3d at 1183. Because the CRA exists to "help end voting discrimination," *Benson*, 179 F.4th at 474, the purpose of a Title III demand must involve "an investigation into potential violations of an individual's right to vote," *Warner*, 840 F. Supp. 3d at 455; *accord Amore*, 831 F. Supp. 3d at 157–58; *Oregon*, 828 F. Supp. 3d at 1105.

DOJ argues (at 41) that there is "no limitation on the permissible purpose of the Attorney General's demand." But that reading would render the purpose requirement effectively meaningless—a result Congress could not have intended. It also ignores both the widespread, notorious discrimination in voting that the CRA was enacted to help remedy and the election-specific structure of Title III itself. *See* 52 U.S.C. § 20701 (imposing preservation obligation on "[e]very officer of election" for records they obtain "relating to an act requisite to voting" for a period of time set with reference to federal elections).

DOJ alternatively argues (at 43) that its proffered purpose—to investigate Connecticut's list maintenance practices—is permissible because it "relates to individual voting rights." List-maintenance procedures can, of course, implicate that right: eligible voters must be able to cast ballots that will be counted, and improper removal of voters,

particularly close to an election or without the safeguards required by the NVRA, can threaten that right. *See* 52 U.S.C. § 20507(d). But DOJ's argument quickly departs from that legitimate concern. In the next breath, DOJ says (at 44) that its demand is justified by speculation about the impact of "fraudulent votes." That speculation comes without a shred of allegation or evidence that any such votes have been or will be cast in Connecticut. And the December 12 Letter—the operative document—does not even mention this supposed purpose. Even if properly presented and supported, a fishing expedition for improperly cast ballots would do nothing to advance the voting rights of Connecticut voters and thus "lack[s] any reference or relation to the purposes for which Title III was enacted." *Oregon*, 828F. Supp. 3d at 1105.

*Second*, it is *states*—not the federal government—who are tasked with list maintenance, *see* 52 U.S.C. § 21083(a)(2)(A) (stating that states must "perform list maintenance . . . on a regular basis"), and those states, such as Connecticut, have significant discretion under federal law as to how to conduct that maintenance. Indeed, under HAVA's plain text, "[t]he specific choices on the methods of complying with" HAVA's list maintenance procedures "shall be left to the discretion of the State." 52

U.S.C. § 21085; *see Bellows*, 834 F. Supp. 3d at 126; *Amore*, 831 F. Supp. 3d at 152; *Oregon*, 828 F. Supp. 3d at 1097.

*Third*, the requested records are not germane or necessary for determining Connecticut's compliance with HAVA because any copy of a voter file reflects just one point in time, whereas the voter file itself is constantly changing and iterating. DOJ seeks a static voter list, while Connecticut's list is constantly evolving, in accordance with state law.

*Fourth*, DOJ has not provided any evidence of anomalies suggesting that Connecticut's list-maintenance efforts are anything other than reasonable and lawful. The closest it comes are the EAVS questions posed in the August 6 Letter, which do not form part of DOJ's demand. But, as discussed above, those questions do not themselves identify any facts suggesting irregularities, much less establish a valid purpose for DOJ's sweeping demand for the SVRL.[20]

---

[20] The August 6 Letter never suggests any reason to think that Connecticut's list maintenance procedures might not comply with the NVRA or HAVA. *See* App. 34–36. It points out that EAVS-reported categories of data like removals of deceased persons are somewhat different for Connecticut than for other states, and asks for information on confirmation notices and duplicate registrations. App. 34–35. But as the 2024 EAVS Report itself acknowledges, such differences are to be expected between the states, and even within states. *See* U.S. Election

*Fifth*, far from indicating a purpose of ensuring compliance with federal list maintenance requirements under HAVA, DOJ's actions and desired outcome here would violate that very statute. In connection with its request for statewide voter files across the country, DOJ has sought states' agreement to a memorandum of understanding (MOU). *See* App. 100–08. The MOU's terms fly in the face of the requirements set forth in HAVA and the NVRA. For one, DOJ's MOU would place authority to identify supposedly ineligible voters in the hands of the federal government, *see* App. 101, 104, directly contrary to HAVA's requirement that procedures for complying with the statute be "left to the discretion

---

Assistance Comm'n, *Election Administration and Voting Survey 2024 Comprehensive Report* 2 (2025), https://perma.cc/9M99-STAY ("Broad legal and procedural authority [over elections] rests with the states . . . . As a result, wide variation exists in the policies and practices for conducting elections across and sometimes within states, and these policies and practices are constantly changing"). The August 6 Letter never explains how the survey responses DOJ inquired about are even *potentially* indicative of any improper practice under the NVRA or HAVA or otherwise inconsistent with the "reasonable effort" at list maintenance that those statutes require. *Cf. Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 624–27 (6th Cir. 2025) (describing statutorily-required "reasonable effort" for purposes of NVRA and HAVA as "a serious attempt" which "need not be perfect, or even optimal"), *cert. denied*, 2026 WL 568298 (U.S. Mar. 2, 2026).

of the State." 52 U.S.C. § 21085; *see also id.* § 21083(a)(2), (4). In addition, the MOU's substantive terms would allow DOJ to compel states to remove supposedly ineligible voters "within forty-five (45) days," App. 104, in a manner that would violate multiple protections of the NVRA and HAVA, including the requirement to provide voters with notice prior to their removal from the rolls and the firm bar against systematic voter removals within 90 days of an election, 52 U.S.C. § 20507, § 21083(a)(2)(A). The MOU confirms that DOJ's stated purpose of ensuring compliance with list maintenance procedures in federal voting statutes is not accurate or plausible.

For all these reasons, DOJ's demand fails Title III's command to provide the purpose for the demand in writing, thus providing another basis for dismissal.

*3. DOJ's demand separately fails because it is pretextual.*

DOJ's demands for SVRLs separately fail Title III's requirements because DOJ's stated purpose was contrived and directly contradicted by

public representations. Although the district court below did not reach this issue, multiple courts have reached this conclusion.[21]

The courts in Pennsylvania, Oregon, and California all found that DOJ's purpose outlined in its written demands for states' unredacted voter files was pretextual and that its true goal is "to gather the sensitive, private information of millions of Americans for use in a centralized federal database." *Weber*, 816 F. Supp. 3d at 1184; *accord United States v. Schmidt*, 835 F. Supp. 3d 697, 699–700 (W.D. Pa. June 27, 2026) ("Public statements from government officials reveal its intentions: to create a nationwide voter-database, for potential weaponization in future elections; as a 'fishing expedition,' hoped to advance unsubstantiated claims of non-citizen voting; and as a tool for immigration enforcement."); *Oregon*, 828 F. Supp. 3d at 1106, 1108 ("[DOJ's] statements that it intends to create a nationwide database of confidential voter information and use it in unprecedented ways, including immigration enforcement efforts, is chilling.").

[21] *See Warner*, 840 F. Supp. 3d at 456 n.9; *Schmidt*, 835 F. Supp. 3d at 699; *Oregon*, 828 F. Supp. 3d at 1106–08; *Weber*, 816 F. Supp. 3d at 1184–86; *Oliver*, 2026 WL 2031479, at *6 n.15.

These courts have called DOJ's stated purpose "pretextual" and "contrived." *Weber*, 816 F. Supp. 3d at 1184–86; *accord Oregon*, 828 F. Supp. 3d at 1106 (quoting *Weber*'s "pretextual" finding); *Schmidt*, 835 F. Supp. 3d at 700 (same). They have found that the government has "sa[id] the quiet parts out loud." *Schmidt*, 835 F. Supp. 3d at 699 (citation omitted). And they have held that "[t]he presumption of regularity that has been previously extended to [DOJ] that it could be taken at its word—with little doubt about its intentions and stated purposes—no longer holds." *Oregon*, 828 F. Supp. 3d at 1107.

There is copious judicially noticeable evidence supporting these findings. In its litigation across the country, DOJ has admitted in open court that it will use and share the gathered information with agencies such as the Department of Homeland Security, thus potentially facilitating immigration investigations. *See, e.g.*, Hr'g Tr. at 50:21–23, 65:1–66:18, *United States v. Amore*, No. 25-cv-639, Dkt. No. 47 (D.R.I. Mar. 26, 2026). This is plainly outside the purported purpose DOJ put in writing. As noted *supra*, it is a matter of public record that DOJ has demanded unredacted voter rolls from all 50 states and has initiated 31 lawsuits to force production from unwilling states—despite claiming to

have state-specific reasons to request each state's list. Earlier this year, DOJ admitted that the federal government has shared state voter roll information with groups seeking to deny election results, as well as unknown amounts of social security data on an unapproved third-party server, in a "manner [that] is outside [the U.S. Social Security Administration's] security protocols." *AFSCME* Notice at 6. As noted *supra*, DOJ had been actively soliciting states like Connecticut to sign an MOU that violates the very federal voting statute that DOJ is purporting to enforce. *See* App. 100–08. President Trump has issued an executive order requiring the creation of a national voter registration list, *see* Exec. Order No. 14,399, 91 Fed. Reg. 17125 (Mar. 31, 2026), and former DOJ employees have stated that they were tasked with procuring states' voter rolls for purpose of matching with data from the Department of Homeland Security.[22] And the then-Attorney General herself wrote to the Minnesota Governor tying "Operation Metro Surge," which involves well-documented abuses by United States Immigration and Customs

[22] Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. Times Mag., Nov. 16, 2025, https://perma.cc/L39A-S5VZ.

Enforcement against the civilian population in the state, to Minnesota's refusal to turn over its unredacted voter file.[23]

Tellingly, DOJ does not deny *any* of these facts, claiming only (at 48–49) that much of this evidence is based on "out-of-court statements and news articles" and claiming that showing pretext is "a burden not easily met." Yet none of the above is hearsay and this Court may take judicial notice of it. In particular, this Court may note the fact of DOJ's lawsuits against more than half of the states and its admissions in court of mishandling of confidential information. *See Global Network Comm'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (contemplating judicial notice of "the fact of . . . litigation and related filings"). This Court may note Attorney General Bondi's letter leveraging deployment of federal law enforcement to compel production of Minnesota's SVRL, DOJ's MOU that would commandeer state list maintenance and run afoul of the NVRA and HAVA, and President Trump's comments about nationalizing elections. *See N.Y. Times Co. v. U.S. Dep't of Just.*, 756 F.3d 100, 110–11 n.8 (2d Cir. 2014) (taking judicial notice of statements made

---

[23] *Read Bondi's Letter to Minnesota's Governor*, N.Y. Times, Jan. 24, 2026, https://perma.cc/H5GY-ZKBS.

by President Obama in a graduation speech and by Attorney General Eric Holder in a letter to the Senate); *Kalyanaram v. Am. Ass'n of Univ. Professors at N.Y. Inst. of Tech., Inc.*, 742 F.3d 42, 44 n.1 (2d Cir. 2014) ("[O]n a motion to dismiss, a court may consider . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." (citation omitted)). DOJ has no answer for any of this.

As noted above, Title III requires that DOJ provide in writing a statement of "*the* basis and *the* purpose" for its demand. 52 U.S.C. § 20703 (emphases added). By twice using the definite article, the statute requires not just a conceivable or possible basis or a purpose, but *the* complete basis and *the* complete purpose underlying the request. *See Niz-Chavez v. Garland*, 593 U.S. 155, 165–66 (2021) (noting that the inclusion of a definite article with a singular noun implies that each noun is "a discrete thing"). Here, DOJ's written demand, when evaluated alongside the unrebutted evidence listed above, establishes the kind of "significant mismatch" between stated and actual reasons that the Supreme Court has held that courts need not accept. *Dep't of Com. v. New York*, 588 U.S. 752, 755, 785 (2019) (rejecting agency's "contrived" justification and refusing to "exhibit a naiveté from which ordinary citizens are free"

(citation omitted)). That DOJ did not disclose its true and complete motivations in seeking Connecticut's unredacted voter rolls further compels the conclusion that DOJ's demand fails to comply with Title III.

## III. Connecticut Voters' Constitutional Rights Require Redaction, so the Requested Relief Fails.

Even if DOJ had met all the statutory requirements necessary for disclosure of certain records under the CRA—which it has not—it would still not be entitled to its requested relief. Indeed, courts have found that redaction may be required to prevent the disclosure of sensitive personal information that would create an intolerable burden on the constitutional right to vote. This concern is heightened here, given DOJ's admissions that federal government officials have improperly shared sensitive Social Security data with third-party election denier groups. *See AFSCME* Notice.

Cases interpreting Section 8(i) of the NVRA—the NVRA's public disclosure provision—are instructive when interpreting Title III because both statutes use the same "all records" language. *Compare* 52 U.S.C. § 20507(i) ("Each State shall maintain for at least 2 years and shall make available for public inspection . . . *all records* concerning the implementation of programs and activities conducted for the purpose of

ensuring the accuracy and currency of official lists of eligible voters" (emphasis added)), *with* 52 U.S.C. § 20701 ("Every officer of election shall retain and preserve, for a period of twenty-two months . . . *all records* and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." (emphasis added)). Courts must interpret the NVRA's disclosure provisions in a manner that does not unconstitutionally burden the right to vote. *See United States v. Coonan*, 143 F.4th 119, 128 (2d Cir. 2025) (noting how "the doctrine of constitutional avoidance" requires this Court to "consider the constitutional implications of our decisions" in interpreting a statute, and avoid those interpretations which "would raise a multitude of constitutional problems" (citation omitted)).

Federal courts interpreting the NVRA's public disclosure provision have consistently struck this balance, interpreting the "all records" language in Section 8(i) to permit—and sometimes require—redaction and the protection of confidential materials. As the First Circuit has noted, "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the

Voter File," and such redaction "can further assuage the potential privacy risks implicated by the public release of the Voter File." *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024); *see also Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 266–68 (4th Cir. 2021) (holding that the potential connection to ongoing criminal investigations and the possibility of erroneously labeling a voter as a noncitizen and subjecting them to public harassment warrants maintaining confidentiality). Other courts have consistently recognized that the NVRA does not compel the release of sensitive information otherwise protected by federal or state laws. *See, e.g.*, *N.C. State Bd. of Elections*, 996 F.3d at 264; *Pub. Int. Legal Found., Inc. v. Dahlstrom*, 673 F. Supp. 3d 1004, 1015–16 (D. Alaska 2023); *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 942 (C.D. Ill. 2022), *clarified on denial of reconsideration*, No. 20-cv-3190, 2022 WL 1174099 (C.D. Ill. Apr. 20, 2022).

Redaction also may be affirmatively required if the disclosure would "create[] an intolerable burden on [the constitutional right to vote] as protected by the First and Fourteenth Amendments." *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012)

(citation omitted). The Fourth Circuit, even while granting access to voter registration applications, affirmed the importance of redacting Social Security numbers, which are "uniquely sensitive and vulnerable to abuse." *Id.* The court emphasized that the NVRA reflected Congress' view that the right to vote was "fundamental," and that the unredacted release of records risked deterring citizens from registering to vote and thus created an "intolerable burden" on this fundamental right. *Id.* at 334, 339; *cf. In re Coleman*, 208 F. Supp. at 200 (noting, in the context of a Title III records request, multiple considerations which could be "[s]ignificant," including whether "official records are privileged, or exempt from discovery for any sound reason of public policy," or "that an inspection of these records would be oppressive, or any unlawful invasion of any personal constitutional right"). As such, public disclosure provisions such as those in the NVRA and Title III must be interpreted to avoid this unconstitutional burden. *See Long*, 682 F.3d at 339; *Bellows*, 92 F.4th at 56.

The same privacy and constitutional concerns warranting redactions under the NVRA apply equally to requests under the CRA. *See Bellows*, 834 F. Supp. 3d at 121 n.7 (noting that "the NVRA frames its

disclosure requirement in very similar terms" to Title III and finding persuasive that the NVRA does not prohibit redaction); *cf. Sheetz v. Cnty. of El Dorado*, 601 U.S. 267, 281–82 (2024) (Gorsuch, J., concurring) ("[O]ur Constitution deals in substance, not form. However the government chooses to act, . . . it must follow the same constitutional rules."). And the limited case law considering CRA records requests acknowledges that courts retain the "power and duty to issue protective orders," *Lynd*, 306 F.2d at 230, such as the redaction of sensitive fields that courts have consistently determined are entitled to protection from disclosure. *See also Oregon*, 828 F. Supp. 3d at 1108 ("[T]he vast array of cases cited above addressing the propriety of redaction in the context of the NVRA confirm that such redaction is appropriate and permissible.").

Consequently, at least four courts analyzing DOJ's requests for states' voter files have held in particular that DOJ is not entitled to *unredacted* records because of the danger to voters' constitutional and privacy rights. *See Warner,* 840 F. Supp. 3d at 455–56 (finding DOJ "does not provide any reasonable explanation" for why it needs "highly sensitive voter data" and noting that "[c]ourts have recognized that states are entitled to redact sensitive voter information . . . and that this

information is not relevant to the removal of ineligible voters from voting rolls."); *Bellows*, 834 F. Supp. 3d at 121 n.7; *Oregon*, 828 F. Supp. 3d at 1107–08; *Weber*, 816 F. Supp. 3d at 1187–88 (noting that "[DOJ] itself [has] acknowledged these privacy risks itself" in previous litigation, and finding that DOJ "makes no persuasive argument for why this large amount of unredacted voter information is necessary to evaluate state policies"). There is no reason for this Court to conclude otherwise.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's decision to dismiss Appellant's complaint and deny its motion to compel.

Dated: November 12, 2026

Respectfully submitted,

/s/William Hughes

William Hughes
Theresa J. Lee
Sophia Lin Lakin
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2500
whughes@aclu.org
tlee@aclu.org
slakin@aclu.org

Joseph Gaylin
Dan Barrett
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF CONNECTICUT
80 State House Square
P.O. Box 230178
Hartford, CT 06123
jgaylin@acluct.org
dbarrett@acluct.org

*Counsel for Common Cause and Claire Ewing*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the requirements of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this brief contains 13,751 words. This brief further complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook Font.

Dated: November 12, 2026

Respectfully submitted,

/s/William Hughes
William Hughes

*Counsel for Common Cause and Claire Ewing*